Columbia Pictures Industries Inc v. Bunnell Doc. 376

**Ira P. Rothken (SBN #160029)**
ROTHKEN LAW FIRM LLP
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 924-4250
Facsimile: (415) 924-2905

**Kirk J. Retz (#170208)**
LAW OFFICES OF KIRK J. RETZ, APC
21535 Hawthorne Blvd., #200
Torrance, CA 90503
Telephone: (310) 540-9800
Facsimile: (310) 540-9881

Attorney for Defendants
Justin Bunnell, Wes Parker
and Valence Media, Ltd.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>JUSTIN BUNNELL, et al.,<br><br>Defendants. | **Case No. 06-01093 FMC (JCx)**<br><br>**DEFENDANTS' OBJECTIONS TO PROPOSED PERMANENT INJUNCTION**<br><br>Judge: Florence Marie Cooper<br>Ctrm: 750 |



Dockets.Justia.com

## TABLE OF CONTENTS

**Page**

Legal Standard and Summary of Objections .................................................... 1

Objection 1. Defendants Object to the Proposed Permanent Injunction in its Entirety Because There is No Valid Claim Alleged in the Complaint. ............. 5

Objection 2. Defendants Object to Certain Factual Findings and to Paragraph 1(b)(ii) in the Proposed Permanent Injunction That Have No Basis in Allegations of the Complaint or in Evidence. .................................................... 16

Objection 3. Defendants Object to All Language In Paragraphs 1(a) Beginning With "until such time" on the Grounds that Such Language Is Devoid of Meaning and an Attempt to Insert a False Factual Finding Into the Permanent Injunction. ......................................................................... 20

Objection 4. Defendants Object to Paragraphs 1(b), 1(b)(i) and 2 of the Proposed Permanent Injunction Because They Lack Specificity and Are Overbroad. ............................................................................................ 28

Objection 5. Defendants Object to the Conditions Imposed on Transfers Of Assets Under Paragraph 3 of the Proposed Permanent Injunction Because the Imposition is Punitive and Without Connection to Copyright Infringement. .... 35

## INDEX OF AUTHORITIES

**CASES**


*A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896 (N.D.Cal. 2001) .................... 19

*A & M Records, Inc. v. Napster, Inc.*, 2001 U.S. Dist. LEXIS 2186, No. C MDL-00-1369 MHP, 2001 WL 227083 (N.D. Cal. Mar. 5, 2001) (Patel, C.J.), aff'd, 284 F.3d 1091 (9th Cir. 2002) .................... 6

*A & M Records, inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) .................... 19

*ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996) .................... 10

*Alexander v. United States*, 509 U.S. 544, 113 S. Ct. 2766, 125 L. Ed. 2d 441 (1993) ... 31

*Anderson v. Air West, Inc.*, 542 F.2d 1090 (9th Cir. 1976) .................... 5

*Arista Records, Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. LEXIS 16165, No. 00 CIV. 4660, 2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) .................... 18

*Ashcroft v. ACLU*, 542 U.S. 656, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004) .................... 10

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) .................... 33

*Bartnicki v. Vopper*, 532 U.S. 514, 149 L. Ed. 2d 787, 121 S. Ct. 1753 (2001) .................... 32

*Bell Atlantic v. Twombly*, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007) .................... 7, 16

*Benny v. Pipes*, 799 F.2d 489 (9th Cir. 1986) .................... 1

*Bernstein v. JCPenney, Inc.*, 1998 U.S. Dist. LEXIS 19048, No. 98-2958, 1998 WL 906644, (C.D. Cal. Sept. 29, 1998) .................... 18

*Brennan v. Saghatelian*, 514 F. 2d 619 (9th Cir. 1975), reh'g denied sub nom *Dunlop v. Saghatelian*, 520 F.2d 788 (9th Cir. 1975) .................... 36

*Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) .................... 7

*Cripps v. Life Ins. Co. of North America*, 980 F.2d 1261, 1267 (9th Cir. 1992) .................... 1

*Cummings v. Connell*, 316 F.3d 886 (9th Cir. 2003) .................... 37

*Danning v. Lavine*, 572 F.2d 1386 (9th Cir. 1978) .................... 1

*DirecTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) .................... 1, 5, 16

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641

(2006)........................................................................................................6, 17
*Elektra Entm't Group, Inc. v. Bryant*, No. CV 03-6381GAF(JTLx),, 2004 WL 783123 (C.D. Cal. Feb. 13, 2004) ....................................................................19, 20
*Entertainment Software Association v. Blagojevich*, 469 F.3d 641(7th Cir. Ill. 2006)....33
*Entertainment Software Association v. Foti*, 451 F. Supp. 2d 823 (M.D. La. 2006) .......33
*Federal Election Com. v Furgatch*, 869 F.2d 1256 (9th Cir. 1989)..................................37
*Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 39 L. Ed. 2d 435, 94 S. Ct. 1113 (1974) ...............................................................................30
*Hughes Tool Co. v. Trans World Airlines, Inc*., 409 U.S. 363, 34 L. Ed. 2d 577, 93 S. Ct. 647 (1973)..........................................................................................5
*In re Napster, Inc. Copyright Litig.*, 377 F.Supp.2d 796 (N.D. Cal. 2005) .......................2
*Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312 (Fed. Cir. 2004)...............................30
*Madsen v. Womens' Health Center, Inc.*, 512 U.S. 753, 14 S. Ct. 2516, 129 L. Ed. 2d 593 (1994)..........................................................................................33
*MGM Studios, Inc. v. Grokster, Ltd*., 518 F. Supp. 2d 1197 (C.D. Cal. 2007) .........passim
*Micro Star v. Formgen Inc*., 154 F.3d 1107 (9th Cir.1998) ...........................................19
*Modtech, Inc. v. Designed Facilities Constr., Inc.*, 51 U.S.P.Q.2D (BNA) 1206, 1999 U.S. Dist. LEXIS 21474, No. CV 98-2871 CBM (MCx) (C.D. Cal. 1999) ................31
*Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849 (8th Cir. 2004) .............................4, 29
*Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426 (8th Cir. 1993)..........................................................................................2
*New.net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071 (C.D. Cal. 2003) .................................32
*Newmark v. Turner Broadcasting Network* 226 F.Supp.2d 1215, (C.D. Cal. 2002)........29
*Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200 (5th Cir. 1975) ......1, 5, 17
*Online Policy Group v. Diebold, Inc.,* 337 F. Supp. 2d 1195 (N.D. Cal. 2004) .............18
*Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S. Ct. 1575, 29 L. Ed. 2d 1 (1971)..........................................................................................32
*Peregrine Myanmar v. Segal*, 89 F.3d 41 (2d Cir. 1996) ...............................................30

*Perfect 10 v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) ..................................13, 18
*Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828 (C. D. Cal. 2006)...........................13, 18
*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)....................7, 14, 16
*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007).......................................11
*Premier Communications Network, Inc. v. Fuentes*, 880 F.2d 1096 (9th Cir. 1989)........31
*Reno v. ACLU*, 521 U.S. 844, 138 L. Ed. 2d 874, 117 S. Ct. 2329 (1997) ......................10
*Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 45 L. Ed. 2d 12, 95 S. Ct. 2069 (1975).............................................................................................................36
*S.E.C. v. Smyth*, 420 F.3d 1225, 1232 (11th Cir. 2005)....................................................4
*Schmidt v. Lessard*, 414 U.S. 473, 38 L. Ed. 2d 661, 94 S. Ct. 713 (1974) .....................30
*Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978 (W.D. Tenn. 2006)......30
*Subafilms, Ltd. v. MGM-PatheCommunications Co.*,24 F.3d 1088 (9th Cir.) (enbanc), *cert. denied*, 513 U.S. 1001 (1994) ..........................................................................34
*TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987)...............................4
*Thomson v. Wooster*, 114 U.S. 104, 5 S. Ct. 788, 29 L. Ed. 105 (1884)...........................2
*Ticketmaster Corp. v. Tickets.com, Inc.*, 2000 U.S. Dist. LEXIS 4553, No. CV 99-7654, 2000 WL 525390 (C.D. Cal. Mar. 27, 2000) .....................................................18
*Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001 (9th Cir. 1985) *cert. den.* 474 U.S. 1059 (1986)..........................................................................................30
*Twentieth Century Fox Film Corp. v. Streeter*, 438 F.Supp.2d 1065 (D. Ariz. 2006).....19
*Union Pac. R.R. v. Mower*, 219 F.3d 1069 (9th Cir. 2000) ..............................................30
*United States v W. T. Grant Co.*, 345 US 629, 97 L Ed 1303, 73 S Ct 894 (1953) ...36, 37
*United States v. Playboy Entm't. Group*, 529 U.S. 803, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000).............................................................................................................33
*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001) ............................11
*Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775 (2d Cir. 1994).............................4, 30

**STATUTES**

Fed. R. Civ. P. 55 ..........................................................................................1, 4

Fed. R. Civ. P. 65 .......... 4

**OTHER AUTHORITIES**

Holmes, *The Common Law* (1881) .......... 37

Defendants[1] Justin Bunnell, Wes Parker and Valence Media, LLC (hereinafter "defendants") hereby submit their Objections[2] to the Proposed Permanent Injunction submitted by plaintiffs.

**Legal Standard and Summary of Objections**.

In *DirecTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007), the court held that no default judgment could be entered because the Complaint in the case failed to allege facts sufficient to sustain the claim. The court ruled that it:

> <<takes "the well-pleaded factual allegations" in the complaint "as true." *Cripps v. Life Ins. Co. of North America*, 980 F.2d 1261, 1267 (9th Cir. 1992); see also Fed. R. Civ. P. 55(a); *Benny [v. Pipes*, 799 F.2d 489, 495 (9th Cir. 1986)*]* at 495. However, a "defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).>>
> See also *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978).

Both *Hoa Huynh* and *Danning* quote from *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975), where the Court held:

---

[1] The action against defendant Forrest Parker has been stayed pursuant to 15 U.S.C. § 362(a) (bankruptcy petition triggers stay of continuation of proceedings against the debtor). In light of the bankruptcy petition and the automatic stay for Forrest Parker, the notion that there is no emergency mandating an injunction (as US access has been turned off since August 2007), and to promote judicial economy and avoid balkanized hearings and inconsistent findings, defendants suggest to the Court to stay the entire action until the bankruptcy impact can be more clearly discerned.

[2] Defendants have not discerned clear guidance regarding a page limit for their Objections and given the gravity of the case and what is at stake, the interests of due process, and placing a robust record before the Court on which to make its equitable ruling, defendants have included numerous quotations resulting in a 38 page document. If Defendants' Objections are to be treated as a Brief with a 25 page limit without leave of Court, Defendants respectfully request such leave or the opportunity to formally make such request before the matter is ruled upon. Suffice it to say that plaintiffs have and will have filed many more pages of documents in the default hearing/remedy process than defendants and thus eleven pages here does not create unfair prejudice to them.

<<a defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered. As the Supreme Court stated in the "venerable but still definitive case" of *Thomson v. Wooster*[, 114 U.S. 104, 5 S. Ct. 788, 29 L. Ed. 105 (1884)] : a default judgment may be lawfully entered only "according to what is proper to be decreed upon the statements of the bill, assumed to be true," and not "as of course according to the prayer of the bill." 114 U.S. at 113, 5 S. Ct. at 792, 29 L. Ed. at 108. The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. In short, despite occasional statements to the contrary, a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover. *Thomson v. Wooster...*>> (Footnotes omitted.)

Defendants object to the Proposed Permanent Injunction in its entirety because there is no valid claim alleged in the Complaint.  See Objection 1, infra.  Plaintiffs cannot and do not specify their claims in any detail finer than sweeping conclusions of law, e.g. “defendants are liable for inducement of copyright infringement, contributory copyright infringement, and vicarious copyright infringement.”  (Proposed Permanent Injunction at 2:10-12.)  The “well-pleaded allegations” of the  Complaint, even when supplemented by discovery, do not add up to a valid claim. There is no legally recognizable copyright claim for “making available or distributing a dot torrent file.” *In re Napster, Inc. Copyright Litig.*, 377 F.Supp.2d 796, 802-05 (N.D. Cal. 2005), *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993) (stating that infringement of the distribution right requires the actual dissemination of copies or phonorecords). Torrent text like files are not copyrighted works and they are not copies of copyrighted works. Compare the above to cases (not here) where the copyrighted work was located on the defendant's servers under the rubric of “making available.”   Plaintiffs are asking the court for a brand new theory of making available in the context of this case in that there is no legally recognizable claim for tertiary copyright infringement nor has there been a showing of any causation nor the requisite level of knowledge and intent – defendants have no relationship whatsoever with the copyrighted work – they don’t touch it nor do they host it and they certainly do not

distribute it or make it available.

Plaintiffs' Proposed Permanent Injunction incorporates factual findings that have no basis in the Complaint and/or that are nothing more than conclusions of law and/or that would require a hearing with evidence presented on both sides before the court could make such a finding. E.g., the Proposed Permanent Injunction would appear to find Defendants liable for ***direct*** copyright infringement, as to which they have never previously been accused; and Paragraph 1(b)(ii) of the Proposed Permanent Injunction appears to enjoin Defendants from direct copyright infringement. Such factual findings and such an injunction should not become part of a Permanent Injunction when there is no basis in the record for them. See Objection 2, infra.

Should the Court overrule Objection 1, supra, it is anticipated that the Court will possibly issue a Permanent Injunction like that in Paragraph 1(a) of the Proposed Permanent Injunction at 4:23 - 5:5:4, that enjoins Defendants from operating the TorrentSpy System. Defendants object to certain unnecessary, meaningless and potentially prejudicial language in Paragraph 1(a). See Objection 3, infra.

The defects in the Complaint, in their totality, become apparent when considering the terms of a permanent injunction. Because no specific claims are defined or can be defined, the specificity needed for an injunction cannot be attained. Defendants object to Paragraph 1(b) and 1(b)(i) of the Proposed Permanent Injunction on the grounds of lack of specificity and overbreadth. Among other excesses, it constitutes a prior restraint on defendants' protected speech "about BitTorrent technology." See Objection 4, infra.

Paragraph 3 of the Proposed Permanent Injunction would burden any sale of Defendants' business assets with conditions that would make such assets unmarketable. Defendants have closed TorrentSpy and are entitled to market and sell the assets. Plaintiffs want to use the Permanent Injunction as a punishment – using it to destroy the value of Defendants' business assets – but such use of the injunctive remedy is improper. If an injunction is to issue, it will contain Paragraph 1(a). There

is no reason to go beyond the protection accorded by the final sentence of Paragraph 3 of the Proposed Permanent Injunction, as follows: “Defendants further shall not engage in a Transfer of TorrentSpy-Related Assets with or to any person whom Defendants know to be engaged in conduct that would violate the terms of Paragraph 1 above.” Other than that sentence, Defendants object to Paragraph 3. See Objection 5, infra.

In connection with Objection 5, Defendants submit that the Court should dissolve any prior injunctive relief, e.g., the Temporary Restraining Order previously entered and/or any Preliminary Injunction.

As stated in *MGM Studios, Inc. v. Grokster, Ltd*., 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007):

> <<A permanent injunction must be carefully crafted. "[T]he scope of the injunction should be coterminous with the infringement." 4 Nimmer & Nimmer, supra, § 14.06[C]. This is perhaps partly why "blanket injunctions to obey the law are disfavored." *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 n.1 (8th Cir. 2004). Rule 65(d) also requires that injunctions be specific:
>
>> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.
>
> Fed. R. Civ. P. 65(d). "Injunctive relief should be narrowly tailored to fit specific legal violations." *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994). The devil is in the details.>>

Fed. R. Civ. P. 55(b) authorizes the court to conduct a hearing or to make a referral. Defendants submit that when, as here, “all essential evidence” has not been put into the record, due process requires a hearing before remedies are imposed. See

*S.E.C. v. Smyth*, 420 F.3d 1225, 1232, 1233 (11th Cir. 2005).[3]

**OBJECTION 1: DEFENDANTS OBJECT TO THE PROPOSED PERMANENT INJUNCTION IN ITS ENTIRETY BECAUSE THERE IS NO VALID CLAIM ALLEGED IN THE COMPLAINT.**

A "defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." When the facts of the Complaint do not add up to cognizable claim, the Court should refuse to enter a default judgment. *DirecTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).[4]

There is no allegation in the Complaint that defendants themselves engaged in direct copyright infringement. As shown in detail infra, the Complaint alleges that

---

[3] In *Cripps*, supra, 980 F.2d at 1268, the court vacated the default judgment but not the default and remanded the case to the trial court for fact-finding as to the underlying validity of the claim. The district court held an evidentiary hearing in *Benny v. Pipes*, supra, 799 F.2d at 495, n.8. See also *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987) (trial court struck defendants' answer as sanction for litigation misconduct but ordered a hearing where plaintiff put on its prima facie case).

[4] In *Anderson v. Air West, Inc.*, 542 F.2d 1090 (9th Cir. 1976), on which Plaintiffs rely (MPA in Support of Motion at 3:4-6), the court ruled:

> <<Defendants' failure-to-state-a-claim argument was included as one of their "affirmative defenses" below. Both parties recognize that by striking those defenses the district court did not impliedly reject defendants' argument that no claim was stated. Rather, it is not apparent that the district court ever considered the argument. If in fact no claim is stated, the default order may have to be vacated. See *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 34 L. Ed. 2d 577, 93 S. Ct. 647 (1973).>>

defendants formerly[5] provided information services and information to anonymous Internet visitors, whom Plaintiffs call "users," who came to Defendants' website to obtain information needed to carry out P2P file exchanges. Such exchanges may have ultimately infringed on copyrights somewhere in the World under a given jurisdiction's laws, but any potential primary infringement occurred after the user had left Defendants' website, with intermediate stages of Internet activity separating the user's visit at Defendants' website from any file exchange. Many visitors to Defendants' websites, which site(s) were and are located in the Netherlands, used the resources for non-infringing purposes and the vast majority of the Torrentspy.com users were located outside the United States. Under these facts and circumstances, no valid claim for liability can be or has been shown. Defendants do nothing other than to provide information that has no copyrighted content to other persons that those persons use to leave the site and then access P2P file exchanges. Defendants do not themselves set up P2P file exchanges. There is nothing inherent in the operations of Defendants' system that induces or contributes to copyright infringement. "Whether BitTorrent is used for legitimate purposes or copyright infringement is determined by those who operate its websites and its servers." (Complaint at 4:2-4.)

As shown by plaintiffs' allegations, there is a class of persons who are similar to Defendants, namely, "operators of torrent sites," (Complaint, ¶ 14) who may be affected by a judgment issued by the court. For example, if the court were to find as a matter of fact that an operator of a torrent site "could easily prevent infringement of Plaintiffs' copyrighted works" (Complaint, ¶ 29), such a finding could have serious consequences for other torrent site operators – especially because the proposition is not

[5] As indicated in declarations previously provided in this case herein TorrentSpy ceased providing services to persons connecting through U.S. providers in August, 2007. TorrentSpy shut down completely on March 24, 2008. Arguably the request for injunction is moot and thus no injunction should issue.

factually correct.[6] The standard for issuance of an injunction calls for an inquiry into the question of whether "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006). Defendants submit that, given the lack of specificity in the allegations of the Complaint, the failure of the Complaint to actually state a valid claim, the potential (but unknown) impact on national policies[7] and the potential (but unknown) impact on a class of persons not before the Court, the public interest would be disserved by a permanent injunction. Therefore, the Motion for Permanent Injunction should be denied.

As a preliminary matter, Defendants object to a determination that the validity of Plaintiffs' claim is established by reason of the Court's Order Denying Motion to Dismiss for Failure to State a Claim (Docket #22) (May 10, 2006), as recited in the Proposed Permanent Injunction at 2:12-13. Under the current standard, to survive a 12(b)(6) motion, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 127 S.Ct. 1955, 1965, 167 L.

---

[6] See *A & M Records, Inc. v. Napster, Inc.*, 2001 U.S. Dist. LEXIS 2186, No. C MDL-00-1369 MHP, 2001 WL 227083 (N.D. Cal. Mar. 5, 2001) (Patel, C.J.), aff'd, 284 F.3d 1091 (9th Cir. 2002) for some of the difficulties to be anticipated in "filtering" files.

[7] National policies: "promote the continued development of the Internet," "preserve [its] vibrant and competitive free market" and "***encourage the development of technologies which maximize user control***." 47 U.S.C. § 230(b) (emphasis added).

Ed. 2d 929 (2007), "[8]retir[ing]" the "no set of facts" language of *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) under which the Motion to Dismiss was decided. In *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007), issued after the Motion to Dismiss, the court held that a theory of vicarious liability could not be sustained against Google because Google did not have "the legal right to stop or limit the direct infringement of third-party websites," exactly the situation

---

[8] In looking at the equities, the Court can and should take into consideration the pleadings on file in the related case of Bunnell, et al. v. MPAA, U.S. District Court, Central District of California Case No. 2:06-cv-03206 FMC-JC for the notion that the plaintiffs began this copyright case via an investigation by its trade organization, the MPAA, whereby the MPAA admitted to paying a hacker $15,000 dollars for information obtained from the Torrentspy defendants by intercepting emails without their authorization. Indeed, while it is axiomatic that two wrongs do not make a right, it does tend to rationally explain the notion that defendants conduct in the instant case has been driven by a desire to retain privacy.

here.[9] This recent decision also reformulated the standard for contributory infringement. The validity of the claims at this stage of the proceedings, after discovery and creation of a record, requires more careful scrutiny than at the initial pleading stage.

According to the Complaint, copyrights protecting plaintiffs' movies and television programs are infringed by activities involving "an online computer network known as 'BitTorrent.'" (Complaint, ¶¶ 4-6.) Defendants' former website, TorrentSpy, was a tangential part of the BitTorrent Network. BitTorrent is a peer-to-peer network optimized for the copying and downloading of large files. Actual file exchanges, which are the directly infringing acts, take place between users or "peers," each a person with a BitTorrent "client application" in his or her personal computer. In addition to the class of users, the BitTorrent Network involves a class of indexing websites known as "torrent sites" and a class of computer servers known as BitTorrent

---

[9] According to plaintiffs' expert Professor Horowitz Torrentspy provided (at the time of his deposition) search results that link to dot-torrent files found on third party sites (see Excerpts of Deposition of Professor Ellis Horowitz taken November 28, 2007, attached as Exhibit A to Declaration of Jared R. Smith (hereafter referred to as "Horowitz Deposition" at 24:15-20):

Q. To the best of your knowledge currently Torrentspy provides search results that link to dot-torrent files found elsewhere; correct?
A. Yes. To the best of my knowledge at this point the links that are provided link to third-party sites.

Professor Horowitz makes clear that the Torrentspy.com servers are not involved with any content hosted on third party sites once the user controlled BitTorrent client application takes over (Horowitz Deposition at 30:4-10):

Q. TorrentSpy.com, their servers are not involved once the client application BitTorrent takes over; correct?
MR. SERVODIDIO: Vague and ambiguous.
THE WITNESS: Yes. That's correct. Once the dot-torrent file has been downloaded, TorrentSpy machines are not involved.

"trackers." (*Id.*, ¶¶ 7-10.)

Defendants were sued solely as a member of the class of "torrent sites" that provides indexing services and related services. Plaintiffs' allegation: "Whether BitTorrent is used for legitimate purposes or copyright infringement is determined by those who operate its websites and its servers," applies to torrent sites. (*Id.*, ¶ 7.) It is undisputed that BitTorrent is used to download large volumes of non-infringing materials, such as independent video productions; and it is undisputed that software, games and updates are routinely downloaded by users using BitTorrent. Hollywood provides its own products through BitTorrent technology.[10]

Defendants operated a "comprehensive aggregator," gathering material from all available sources, like Google does, but specializing as an information node for torrent files and links. There were and are competitors in providing such aggregation and search engine services to Internet visitors and such aggregators/search engines play an essential role in BitTorrent technology. (Complaint, ¶¶ 11-12.)

Torrent sites like the former TorrentSpy provide users with "small files known as 'torrents.'" Loaded into the client application in the user's personal computer, a torrent "instruct[s] a user's computer where to go and how to get the desired file. Torrents interact with specific trackers..." (*Id.*, ¶ 12.) Any file exchange occurs after termination of all connections between the visitor and the torrent site.

> "Torrent sites play an integral role in the process of using BitTorrent to download files. Without them, users could not identify, locate or download infringing files. Indeed, the content available on the BitTorrent network is

---

[10] In the accompanying Request for Judicial Notice, Defendants ask that the Court find that Internet accessibility makes certain facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" (Fed. Rule of Evid 201(b)(2)), namely that: "BitTorrent technology is presently being used for authorized distributions of copyrighted movies and television programs, including copyrighted movies and television programs owned by some plaintiffs (or affiliates of plaintiffs)."

> defined entirely by what files the ***operators of torrent sites*** – such as Defendants – choose to allow to be indexed and distributed.” (*Id.*, ¶ 14, emphasis added.)
>
> “The fact is that Defendants easily could prevent infringement of Plaintiffs’ copyrighted works by not indexing torrent files corresponding to Plaintiffs’ copyrighted works.” (*Id.*, ¶ 29.)

When evaluated by current authorities, Plaintiffs’ allegations fail to state a claim for any kind of secondary copyright infringement.

This is not a case suitable for the inducement rule of *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919; 125 S. Ct. 2764; 162 L. Ed. 2d 781 (2005), which dealt with “one who distributes a device with the object of promoting its use to infringe copyright.” Here, defendants did not distribute a “device” but defendants only distributed non-copyrighted “torrent” files and links, nothing but ***information*** that, defendants submit, is protected by the First Amendment to the United States Constitution In a series of decisions, the United States Supreme Court and lower federal courts have protected speech over the Internet because the Internet provides "the most participatory form of mass speech yet developed,"[11] a statement that especially applies to BitTorrent technology at issue here.

The lack of any “device” at issue is demonstrated by Plaintiffs’ definition of “the TorrentSpy System” at 4:16-18, namely, “the software, websites, electronic data, forums, guides, and FAQS that make up or support www.torrentspy.com.”

---

[11] *ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996) at 883, upheld in *Reno v. ACLU*, 521 U.S. 844, 870, 138 L. Ed. 2d 874, 117 S. Ct. 2329 (1997). See also *Ashcroft v. ACLU*, 542 U.S. 656, 673, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004) (burden of filtering Internet content for materials harmful to children should be borne by parents rather than by constraining general Internet activity); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445-449 (2nd Cir. 2001). ("Communication does not lose constitutional protection as 'speech' simply because it is expressed in the language of computer code.")

Some of these items, such as data, forums, guides and FAQS are nothing but information protected by the First Amendment. See *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445-449 (2nd Cir. 2001). ("Communication does not lose constitutional protection as 'speech' simply because it is expressed in the language of computer code.") Software and websites might contain "devices" but Defendants did not distribute any such "devices." Cf. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102,1114 (9th Cir. 2007) (defendants' password hacking website compared to "software provided by Grokster.") Accordingly, Defendants cannot be held liable for inducement under *Grokster*.

The complaint seeks to interpret current law so as to apply to a new kind of technology. Involving older technology, *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919; 125 S. Ct. 2764; 162 L. Ed. 2d 781 (2005) dealt with "one who distributes a device with the object of promoting its use to infringe copyright." Here, defendants did not distribute a "device" but defendants only distributed non-copyrighted "torrent" files and links, nothing but ***information*** that, defendants submit, is protected by the First Amendment to the United States Constitution.

One of the lessons assumed from *Grokster* but rarely scrutinized is that the now famous inducement holding, pled by the plaintiffs in the complaint upon which they are seeking a default, applies to search engines and almost any other type of web service. But a closer reading raises the question whether the inducement liability holding in *Grokster* even applies to Internet search engines or link sites like Google[12] or Torrentspy or other torrent file search engines. As stated in *Grokster*:

> The question is under what circumstances the distributor

---

[12] According to Professor Horowitz Google provides search results that link to dot torrent files (Horowitz Deposition at 23:25 –24:2):

Q. My question is this then: One could do a file type Torrent search on Google and find dot-torrent files; correct?
A. Yes, you could do that.

> of a **product** capable of both lawful and unlawful use is liable for acts of copyright infringement by third parties **using the product**. We hold that one who distributes a **device** with the object of promoting **its use to infringe copyright**, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.

Further down in the opinion Justice Souter further clarifies and states:

> In addition to intent to bring about infringement and distribution of a **device suitable for infringing use**, the inducement theory of course **requires evidence of actual infringement by recipients of the device**, the software in this case.

If one were to read and "scrutinize" the actual issue and holding of *Grokster* above it would seem to only apply to "products" or "devices" that can be "used" by third parties to commit copyright infringement. The *Grokster* software "device" handled the allegedly illegal copying between computers - it was "used" for the copyright infringement.

But that is arguably not the case with Internet search engines or sites that manifest hyperlinks to dot torrent files like Torrenstpy.com. First it is arguable that a search engine is not a device or product (like say the executable software "product" at issue in *Grokster*) **<u>but even if it is</u>** - it is hard to understand how a third party can <u>use</u> such a device for the actual commission of copyright infringement.

For example, if one were to query Google for a famous musician's song unauthorized to be on the net and then click on the link to download it from a third party site the Google search engine is not being used to commit copyright infringement as no copying is being done using the Google site or “device” - the copying is being done using the surfer's browser “device” directly connected to a third party site after the connection with Google is lost. In other words search engine result hyperlinks are not a device that can be "used" to commit copyright infringement - that device usually

is the user's browser (or like in the Grokster case the thin client software known as *Grokster*) directly connecting to a third party site or server (the recent case of *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 842 (C. D. Cal. 2006), affirmed in part, reversed in part, *Perfect 10 v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) provides support for this view related to the connection between the user and the third party site after a hyperlink is clicked through).

Torrentspy is arguably further removed from potential downstream infringements than Google as Torrentspy provided hyperlinks to dot torrent files (text-like files) that, when clicked on, were downloaded to the user's hard drive – after the connection with Torrenstpy was lost the user could if they wanted to then load up their software "device" namely the Bittorrent software[13], load the torrent file, and then possibly download potential infringing files – thus the notion that *Grokster* does not apply to

---

[13] According to Professor Horowitz BitTorrent peer to peer technology involves a software application that users install on their computers known as a client application (Horowitz Deposition at 22:8-12):

Q. Now, the BitTorrent peer technology involves a software application that users install on their computers known as a client application; is that correct?
A. Yes, that's correct.

Professor Horowitz testified that the BitTorrent client application is a piece of software that has built within it knowledge of the BitTorrent protocol and it's able to take dot-torrent files and cause the corresponding content to be downloaded to the user's machine. (Horowitz Deposition at 22:13-17):

Q. What is a client application?
A. It's a piece of software that has built within it knowledge of the BitTorrent protocol, and it's able to take dot-torrent files and cause the corresponding content to be downloaded to the user's machine.

Professor Horowitz favors the BitTorrent client application (Horowitz Deposition at 22:18-21):

Q. And can you give us an example of any such client applications?
A. Sure. The one that I favor is the one from BitTorrent, which is called BitTorrent.

web sites that provide mere hyperlinks is even more compelling for Torrentspy. Users of the Torrentspy search engine or hyperlink device cannot use such device to commit copyright infringement and therefore *Grokster* and the inducement theory do not apply to Internet search engines and plaintiffs' claims based on tertiary liability are not legally recognizable under any case precedent.

In addition, given the notion that Torrentspy provided information and it is such information that involves the core of the site and this case, the First Amendment is squarely at issue. Indeed, it is hard to find any cases in the history of American jurisprudence where a web site that did not provide hyperlinks to copyrighted works and that did not have copyrighted works passing through its servers or a software device (like in Napster and Grokster) wherein such site was held liable for secondary copyright infringement under any theory – this may be a case of first impression and even in a default scenario should not be decided or an injunction issued until the court is satisfied that plaintiffs have a real "legally recognizable" claim – especially given that defendants are attenuated and so far removed from downstream conduct that there is little case precedent for Torrentspy having real responsibility for potential off site infringements recognizable under the law.

As held in *Perfect10 v. Amazon.com*, supra, at 487 F.3d at 729, a party is:

> "contributorily liable if it 'has actual knowledge that specific infringing material is available using its system,' *Napster*, 239 F.3d at 1022, and can 'take simple measures to prevent further damage' to copyrighted works, Netcom, 907 F. Supp. at 1375, yet continues to provide access to infringing works."

Here, Plaintiffs' Complaint has nothing but conclusions that "Defendants have actual and constructive knowledge of the infringing activity that occurs on their torrent site." (Complaint at 10:10-11.) The allegation is false: ***No infringing activity***

***occurred on Defendants' torrent site***.[14] Even if a visitor came to Defendants' website to obtain information for purposes of copyright infringement, and even if the visitor obtained that information at Defendants' website, the visitor had to leave the website and perform several intermediate steps before any potential copyright infringement could be carried out. Plaintiffs consistently misrepresent the facts because it is only by misrepresentation that a pretense of a valid claim can be maintained.

Held against the standard, there is no allegation in the Complaint that Defendants have actual knowledge that specific infringing material is available using Defendants' systems. Defendants' knowledge is alleged to come through Defendants' "creation, maintenance, and operation" of the website (Complaint at 10:13) rather than actual knowledge of specific infringing material. The Complaint fails to state a cause of

---

[14] According to the deposition testimony of plaintiffs' expert Professor Horowitz dot torrent files do not contain actual copies of a content item (Horowitz Deposition at 28:6-22):

Q. Dot-torrent files do not contain actual copies of a content item; correct?
A. That's correct.
Q. Torrent files contain data that provides an address where content may possibly be found; correct?
MR. SERVODIDIO: Vague and ambiguous.
THE WITNESS: No. That's not accurate. Torrent files contain an address, one or more addresses of trackers who in turn have knowledge of where the content can be found.
BY MR. ROTHKEN:
Q. Okay. Thank you for that clarification.
TorrentSpy.com did not provide content files; correct?
MR. SERVODIDIO: Vague and ambiguous.
THE WITNESS: That's correct. They do not provide the content file.

Professor Horowitz also testified that the defendants in this case do not run a tracker (Horowitz Deposition at 24:12-14):

Q. The defendants in this case do not run a Tracker; correct?
A. That's correct. They do not run a Tracker.

action, unless a reader were to enter into speculation, a practice prohibited under *Bell Atlantic v. Twombly*, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007), quoted supra.

Combined with a confirmation of Plaintiffs factually false allegation in ¶ 12 of the Complaint discussed supra ["The fact is that Defendants easily could prevent infringement of Plaintiffs' copyrighted works by not indexing torrent files corresponding to Plaintiffs' copyrighted works."], a holding that Defendants are liable for contributory copyright infringement would amount to holding an independent torrent site operator liable simply by reason of the site's existence. Such a result should not come about for reasons of national policy and fairness to third parties not present in this proceeding, as set forth supra.

As noted supra, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007) held that a theory of vicarious liability could not be sustained against Google because Google did not have "the legal right to stop or limit the direct infringement of third-party websites," exactly the situation here. It is not alleged and factually not the case that Defendants could stop or limit any direct infringement in this case. Defendants did nothing but provide information services to purposeful visitors. There are many torrent sites for users to visit.

Accordingly, none of the theories of secondary copyright infringement can be sustained. The court should decline to enter a default judgment and should decline to issue a permanent injunction. *DirecTV, Inc. v. Hoa Huynh*, 503 F.3d 847 (9th Cir. 2007).

**OBJECTION 2: DEFENDANTS OBJECT TO FACTUAL FINDINGS AND AN ORDER IN THE PROPOSED PERMANENT INJUNCTION THAT HAVE NO BASIS IN ALLEGATIONS OF THE COMPLAINT OR IN EVIDENCE.**

Plaintiffs are seeking to use the circumstances of the default procedure to insert false and/or improper material into the Court's Order. Plaintiffs' evident purpose

behind such insertions is to use this case as part of their broader campaign against independent BitTorrent operators. The Court should remove such provisions from any Permanent Injunction in the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006). As discussed supra, a defaulting "defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).

A. Defendants object to the statement at 2:17 of the Proposed Permanent Injunction that, unless an injunction is issued, there will be “a threat that Defendant would again infringe Plaintiffs’ copyrighted works.” Defendants object to the Order in Paragraph 1(b)(ii) which enjoins Defendants from “reproducing, downloading, distributing, uploading, linking to, or publicly performing or displaying any Copyrighted Work.”

**Argument**. The proposed language at 2:17 implies that defendants directly infringed Plaintiffs’ copyrighted works. The Complaint does not allege that defendants infringed Plaintiffs’ copyrighted works. There is no evidence that defendants infringed Plaintiffs’ copyrighted works. What is alleged is that defendants are to be held secondarily liable for infringing acts of third parties. The proposed language should not be included in any Permanent Injunction.

The admonitions stated in the recent proceedings in *MGM Studios, Inc. v. Grokster, Ltd*. and quoted supra require that “‘Injunctive relief should be narrowly tailored to fit specific legal violations.’” Since there is no finding and should be no finding as a matter of law that Defendants reproduced, downloaded, distributed, uploaded, linked to (meaning hyperlink as used in the ordinary course), or publicly performed or displayed any Copyrighted Work, the proposed injunctive provision is improper.

Defendants specifically object to an injunction against “linking to” Plaintiffs’ Copyrighted Works. As stated in *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 842

(C. D. Cal. 2006), affirmed in part, reversed in part, *Perfect 10 v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007):

> <<[L]inking does not implicate any of the exclusive rights under copyright. *Ticketmaster Corp. v. Tickets.com, Inc.*, 2000 U.S. Dist. LEXIS 4553, No. CV 99-7654, 2000 WL 525390, at *2 (C.D. Cal. Mar. 27, 2000) ("Hyperlinking does not itself involve a [direct] violation of the Copyright Act (whatever it may do for other claims) since no copying is involved."); *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1202 n.12 (N.D. Cal. 2004) ("Hyperlinking per se does not constitute direct copyright infringement because there is no copying, [although] in some instances there may be a tenable claim of contributory infringement or vicarious liability."); *Bernstein v. JCPenney, Inc.*, 1998 U.S. Dist. LEXIS 19048, No. 98-2958, 1998 WL 906644, at * 1 (C.D. Cal. Sept. 29, 1998) (unpublished) (granting, without discussion, defendant's motion to dismiss on the ground that hyperlinking cannot constitute direct infringement); *Arista Records, Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. LEXIS 16165, No. 00 CIV. 4660, 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002) (unreported) (linking to content does not implicate distribution right and thus, does not give rise to liability for direct copyright infringement).>>

There has never previously been any suggestion that "linking to" Plaintiffs' Copyrighted Works was involved in this case.

The injunctive relief in Paragraph 1(b)(ii) is unconnected with anything Defendants have done. Plaintiffs accuse Defendants of wanting to infringe copyrights but it is apparent from the record that Defendants have more practical desires focused on sales of Internet advertising and development of websites that draw traffic to Internet advertising. A broadly general and non-specific injunction such as Paragraph 1(b)(ii), unconnected any offense properly alleged in the Complaint or shown in evidence, punitively and improperly limits Defendants opportunities in a dynamic industry. See further discussion in Objections 3 and 4.

B. Defendants object to provisions 3:3-18 of the Proposed Permanent Injunction, namely the following:

> The overwhelming infringement facilitated by defendants significantly and irreparably undermines plaintiffs' control over their intellectual property.

> *See A & M Records, inc. v. Napster, Inc.*, 239 F.3d 1004, 1029 (9th Cir. 2001) (imposing injunctive relief in peer-to-peer infringement case because otherwise "Plaintiffs would lose the power to control their intellectual property"). The online infringement that defendants induce and facilitate uniquely exposes plaintiff's works to "viral" infringement by allowing end users to further distribute digital copies of plaintiffs' works. *See Twentieth Century Fox Film Corp. v. Streeter*, 438 F.Supp.2d 1065, 1073 & n.2 (D. Ariz. 2006) (distribution of digital copies via Internet "is potentially exponential rather than linear, threatening virtually unstoppable infringement of the copyright"); *Elektra Entm't Group, Inc. v. Bryant*, No. CV 03-6381GAF(JTLx),, 2004 WL 783123, at *6 (C.D. Cal. Feb. 13, 2004)("Defendant's means of infringement - an online distribution system with tens of millions of potential users - has left Plaintiffs' sound recordings vulnerable to massive, repeated, near-instantaneous, and worldwide infringement").

**<u>Argument</u>**

1. The objectionable provisions are irrelevant.

In context in the Proposed Permanent Injunction, the challenged provisions are factual predicates for a finding of "irreparable injury." The following finding of the Proposed Permanent Injunction at 3:18-19 immediately follows the provisions quoted supra: "Accordingly, Plaintiffs will be irreparably harmed..."

However, as stated in Plaintiffs' authority, *Twentieth Century Fox Film Corp. v. Streeter*, 438 F.Supp.2d at 1065, 1072 (D. Ariz. 2006):

> Copyright infringement is presumed to give rise to irreparable injury. *A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 925 (N.D.Cal. 2001) reversed in part on other grounds, citing *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1109 (9th Cir.1998).

Because "irreparable injury" is presumptive in this case if the Court were to discern there are actionable infringements that defendant(s) are legally secondarily responsible for, factual embellishment is unnecessary .

2. The factual statements in the subject provisions are without foundation in the Complaint or in any evidence. The phrase "plaintiffs' control over their

intellectual property" comes from the *Napster* case where a substantial record was developed during preliminary injunction proceedings. The situation in this case is very different because here Plaintiffs' control over their intellectual property has been undermined by technological development, e.g., of BitTorrent technology, not by anything Defendants have done or threaten to do. There is nothing "unique" about any threats that might be posed by Defendants. Probably, more serious threats are posed by Google which builds far larger data aggregations and which provides more powerful public search engines. There are a multitude of BitTorrent sites, including numerous sites worldwide that are beyond the reach of Plaintiffs. There are many means of Internet file exchange other than BitTorrent, including the *Napster* system, "Morpheus" at issue in *Grokster* and "Kazaa" at issue in *Elektra Entm't Group, Inc. v. Bryant* cited by Plaintiffs. The ungrounded factual statements are inserted by Plaintiffs to justify citations to authority. Neither the ungrounded factual statements nor the citations should be part of a Permanent Injunction.

**OBJECTION 3: DEFENDANTS OBJECT TO ALL LANGUAGE IN PARAGRAPHS 1(a) BEGINNING WITH "until such time" ON THE GROUNDS THAT SUCH LANGUAGE IS DEVOID OF MEANING AND AN ATTEMPT TO INSERT A FALSE FACTUAL FINDING INTO THE PERMANENT INJUNCTION .**

In this Objection and in Objection 4, infra, Defendants proceed with the understanding that the Court will overrule Objection 1 and issue a Permanent Injunction as Plaintiffs request under Paragraph 1(a) of the Proposed Permanent Injunction. In other words, Defendants anticipate provisions that enjoin Defendants etc.

> "from directly or indirectly operating, or supporting, assisting or participating in the operation of, the TorrentSpy System until such time as Defendants have satisfied the Court that the TorrentSpy System can and will be operated in a manner that does not result in the infringement of the Copyrighted Works." (Proposed Permanent Injunction at 4:26-5:4.)

Defendants' submits that all language beginning with "until such time..." is

devoid of content. How could Defendants so satisfy the Court without running prolonged real-life tests that would violate the injunction? The language is apparently an attempt to insert an implied factual finding into the terms of the Permanent Injunction, namely, that TorrentSpy operations could satisfy such allegations in the Complaint as "The fact is that Defendants easily could prevent infringement of Plaintiffs' copyrighted works by not indexing torrent files corresponding to Plaintiffs' copyrighted works." (Complaint at 8:20-22.)

Indeed according to Professor Horowitz Defendants provided robust systems to remove dot torrent files that copyright owners found offending given the constraints of a search engine like Torrentspy.com that did not "touch" or download copyrighted content (thus making viewing or reviewing such content located on third party servers impractical):

**Professor Horowitz testified in essence that Defendants can and do ban Torrentspy users either by user name or IP addresses for various infractions and Defendants can and do ban trackers for various reasons and will not index dot torrent files from banned trackers** (Horowitz Deposition at 39:5-16)

Q. The defendants in this case can and do ban
TorrentSpy users either by user names or IP addresses
for various infractions; true?
A. Yes. Apparently they do.
Q. Defendants can and do ban trackers for various
reasons; correct?
A. Yes, that's correct.
Q. TorrentSpy.com will not index incoming
dot-torrent files from trackers that are banned;
correct?
A. That's correct. They will not index
dot-Torrent files from banned trackers.

**Professor Horowitz testified in essence that Defendants provided an interface for Torrentspy site administrators to ban trackers** (Horowitz Deposition at 39:17-19):

17 Q. Defendants provide interface for TorrentSpy
18 site administrators to ban trackers; correct?
19 A. Yes, they do. That's correct.

**Professor Horowitz testified in essence that Defendants block and delete dot torrent files through their software** (Horowitz Deposition at 39:20-24):

20 Q. Defendants can and do block and delete
21 dot-torrent files through their software; correct?
22 A. They have the facility to block and delete
23 dot-torrent files, and my understanding is they have
24 done that.

**Professor Horowitz testified in essence that Torrentspy blocks dot torrent files which are then flagged as such in Torrentspy's index and the files with the same info hash will not be reindexed** (Horowitz Deposition at 39:25 – 40:4):

25 Q. And blocked dot-torrent files are flagged as
1 such in TorrentSpy's index and will not be reindexed on
2 TorrentSpy; correct?
3 A. That's correct. The specific file with that
4 info hash will not be reindexed.

**Professor Horowitz testified in essence that Site administrators can block any dot torrent file on Torrentspy and have a mass blocking functionality through the administrator interface** (Horowitz Deposition at 40:5-9)

5 Q. Site administrators can block any dot-torrent
6 file on TorrentSpy and can block several files at once
7 using the mass block functionality; correct?
8 A. Yes, that's correct. It is provided through
9 the interface.

**Professor Horowitz testified in essence that Defendants have allowed several companies access to their site in such a manner that these companies after identifying a specific torrent file could have that torrent blocked** (Horowitz

Deposition at 40:10-16):

Q. Defendants have given DMCA members functionality to block dot-torrent files; true?

MR. SERVODIDIO: Vague and ambiguous.

THE WITNESS: Defendants have allowed several companies access to their site in such a manner that these companies after identifying a specific torrent could have that torrent blocked.

**Professor Horowitz testified in essence that Torrentspy.com filters or blocks DMCA noticed Torrent files by hash value regardless of the file name and such files with the same hash value will not be reindexed** (Horowitz Deposition at 43:22-46:11):

Q. And it's your understanding that one of those mechanisms is to block dot-torrent files that result from DMCA notifications; correct?

A. Yes. They apparently have some mechanism in place for blocking such files.

Q. That's done by hash value; correct?

A. No. It seemed to be done by a link to the content. I believe the DMCA notice requires the copyright owner to provide such a link, and then TorrentSpy staff members who have been assigned to the process then follow through and attempt to block the corresponding content.

Q. The filtering that goes on by TorrentSpy.com for DMCA noticed Torrent files is to block the Torrent files by hash value; correct?

MR. SERVODIDIO: Objection. Asked and answered.

THE WITNESS: Well, there is a specific file that's being blocked and hence yes, it would be -- would correspond to a specific hash value.

BY MR. ROTHKEN:

Q. So regardless of what the Torrent file name is, any Torrent file that had the hash value that was blocked would be blocked; correct?

A. Yes. I believe that is the case. They do check via the hash value.

Q. And so if someone provided a DMCA notice for a specific dot-torrent file that had a particular hash value, then -- and that was blocked by TorrentSpy.com,

then every other dot-torrent file on its system that had the same hash value would be blocked; correct?

A. Yes. There should not be multiple entries having the same hash value. So I don't think there's anything to be gained here with your question. Once they've blocked the entry with a corresponding hash, it's blocked. There shouldn't be any additional occurrences with that file with the same hash.

Q. Unless somebody named the Torrent file differently that had the same hash value; correct?

A. Well, I thought you were saying that they might have renamed the file. So the entry would still be there, only have a different name value, same hash value.

Q. I'll start over with the hypothetical. I just want to make sure that it's accurate.

Under the technology that's used by TorrentSpy.com for blocking Torrent files obtained through DMCA notices, if TorrentSpy.com were to block a specific dot-torrent file that had a specific hash value, all other dot-torrent files regardless of their name that had the same hash value would be blocked too; true?

MR. SERVODIDIO: Object as vague and ambiguous.

THE WITNESS: I would say it this way. That is, if they encountered at a later time a Torrent file that had the same hash, it would not be downloaded and reindexed. So that once a file with the specific hash value is blocked, it is continually blocked going forward.

BY MR. ROTHKEN:

Q. In other words, the dot-torrent file that's
blocked would not appear in its search results
regardless of a file name?
A. Yes. That's correct.

**Professor Horowitz testified in essence that The cooperation of the copyright owners would be helpful for keyword filtering** (Horowitz Deposition at 50:3-9):

Q. So therefore you're agreeing that the
cooperation of the copyright owners to properly label
things and to cooperate is crucial in order for keyword
filtering to be accurate and successful?
MR. SERVODIDIO: Misstates the witness's
testimony, argumentative.
THE WITNESS: It would certainly be helpful.

**Professor Horowitz does not know how many words in the dictionary would be taken up if one were to analyze for keywords to use in theoretical keyword filters all the copyrighted movies, videos, and songs in the United States** (Horowitz Deposition at 50:14-23):

Q. How many words, if you know -- and tell me if
you don't know. How many words in the dictionary would
be taken up if one were to analyze all the copyrighted
movies, videos and songs in the United States?
MR. SERVODIDIO: Vague and ambiguous, calls
for speculation.
THE WITNESS: First of all, your assumption
that all of the copyrighted songs and movies would have
to be somehow kept track of I think is unrealistic, and
of course I don't know what that number is.

**Professor Horowitz is of the view that providing keywords for filtering or keeping track of and filtering "all" copyrighted songs and movies is somewhat unrealistic** (Horowitz Deposition at 50:14-23):

Q. How many words, if you know -- and tell me if

you don't know. How many words in the dictionary would be taken up if one were to analyze all the copyrighted movies, videos and songs in the United States?

MR. SERVODIDIO: Vague and ambiguous, calls for speculation.

THE WITNESS: First of all, your assumption that all of the copyrighted songs and movies would have to be somehow kept track of I think is unrealistic, and of course I don't know what that number is.

**Professor Horowitz does not think it is necessary to block all copyrighted content using keyword filters on dot torrent search engines especially content that ever appeared over the last 20 to 50 years because he thinks the sites that are offering recent content is where copyright infringement seems to be taking hold** (Horowitz Deposition at 50:25-51:8):

Q. Why would it be unrealistic?

A. Well, I don't think it's necessary to block all -- all copyrighted content that's ever appeared over the last -- I don't know -- 20 or 50 years.

Q. Why is that?

A. Well, because I think largely the sites are offering recent content, new movies, new music. That's where the copyright infringement seems to be taking hold.

**Professor Horowitz is of the opinion that in using a keyword filtering technique from a technical perspective on dot torrent sites that some downstream copyright infringement that occurs on third party sites should be tolerable** (Horowitz Deposition at 51:9-21):

Q. Okay. So you're saying then that in a keyword filtering technique, that some downstream copyright infringement should be tolerable?

MR. SERVODIDIO: Objection. Misstates the witness's testimony, calls for a legal conclusion, beyond the scope.

THE WITNESS: Yeah. I'm just viewing it as from a technical perspective, and from a technical perspective I think the issue is you would want to keep the database or block list size sufficiently small, and there's no reason that it couldn't be kept reasonably small because not all of the copyrighted material need to be included.

**Professor Horowitz does not want to be committed to a view on whose copyrighted content should be left out of the keyword filter and he believes that one could do a study and come up with a reasonable set based upon current trends and he has not done such a study** (Horowitz Deposition at 51:23-52:8):

Q. Okay. So whose unauthorized copyrighted content gets to be left out?

MR. SERVODIDIO: Objection. Calls for speculation, beyond the scope, calls for a legal conclusion.

THE WITNESS: Well, again, I haven't sat down and tried to work out all the details. I don't want to be committed to something. But I think -- I don't think there's any particular vendor of copyrighted material that I would necessarily cut out. I don't think that's the way to view it.

Accordingly, Defendants object to the following language in Paragraph 1(a): "until such time as Defendants have satisfied the Court that the TorrentSpy System can and will be operated in a manner that does not result in the infringement of the Copyrighted Works" as it appears that plaintiffs own expert, Professor Horowitz, acknowledges that some quantum of downstream third party infringement should be tolerable given the constraints of the Torrentspy system and the nature of the Internet technology as whole. Providing an impossible standard of 100 percent perfection for filtering would be overbroad, would not take into account fair use, DMCA protections, parody and worldwide extraterritorial users (given copyright protections on different

content worldwide and the wholly extraterritorial paradigm of users interfacing with the defendants' Netherlands servers) and violate the First Amendment. Providing an ambiguous standard or "fuzzy standard" could act as a Pandora's box ready to ensnare someone who meant no harm and had no intention to violate an order. Most importantly, any Torrent file filter system that did not involve plaintiffs providing notice of which of their works in which jurisdiction were being infringed on third party sites and allowing for significant under-breadth of filtering would be doomed to failure – defendants are simply not in the position to visit third party servers and downloads works and then make an assessment on a worldwide basis of what is available with authorization and without, what is an advertisement or teaser and what isn't, what is properly licensed and what isn't, and what is fair use and what isn't for every jurisdiction. Indeed, the Internet and search engines like Torrentspy.com would then only be as good as the most restrictive jurisdiction and that would also impact Free Speech and related Constitutional Protections in the United States.

## OBJECTION 4: DEFENDANTS OBJECT TO PARAGRAPHS 1(b), 1(b)(i) AND 2 OF THE PROPOSED PERMANENT INJUNCTION BECAUSE THEY LACK SPECIFICITY AND ARE OVERBROAD.

Paragraph (1)(b) of the Proposed Permanent Injunction (at 5:5-20) enjoins Defendants from "directly, indirectly, contributorily, or vicariously infringing any Copyrighted Works." "[I]ncluding without limitation," the "following activities" are apparently definitional of a violation:

> "(i) encouraging, promoting, soliciting or inducing, or knowingly materially contributing to, enabling, facilitating, or assisting, any person or entity, via any computer server, computer program, website, or online system, network or service, including without limitation any peer-to-peer or file-trading network, (A) to reproduce, download, distribute, upload, link to, or publicly perform or display any Copyrighted Work, or (B) to make any Copyrighted Work available for reproduction, downloading, distribution, uploading, linking to, or public performance or display."

As quoted in the Legal Standard, supra, "'blanket injunctions to obey the law are disfavored.' *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 n.1 (8th Cir. 2004)." *MGM Studios, Inc. v. Grokster, Ltd*., 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007). The general language at 5:5-8 (Paragraph 1(b)) is a "blanket injunction" and Defendants object thereto.

As the *Grokster* court also stated (*Ibid*.)

"Rule 65(d) also requires that injunctions be specific:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.

The restraints identified after the "(i)" violate the Rule. Such restraints are not specific but the very opposite of specific.[15] The Proposed Permanent Injunction does not "describe in reasonable detail" any specific act or acts but rather constructs an elastic volume of prohibited activities. The result is to prohibit Defendants from engaging in any communication whatsoever with anyone "involved in any peer-to-peer

---

[15] Indeed under the proposed language of such an injunction defendants' and their families may even be in violation from day one if they own a TIVO DVR (or device like it commonplace in many homes) that has the same or substantially similar functionality to the Replay TV DVR (including such features of video file sharing of which this Court is well aware) in which all or substantially all of the instant plaintiffs have already shown a willingness to sue over and allege in such complaint that such home users were primary infringers on which to hinge their case of secondary liability (see *Newmark v. Turner Broadcasting Network* 226 F.Supp.2d 1215, (C.D. Cal. 2002.)) Needless to say that even if the Court is inclined to enjoin defendants such injunction should be very narrowly tailored to the Torrentspy.com web site and should not subject defendants to such a broad injunction that would go beyond the accused site into the home or impact the ability of defendants to make a living working in their profession for Google or another search engine or any other dot com that must rely upon fair use, parody, (evolving law), and the DMCA to counter balance copyright rights on a worldwide basis.

or file-trading network" and to close Defendants out from any employment in vital areas of technology, even as a commentator or an educator. The Proposed Permanent Injunction would banish Defendants from their area of industrial expertise *in perpetuo* and contrary to the principle that "Injunctive relief should be narrowly tailored to fit specific legal violations." *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994), as stated in *MGM Studios, Inc. v. Grokster, Ltd*., 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007), supra, "Legal Standard."

We note once again Plaintiffs' attempts to enjoin "link to" and "linking to" which, as set forth supra in connection with Objection 2.a, have been held to be free from copyright infringement.

Measured against the requirements of specificity imposed by the authorities, the provisions in Paragraph 1(b) and 1(b)(i) are improper and Defendants object thereto. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 444, 39 L. Ed. 2d 435, 94 S. Ct. 1113 (1974); *Schmidt v. Lessard*, 414 U.S. 473, 476, 38 L. Ed. 2d 661, 94 S. Ct. 713 (1974); *Union Pac. R.R. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (injunction against former employee's disclosure of confidential information reversed because "it provides little, if any, guidance to Mower regarding how he should determine what particular information is confidential or privileged"); *Int'l Rectifier Corp. v. IXYS Corp*., 383 F.3d 1312, 1315-1317 (Fed. Cir. 2004), reversing an injunction granted by the United States District Court for the Central District of California, Judge Manuel L. Real; *Peregrine Myanmar v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ("Segal makes the valid point that it will be impossible for her--a non-lawyer--to know in advance which 'threatened' lawsuits are 'spurious' and which are not."). Cf. *Transgo, Inc. v. Ajac Transmission Parts Corp*., 768 F.2d 1001, 1022 (9th Cir. 1985) *cert. den.* 474 U.S. 1059 (1986) ("The injunction in the instant case precisely sets out the forbidden conduct.") -- see Plaintiffs' Motion at 9:14-17); *Smith & Nephew, Inc. v. Synthes (U.S.A.),* 466 F. Supp. 2d 978, 985-986 (W.D. Tenn. 2006) (injunction tightly tethered to defendants' patent-infringing products, e.g., " any

version of the Trochanteric Fixation Nail products and colorable variations thereof.") -- see Plaintiffs' Motion at 9:17-19; *Modtech, Inc. v. Designed Facilities Constr., Inc.*, 51 U.S.P.Q.2D (BNA) 1206, 1999 U.S. Dist. LEXIS 21474, No. CV 98-2871 CBM (MCx) (C.D. Cal. 1999) (court had enjoined defendant DFC from using "drawings copied or derived from Modtech's drawings.") -- see plaintiffs' Motion at 9:19-23.

Defendants further object to the provisions of Paragraph 1(b)(i) that restrain speech, e.g., injunctions against "encouraging, promoting, soliciting, or inducing, or knowingly contributing to, enabling, facilitating, or assisting, any person" who might thereafter engage in infringing activities. Such an injunction would, for example, prevent Defendants from teaching about P2P systems in a classroom or favorably commenting on P2P systems in public media. The language is so broad and elastic that it would prohibit a Defendant from accepting employment with BitTorrent.com, which is apparently an authorized distributor of movies for Fox, Paramount and Warner Bros. (Please see Request for Judicial Notice.)

In *Premier Communications Network, Inc. v. Fuentes*, 880 F.2d 1096 (9th Cir. 1989), the court reversed a permanent injunction against an owner of equipment that could view copyrighted programs without authorization through a microwave system.

> "Premier is not entitled to an injunction preventing members of the general public from using modern technology that has multiple substantial uses just because one of those uses would be the unlawful reception of its signal. On the other hand, Premier is entitled to an injunction preventing the use of the equipment unlawfully to receive its signal. We conclude that paragraph 3 is ambiguous and overbroad in accomplishing this purpose." 880 F.2d at 1101.

The same defects that led to the reversal in *Fuentes* are present here.

Of special importance is that Paragraph 1(b)(i) restrains Defendants' speech that is protected by the First Amendment. "[P]ermanent injunctions--i.e., court orders that actually forbid speech activities--are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 125 L. Ed. 2d 441 (1993)

An "injunction, so far as it imposes prior restraint on speech and publication,

constitutes an impermissible restraint on First Amendment rights." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418, 91 S. Ct. 1575, 29 L. Ed. 2d 1 (1971).

In *New.net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1084 (C.D. Cal. 2003), the Court held:

> <<The First Amendment offers no protection for false or deceptive commercial speech. [Citation.] However, truthful commercial speech does enjoy meaningful First Amendment protection. ... The Supreme Court has focused on this as a particular basis for proscribing prior restraints, observing: "[t]he special vice of a prior restraint is that communication will be suppressed . . . before an adequate determination that it is unprotected by the First Amendment." [Citation.] In other words, "[t]he danger of a prior restraint, as opposed to [an] ex post . . . action, is precisely that making predictions ex ante as to what restrictions on speech will ultimately be found permissible is hazardous and may chill protected speech." [Citation.] >>

Plaintiffs are improperly asking the Court to enjoin defendants' speech that allegedly "promotes" or "encourages" copyright infringement.

> "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it. The government 'cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts.' [Citation.] First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought. "To preserve these freedoms, and to protect speech for its own sake, the Court's First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct. [Citation]; see also *Bartnicki v. Vopper*, 532 U.S. 514, 529, 149 L. Ed. 2d 787, 121 S. Ct. 1753 (2001) ('The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it'). The government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.' [Citation.] The government may suppress speech for advocating the use of force or a violation of law only if 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.' [Citation.]"

See also *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253, 122 S.Ct. 1389,

152 L.Ed.2d 403 (2002) ("virtual" child pornography could not be outlawed from the Internet on the grounds that it "whets the appetites of pedophiles and encourages them to engage in illegal conduct." *Id*.)

In *Entertainment Software Association v. Blagojevich*, 469 F.3d 641(7th Cir. Ill. 2006), the Court struck down an Illinois statute, the SEVGL, designed to regulate "indecent" video games because the prohibition was not "narrowly tailored" as required by the First Amendment.

> "As the State concedes, the SEVGL is a content-based restriction on speech, and we must employ strict scrutiny in assessing its constitutionality. See *United States v. Playboy Entm't. Group*, 529 U.S. 803, 813, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000). To survive strict scrutiny, the SEVGL 'must be narrowly tailored to promote a compelling Government interest.' *Playboy*, 529 U.S. at 811. Generally, 'a statute is narrowly tailored only if it targets and eliminates no more than the exact source of the "evil" it seeks to remedy.' Put another way, a statute is not narrowly tailored if 'a less restrictive alternative would serve the Government's purpose.' See *Playboy*, 529 U.S. at 813. We must assure that the State does not 'burn the house to roast the pig.' [Citation.]"

469 F.3d at 646 (footnote and some citations omitted).

See also *Entertainment Software Association v. Foti*, 451 F. Supp. 2d 823 (M.D. La. 2006), where interactive video games were held to be protected speech and the Court overthrew a statute that tried to outlaw violent video games as a way of "curbing violent behavior."

In *Madsen v. Womens' Health Center, Inc.*, 512 U.S. 753, 765-766, 14 S. Ct. 2516, 129 L. Ed. 2d 593 (1994), the Court modified an injunction constraining demonstrations at an abortion clinic. holding that free speech rights required it to "ensure that the injunction was no broader than necessary to achieve its desired goals," that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" and that "the injunction [should] burden no

more speech than necessary to serve a significant government interest."[16]

---

[16] Plaintiffs hope to gloss over overbreadth problems related to their proposed injunction including the notion that:

Different rights may apply in different geographical regions and depend on where in the world content files are downloaded from or to and Torrentspy and other search engines cannot be the arbiter and cannot know ahead of time in a preemptive manner such rights;

Content files may be permissible in one geographic area or country and not in another and thus pure keyword filtering on defendants' sites is overbroad and given the notion that Torrentspy's servers are located in the Netherlands any such possible infringement is statistically likely to be extraterritorial and not actionable nor arguably under the subject matter jurisdiction of US Courts under the teachings of *Subafilms, Ltd. v. MGM-PatheCommunications Co.,*24 F.3d 1088 (9th Cir.) (enbanc), *cert. denied*, 513 U.S. 1001 (1994);

There is no defined mechanism for allowing a dot torrent search engine like defendants' to discern when a downstream file has Digital Rights Management ("DRM") encryption and thus using keyword filtering alone is overbroad as it may exclude DRM protected files that require payment or a password as a condition of opening;

There is no evidence put in the record by plaintiffs of whether or not defendants' sites had a greater or lesser percentage of torrent files that allegedly lead at some point to infringing downstream content as compared to dot torrent files found generally on the Internet as a whole. Without such an analysis, there is no foundation to find that Torrentspy induces or materially contribute to infringement merely by providing search of the dot torrent file format on the Internet as a whole, as the dot torrent files found on Torrentspy may be a comprehensive reflection of the statistical makeup of dot torrent files on the Internet as a whole on the date and time of such a search or attempted analysis and to enjoin defendants' sites is the equivalent of enjoining the Torrent file protocol on the Internet. For example it could hardly be material contribution to infringement if alleged third party content files for Google and other search engines, as they relate to torrent files retrieved via Google and other search engines, are similar to torrent files found on or linked to by defendants' sites (and thus there is little materiality or inducement if the above sites merely reflect the state of dot torrent files on the Internet as a whole) to provide an injunction in such an instance would in essence to outlaw a site from having on it a Google generic search box for anything "filetype:torrent".

Here too, if any injunctive remedy is to be imposed, it must be "narrowly tailored" to target and eliminate no more than the "exact source of the 'evil' it seeks to remedy." Such an injunction should be "no broader than necessary to achieve its desired goals." The provisions in Paragraph 1(b), 1(b)(i) and (2) are not specific but excessive and overbroad and Defendants object thereto.

**OBJECTION 5: DEFENDANTS OBJECT TO THE CONDITIONS IMPOSED ON TRANSFERS OF ASSETS UNDER PARAGRAPH 3 OF THE PROPOSED PERMANENT INJUNCTION BECAUSE THE IMPOSITION IS PUNITIVE AND WITHOUT CONNECTION TO COPYRIGHT INFRINGEMENT.**

Objection 5 presupposes that the Court has denied Objection 1 and decided to issue a Permanent Injunction that contains the chief provision of Paragraph 1(a), which prohibits Defendants from operating the “TorrentSpy System,” which term is defined at 4:16-18 of the Proposed Permanent Injunction, namely, as “the software, websites, electronic data, forums, guides, and FAQS that make up or support www.torrentspy.com.”

In Paragraph 3 of the Proposed Permanent Injunction, at 6:15-19, appears the following prohibition, to which Defendants, pre-supposing as set forth above, do not object: “Defendants further shall not engage in a Transfer of TorrentSpy-Related Assets with or to any person whom Defendants know to be engaged in conduct that would violate the terms of Paragraph 1. The prohibitions apply to “any part of the software, source code, data files, other technology, domain names, trademarks, or brands used in connection with the TorrentSpy System.”

Defendants understand these prohibitions are intended to prevent the operation of TorrentSpy.com under either Defendants’ management or under new management that acquires assets from Defendants. Pre-supposing that these provisions are at the core of a Permanent Injunction, a question is presented as to what further and additional provisions, if any, are needed to protect Plaintiffs from future injury from Defendants.

With the understanding that the foregoing provisions will be in place, Defendants object to any further injunctive provisions. In particular, Defendants object to the remainder of Paragraph 3 that would impose additional restraints on any sale, lease, give away, pledge or other transfer of Defendants' business assets. Plaintiffs propose that any transferee of such assets must sign various legal documents that apparently expose such transferee to all sorts of expense and inconvenience, and perhaps some sort of liability or sanction.

The effect of such an injunction is to destroy the value of the assets altogether. The assets become unmarketable even if they are technological commodities. Defendants cannot even "hypothecate" business assets by giving a bank a security interest in all such assets as part of a loan package for an entirely different business unless they get the bank to enter into this contentious litigation.

The effect is to punish Defendants without any connection between the devaluation of any particular business asset and the claim of copyright infringement against Defendants. Plaintiffs' vague and general Complaint, that floats above any actual infringement, becomes the justification for an all-encompassing system of punitive restraints. Plaintiffs cannot and do not specify what Defendants did that made Defendants liable for secondary copyright infringement so Defendants must be prevented from doing anything at all.

It is well settled that injunctive relief looks to the future; it is "designed to deter, not to punish." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 62, 45 L. Ed. 2d 12, 95 S. Ct. 2069 (1975) (internal quotations omitted). See also *Brennan v. Saghatelian*, 514 F. 2d 619, 622 (9th Cir. 1975), reh'g denied sub nom *Dunlop v. Saghatelian*, 520 F.2d 788 (9th Cir. 1975).

In *United States v W. T. Grant Co.*, 345 US 629, 633, 97 L Ed 1303, 73 S Ct 894 (1953), the Court held:

> "The purpose of an injunction is to prevent future violations, [citation], and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary

> determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."

See also *Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003), quoting *W. T. Grant Co.*, supra.

Defendants submit that the additional restraints on transfer of business-related assets set forth in Paragraph 3 are punitive. *Federal Election Com. v Furgatch,* 869 F.2d 1256 (9th Cir. 1989). They do not guard against "some cognizable danger of recurrent violation," but are designed simply to strike at tools and products that Plaintiffs believe have been used in unlawful ways. This is nothing more than the attempt to resurrect the ancient "desire of retaliation against the offending thing itself." Holmes, *The Common Law* (1881) at 34.

> "...vengeance, not compensation, and vengeance on the offending thing, was the original object. The ox in Exodus was to be stoned. The axe in Athenian law was to be banished. The tree, in Mr. Tylor's instance, was to be chopped to pieces. The slave under all the systems was to be surrendered to the relatives of the slain man, that they might do with him what they liked. The deodand was an accursed thing."
> (*Ibid*., footnote omitted.)

There is no reason to treat the business assets of Defendants as "accursed things" that should be so burdened with restraints as to become unmarketable and without substantial value. Such burdens are merely punitive. Plaintiffs are seeking vengeance, not guarding against future copyright infringements. Accordingly, Defendants object to Paragraph 3 of the Proposed Permanent Injunction from the beginning thereof down to the words "such an order' at 6:15-16.

Dated: April 21, 2008

Respectfully submitted,

ROTHKEN LAW FIRM

/s/

Ira P. Rothken, Esq.,
Attorney for Defendants