**Ira P. Rothken (SBN #160029)**
ROTHKEN LAW FIRM LLP
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 924-4250
Facsimile: (415) 924-2905

**Kirk J. Retz (#170208)**
LAW OFFICES OF KIRK J. RETZ, APC
21535 Hawthorne Blvd., #200
Torrance, CA 90503
Telephone: (310) 540-9800
Facsimile: (310) 540-9881

Attorney for Defendants
Justin Bunnell, Forrest Parker, Wes Parker and Valence Media, Ltd.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>JUSTIN BUNNELL, et al.,<br><br>Defendants. | **Case No. 06-01093 FMC (JCx)**<br><br>**DEFENDANTS' OBJECTIONS TO DECLARATION OF DUANE C. POZZA IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT BY THE COURT**<br><br>Date: May 5, 2008<br>Time: 10:00 a.m.<br>Judge: Florence Marie Cooper<br>Ctrm: 750 |

# TABLE OF CONTENTS


| | Page |
|---|---|
| Objection 1. Defendants object to entry of judgment in favor of Plaintiff Tristar Pictures, Inc. and/or Plaintiff Columbia Pictures Industries, Inc. or in favor of any plaintiff. Judgment should be entered in favor of Defendants. | 1 |
| Objection 2. Defendants object to the Pozza Declaration as a whole because it is not based on personal knowledge. | 3 |
| Objection 3. Defendants object to the admission of Exhibit 1. | 5 |
| Objection 4. Defendants object to all testimony involving "seeders" and "leechers." | 12 |
| Objection 5. Defendants object to all of paragraph 5 of the Pozza Declaration at 3:12-26 with the exception of the introductory clause. | 15 |
| Objection 6. Defendants object to testimony in the Pozza Declaration at 6:7-12 and at 6:14-19. | 16 |
| Objection 7. Defendants object to testimony in the Pozza Declaration at 6:20-23. | 17 |
| Objection 8. Defendants object to testimony in the Pozza Declaration at 6:24-7:6. | 18 |
| Objection 9. Defendants object to Exhibit 2. | 19 |

Defendants[1] Justin Bunnell, Wes Parker and Valence Media, LLC (hereinafter "defendants") hereby submit their Objections to the Declaration of Duane C. Pozza in Support of Plaintiffs' Motion for Entry of Default Judgment by the Court (hereinafter "the Pozza declaration") as follows:

**Objection 1.**

Defendants object to entry of judgment in favor of Plaintiff Tristar Pictures, Inc. and/or Plaintiff Columbia Pictures Industries, Inc., where the Motion in favor of such Plaintiffs is supported only by an impermissible "joint" Declaration of Rani Cherkoori which states at 2:17-18 that "Columbia or TriStar is the owner of the copyright or exclusive online distribution rights" of certain works that are listed in Exhibit 1 thereto without identification of the copyright owner. Defendants request that the Court enter judgment in favor of Defendants and against Plaintiff Columbia Pictures Industries, Inc. and against Plaintiff Tristar Pictures, Inc.

For reasons stated herein, Defendants similarly object to entry of judgment in favor of any Plaintiff, and Defendants request that the Court enter judgment in favor of Defendants and against each Plaintiff.

**Grounds for the Objection**.

Entry of default judgment is a "judicial act" of the Court that calls for " a judicial function and an exercise of the judicial power." *Pope v. United States*, 323 U.S. 1, 12; 65 S. Ct. 16; 89 L. Ed. 3 (1944); See *Markel Am. Ins. Co. v. Woolard*, 2007 AMC 2597, 2007 U.S. Dist. LEXIS 96369 (C.D. Cal. 2007).

In *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C. D. Cal. 2002), the Court held:

---

[1] The action against defendant Forrest Parker has been stayed pursuant to 15 U.S.C. § 362(a) (bankruptcy petition triggers stay of continuation of proceedings against the debtor).

<< Upon entry of default, the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true, with the exception of the allegations as to the amount of damages. See *TeleVideo System, Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987). Thus, the plaintiff is required to provide proof of all damages sought in the complaint. This process is limited by Fed. R. Civ. P. 54(c), which states that "[a] judgment by default shall not be different in kind or exceed in amount that prayed for in the [complaint].">>

The status of the case calls for final judgment. Plaintiff Tristar Pictures, Inc. is entitled to judgment only if it produces evidence in support of its claims. *Kingvision Pay-Per-View, Ltd. v. Dailey*, 2002 U.S. Dist. LEXIS 6839, No. C 01-3877 SI, (N.D. Cal. 2002), citing *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1324 (7th Cir. 1983) ("Dundee must provide evidence in support of the component damages"). This Tristar Pictures, Inc. has failed to do. See *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 (2d Cir. 1982) ("We do not believe that the Copyright Act permits holders of rights under copyrights to choose third parties to bring suits on their behalf.") Judgment cannot be entered in favor of Tristar Pictures, Inc. and should be entered in favor of Defendants and against Plaintiff Tristar Pictures, Inc. The same reasoning applies to Plaintiff Columbia Pictures Industries, Inc.

For reasons stated infra, none of the other Plaintiffs is able to prove damages and each of their claims fails for the same reason as that of Plaintiff Tristar Pictures, Inc. and that of Plaintiff Columbia Pictures Industries, Inc. Accordingly, judgment should be entered in favor of Defendants and against each Plaintiff.

**Objection 2.**

Defendants object to the Pozza Declaration as a whole because it is based, indiscriminately, not only on "personal knowledge" but also "on information provided to me by colleagues or other personnel working under my supervision on this case" as stated therein at 2:7-8. Alternatively, Defendants object to each part of the Pozza Declaration that is not based on personal knowledge or that is based on hearsay that is not supported by an expressly stated grounds for admission.

**Grounds for the Objection**.

Federal Rule of Evidence 602 provides:

> "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

Local Rule 7-7 requires that a declaration supporting a motion conform as far as possible to the requirements of F.R.Civ.P. 56(e), which requires that an:

> "affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."

An attorney's affidavit made on information and belief is properly excluded. *Automatic Radio Mfg. Co. v Hazeltine Research, Inc.* 339 US 827, 831, 70 S Ct 894, 94 L Ed 1312 (1950) *reh den* 340 US 846, 71 S Ct 13, 95 L Ed 620 (1950) (attorney's representation about practices of adverse party).

In *United States v. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970), the court held:

> "Mr. Watkins' affidavit was not made on personal knowledge; it did not set forth facts as would be admissible in evidence; and it did not show that Mr. Watkins was competent to testify to the matters stated therein."

See also *L.A. Times Communs., LLC v. Dep't of the Army*, 442 F. Supp. 2d 880, 886 (C.D. Cal. 2006) ("objections to portions of the Jonasson declaration are

SUSTAINED because it is unclear how Jonasson, in his role as General Counsel, acquired personal knowledge of the procedures for entering SIRs into the database, the role of PSCs, etc.”).

An affidavit complies with Fed. R. Civ. P. 56(e) if it presents evidence which would be admissible at trial; as general rule, this requires that affiant have personal knowledge of information contained in affidavit. *Harris v. Gonzales*, 488 F.3d 442 (D.C. Cir. 2007); *Reed v Aetna Cas. & Sur. Co.* 160 F.R.D. 572 (N.D. Ind. 1995) .

Fatal defects pervade the Pozza Declaration. The language “on information provided to me by colleagues or other personnel working under my supervision on this case” is full of ambiguities. Who are the colleagues and how do they differ from other personnel? Are the colleagues working under Pozza’s supervision? What are the sources of information accessed by the colleagues and other personnel?

Some factual statements in the Pozza declaration are expressly referenced to these colleagues and other personnel, e.g., “Persons acting under my direction” (Pozza Declaration at 2:3), “Persons acting under my direction and under my immediate supervision” (*Id*., at 3:8-9), “gathered at my direction” (*Id*., at 4:4) and “persons under my direction” (*Id*., at 6:24).

It further appears that other matters in the Pozza Declaration are matters personally known only by such colleagues and other persons but this fact is obscured by Pozza’s statements made, not as if on personal knowledge, but with some sort of personal authority that is supposed to gain admissibility for them. It is for this reason that Defendants object infra to testimony in the Pozza Declaration at 4:4-5:22 (testimony about seeders and leechers and about conclusions to be drawn from TorrentSpy records), 6:7-19 (testimony about the “likely” existence of evidence not presented to the Court, about files sizes “Typically” and about the meaning of file size) and 6:24-7:6 (testimony about the nature and meaning of

"User comments" at TorrentSpy and about the relationships of "User comments" to other evidence).

None of these matters is admissible because none is supported by Pozza's personal knowledge. No backup documentation is presented. No one stands up to explain the methods used to assemble the Exhibits.

The Court should strike the entire Pozza Declaration. Defendants object to the Pozza Declaration and to each part of it that does not show Pozza's personal knowledge of the testimony therein.

**Objection 3.**

Defendants object to the admission of Exhibit 1.

**Grounds for the Objection**.

a. Exhibit 1 lacks foundation in that the sources of information are not stated. The Exhibit does not comply with the requirements of Federal Rule of Civil Procedure 1006. *United States v Johnson* (1979, CA9 Ariz) 594 F2d 1253, cert den (1979) 444 US 964, 62 L Ed 2d 376, 100 S Ct 451 ("requiring the proponent to show the admissibility of the underlying materials is necessary to protect the integrity of the Federal Rules"); *United States v. O'Brien*, 601 F.2d 1067, (9th Cir. 1979); *United States v. Pelullo*, 964 F.2d 193 (3d Cir. 1992) (summary was inadmissible under Federal Rule of Evidence 1006, because the underlying materials upon which the summary was based were out-of-court statements.) See also Objection 2, supra. As stated in *Stephens v. Liberty Mut.*, 2008 U.S. Dist. LEXIS 12243, No. C 05-0213 PJH (N.D. Cal. 2008):

> "Exhibit A includes what purport to be excerpts of trial testimony of a number of witnesses. However, the trial testimony is not authenticated (not certified by reporter) and lacks foundation. [Citation.] Moreover, plaintiffs provide no clue as to who these individuals are. Indeed, Ms.

Chang's declaration does not even provide the witnesses' names."

There is a comparable situation here. Plaintiffs provide no clue as to who the individuals are who gathered and assembled Exhibit 1. Plaintiffs do not even provide the witnesses' names. Plaintiffs' declarants had no factual basis to support direct infringement by third parties at the time their depositions were taken in August, 2007. (see Excepts of Depositions of plaintiffs' Declarants attached as Exhibits B-G to the Declaration of Jared R. Smith.) The 30(b)(6) witnesses for plaintiffs testified in pertinent part as follows:

Albert Cheng, for Disney at 43:20-44:25 and 65:16-23:

43

Q Is your company aware of any specific person or entity that's ever downloaded Grey's Anatomy 2112 arising out of a Torrent file obtained from torrentspy.com?
A I don't know.
Q Who would be the person most knowledgeable in your company on that?

44

A The anti-piracy group.
Q And who in the anti-piracy group?
A I don't know specifically.
Q Is your company aware of any specific individual or entity that has ever downloaded any unauthorized copyrighted work arising out of a Torrent file downloaded from torrentspy.com?
MS. FALLOW: Objection; vague and ambiguous to the extent you're not talking about the evidence that we've produced in this case of the downloading of that episode.
BY MR. ROTHKEN:
Q Go ahead and answer the question.
A I don't know.
Q Who would be the person most knowledgeable in your company on that?
A Anti-piracy group.

Q Who in the anti-piracy group?
A I don't know.
Q Has your company ever communicated in writing with any of the defendants in this case?
A I don't know.
Q Has your company ever sent any cease and desist letter to any of the defendants in this case?
A The company has not.

65

Q Is your company aware of any person who's ever downloaded Grey's Anatomy, It's the End of the World, using torrentspy.com?
MS. FALLOW: Objection; asked and answered on multiple occasions.
BY MR. ROTHKEN:
Q You can answer it.
A I don't know.

Rani Cherkoori, for Columbia & TriStar at 17:10-22 and 36:4-37:17:

17

Q Okay. Do you know whether or not -- well, strike that.
Has your company ever sent a DMCA notice to any of the defendants in this case?
MS. FALLOW: Objection; calls for a legal conclusion as to "DMCA notice."
BY MR. ROTHKEN:
Q You can answer.
A To my knowledge, I'm not aware of any.
Q Has your company ever sent out any written communication at all to any of the defendants in this case?
A To my knowledge, I'm not aware of any.

36

Q Is your company aware of any specific persons or entities that ever downloaded any audiovisual files using

torrents found on torrentspy.com which audiovisual files are those indicated as being controlled by your company in Exhibit A?
MS. FALLOW: Objection; vague and ambiguous.
You can answer --
BY MR. ROTHKEN:
Q You can answer.
MS. FALLOW: -- if you understand it.
THE WITNESS: You're asking me whether my company is aware of files that have been downloaded off torrentspy.com?
BY MR. ROTHKEN:
Q All right. Let's start with that. Is your company aware of any files that specific persons or entities that have ever been downloaded from torrentspy.com?
A Yes.
Q Tell me all such.
A I don't think I can reveal that without disclosing attorney-client communications or work-product

37

I think -- I do need to confer further with my company.
Q All right. Go ahead and confer.
Let the record reflect that they're walking out while the question is pending to confer on this issue.
MS. FALLOW: We're conferring on privilege.
(Recess was held from 11:00 to 11:02)
BY MR. ROTHKEN:
Q All right. We're still on the record.
You understand that you're still under oath?
A I do.
Q All right. Do you have an answer to the pending question?
A My company is aware of the downloading of the material through the investigation that was conducted by the Motion Picture Association.
Q Anything else?
A Personally, no.

Steve Kang for Universal City & Universal Studios at 112:21-119:11 and 122:7-16:

112

Q Are you aware or is your company aware of
anyone who has ever used TorrentSpy.com whose
downloaded a copy of the motion picture Daylight?
A Yes.
Q Tell me all such instances.

113

A My understanding is that someone working
at the direction of Jenner and Block, specifically
downloaded Daylight from TorrentSpy.
Q Any others?
A I'm not aware of any specific instances.
No.
Q Who was the person who downloaded Daylight
that you are aware of?
A I believe the person was Bruce Ward.
Q Was Bruce Ward authorized by your company
to download Daylight?
A From TorrentSpy?
Q Yes.
A Yes.
Q Okay. He was not committing copyright
infringement when he did that?
MS. FALLOW: Objection. Calls for a legal
conclusion.
THE WITNESS: Bruce Ward would not have
been an infringer.
BY MR. ROTHKEN:
Q So he downloaded a torrent from
TorrentSpy.com that he then used to download
Daylight?
MS. FALLOW: Objection. Lack of

114

foundation.
BY MR. ROTHKEN:
Q If you have to guess, tell me.
A That is my understanding.
Q Ignorance is testimony, too.
A That is my understanding.
Q What's the basis for the understanding?
A I mean again this is something where I can't point to any conversation. It is my understanding, working on the case.
Q Do you know how bit TorrentSpy works?
A Now you will put me in an unfair position. Yes. I have a rough understanding. I have -- I have a general understanding. I would not say I have a detailed understanding.
Q So you understood that after Mr. Ward downloaded a torrent from TorrentSpy.com, he had to start up specialized business torrent software to get the Daylight movie work?
MS. FALLOW: Objection. Lack of foundation.
BY MR. ROTHKEN:
Q You can answer.
A Again, I don't know the specifics of how Mr. Ward did his work on this case. But that is

115

consistent with my understanding of how it works.
Q Have you ever used a bit torrent client?
A Yes.
Q how many bit torrent clients did you use?
A I'm not sure.
Q But the way it worked was that you would double click and start the bit torrent client?
MS. FALLOW: Lack of foundation.
BY MR. ROTHKEN:
Q You can answer.
A Yes. You would start the bit torrent client.

Q You would load up a torrent file?
A Yes.
MS. FALLOW: Objection.
BY MR. ROTHKEN:
Q Then download an audio work or audio visual work?
MS. FALLOW: Objection. Lack of foundation.
BY MR. ROTHKEN:
Q You can answer.
A Yes.
Q You are setting a record for objections. I have to tell you.



MS. FALLOW: You are setting a record for improper questions.
MR. ROTHKEN: I don't agree with that. He is not two years old. He used the software.
Q Did you ever use it as it relates to torrents you used from TorrentSpy.com?
A I don't recall.
Q Did you register to become a user of TorrentSpy.com?
A I don't recall.
Q You don't recall?
A It's possible I did.
Q When would be the date for that?
A I have no idea.
Q Was it before or after litigation commenced?
A I don't know.
Q Did anyone in your company besides you ever register to become a user in TorrentSpy.com?
A I don't know.
Q Did you make any inquiry before coming here today to determine that?
A Yes.
Q What was the result of the inquiry?

A I don't recall. The inquiries were made

117

around the time of the document production. It was a while ago.

Q What was the result of the inquiry?

A I don't recall.

Q Did you or your did your company ever upload any torrents of TorrentSpy.com?

MS. FALLOW: I instructed the witness not to answer the question last time you asked it.

BY MR. ROTHKEN:

Q Did your company ever upload any torrents that have the word Daylight in them to TorrentSpy.com?

MS. FALLOW: I object. Don't answer. It is precluded by the July 27 order.

BY MR. ROTHKEN:

Q Now, to the best of your knowledge, besides Mr. Ward, is your company aware of any person anywhere in the world that has used a TorrentSpy file found on TorrentSpy.com to download copyrighted works as mentioned in Exhibit A named Daylight?

A We believe a number of people would have used TorrentSpy to download Daylight.

Q Tell me all persons.

A I don't have their names.

Q What's the basis for that belief?

118

A The basis would be the work of -- of the person acting at direction of counsel, Mr. Ward.

The -- just the popularity of TorrentSpy and the -- the presence of Daylight on TorrentSpy.

You know when we get further documentation from your clients regarding the use of the servers, if we were to look at those, that would supplement our understanding.

Q Now, you would agree that you are not aware of Daylight as manifested in Exhibit A ever

actually appearing on the TorrentSpy.com site?
MS. FALLOW: Objection. Vague and ambiguous.
BY MR. ROTHKEN:
Q You are not aware of the copyrighted work Daylight actually being posted by TorrentSpy.com?
A Being what?
Q Posted.
MS. FALLOW: Objection. Vague and ambiguous.
BY MR. ROTHKEN:
Q You can answer.
A No.
Q And you don't know which of any of the search results that you got today actually led to your

119

company's copyrighted work Daylight; true?
A True.
Q In order to know that, you would have to have had downloaded torrent files from those search results and loaded them up into your bit torrent client and viewed the resulting works; correct?
MS. FALLOW: I will object. Vague and ambiguous about how Bit Torrent works.
BY MR. ROTHKEN:
Q You can answer.
A Yes. That would be a way to do it.

122

Q So just to clarify the record, you are not aware factually, you don't have any factual knowledge, that any of the defendants in this case ever downloaded audio or audio visual work arising out of any torrent file downloaded from TorrentSpy?
A That is correct.
Q It's correct the answer is you have no idea?
A I don't have specific knowledge of them

doing so.

David Kaplan for Warner Bros. at 41:2-42:23:

41

Q Okay. Taking a look at Exhibit A --
A To the complaint?
Q -- yes -- is your company aware of any specific individuals or entities that have ever downloaded copies of the four titles included in Exhibit A that are -- we'll just use the word -- owned or controlled by Warner Bros., using torrents downloaded by torrentspy.com?
A I don't know.
Q Okay. Are you the person most knowledgeable in your company on that issue?
MS. FALLOW: Object to the extent there's a suggestion the term "person most knowledgeable" has a legal significance.
BY MR. ROTHKEN:
Q You can answer.
A I don't know.
Q Do you know who in your company would know?
A I don't know, no.
Q All right. Something to be said about honesty.
Is your company aware of any specific individuals or entities that have ever downloaded any unauthorized copyrighted works using torrent files from torrentspy.com?
MS. FALLOW: Objection to the extent you're

42

asking other than the work-product that we have produced in this case for the Exhibit A works.
Are you asking beyond?
MR. ROTHKEN: It includes any copyrighted work.
Q Go ahead and answer the question.
A I am not aware of any other than the work-product generated by counsel in this case.
Q Okay. So are you aware -- is your company aware

of any specific individuals or entities that have downloaded any unauthorized copyrighted works using torrent files obtained from torrentspy.com?

MS. FALLOW: I'll make the same objection as to the last question which I believe was asked and answered.

THE WITNESS: Can you read back the question.

(The record was read as follows:

Q Okay. So are you aware -- is your company aware of any specific individuals or entities that have downloaded any unauthorized copyrighted works using torrent files obtained from torrentspy.com?)

THE WITNESS: Same answer. Other than what counsel has done in this case, no.

Alfred Perry for Paramount at 27:1-28:25:

27

Has your company ever downloaded audio or audio visual works arising out of torrents from TorrentSpy.com?

MS. FALLOW: You should not answer. If there is any, if there is a factual answer, you may give it.

THE WITNESS: It would be work product. If someone had done that, then it would have been something that should be work product.

BY MR. ROTHKEN:

Q You are not aware of anyone doing it?

A Right.

Q Is your company aware of any entity or person, not a party to this case, who has ever downloaded any of your company's copyrighted works arising out of a torrent they downloaded from TorrentSpy.com?

A My company has a general awareness that as set out in the complaint that there is widespread uploading and downloading of our works on sites such as TorrentSpy.

Q That was not my question. I am move to strike. I may get to that question.
My question is: Is your company aware of any specific individual or individuals or entities that

28

have downloaded your company's copyrighted works by using a Torrent file they obtained from TorrentSpy.com?
A I don't think that was the question from before.
Q Fair enough.
A People other than those under the direction of counsel who investigated with respect to this, a specific individual, no.
Q Are you aware of any persons or entities who have downloaded your company's copyrighted works using Torrent files obtained from TorrentSpy.com?
MS. FALLOW: Are you asking about downloading works other than Exhibit A, the work listed in Exhibit A?
BY MR. ROTHKEN:
Q You can answer the question "yes" or "no" to the question.
A My company has a general awareness of persons, numerous persons uploading and downloading motion pictures on sites such as TorrentSpy.
Q How about specific persons or entities? Is your company aware of any they could name?
A I am not aware of that specific information.

and Jane Sunderland for Twentieth Century Fox at 47:8-49:10 and 83:6-84:14:

47

All right. What is your understanding of what "pending" means that's manifested in Exhibit A next to the -- next to the entry for the Simpsons?
A It's my understanding that at the time that the complaint was filed that the certificate had not been

issued by the copyright office or had not been returned
by the copyright office.
Q Uh-huh. To the best of your knowledge, has --
to the best of your company's knowledge, obviously, has
anyone ever used a torrent file from torrentspy.com to
download the Simpsons See Homer Run?
A I'm sorry. Could you repeat -- can you reread
that back for me?
(The record was read as follows:
Q To the best of your knowledge,
has -- to the best of your company's
knowledge, obviously, has anyone ever
used a torrent file from torrentspy.com



to download the Simpsons See Homer
Run?)
THE WITNESS: Well, we are aware that evidence
was gathered for this case.
BY MR. ROTHKEN:
Q Is that it?
A And there's additional evidence that was
collected at that time relating to this particular title.
Q Anything else?
A And then we're relying on counsel and
investigators for that evidence.
Q So is the answer no?
MS. FALLOW: Objection; that mischaracterizes
her testimony.
THE WITNESS: Fox doesn't have any specific
evidence.
BY MR. ROTHKEN:
Q Okay. Is Fox aware of the names of any persons
who used torrent files gathered from torrentspy.com to
download the Simpsons See Homer Run episode?
MS. FALLOW: Objection. Other than what she's
just testified?
BY MR. ROTHKEN:
Q You can answer the question.

A Fox does not have that evidence.

49

Q Okay. Is Fox aware of any person or entity that used a torrent file obtained from torrentspy.com to, in an unauthorized manner, download the Simpsons See Homer Run episode?
MS. FALLOW: Objection; vague and ambiguous, calls for speculation.
Did you say unauthorized or authorized?
MR. ROTHKEN: I said unauthorized.
Q You can answer it.
A It would call for speculation.

83

Q Are you aware of any specific individuals -- when I say "you" I mean your company -- strike that. I'll start over again.
Is your company aware of any specific individuals who ever downloaded copyright infringing works arising out of torrent files downloaded from torrentspy.com?
MS. FALLOW: Objection; asked and answered.
BY MR. ROTHKEN:
Q You can answer it.
A We are aware of the evidence collected for this case, and I don't have -- Fox does not have specific evidence outside of that.
Q Okay. Does Fox have any specific knowledge or understanding of any individuals or entities that downloaded any copyright infringing works arising out of torrent files downloaded from torrentspy.com, yes or no?
MS. FALLOW: I'm objecting to this line of questioning to the extent it's going beyond the Exhibit A works which is what this deposition is limited to.

84

BY MR. ROTHKEN:
Q You can answer the question.

A Regarding the Exhibit A work, we don't have the specific evidence. Fox does not have those records.
Q Okay. I'm going beyond specific A works. I'm asking for any and all copyright infringement.
MS. FALLOW: Then I'm instructing the witness not to answer. The court has already made a ruling on this.
This is actually a good time for me to state for the record that the representation that I made at the commencement of the Universal deposition yesterday which I said would apply to all of these 30(b)(6) depositions I'm incorporating by reference here.

Plaintiffs lacked foundation for any actionable infringement at the time of these depositions and that defect has not been remedied by the evidence presented in this motion.

b. Exhibit 1 is not properly authenticated as required by Federal Rules of Evidence 901. It is impossible to ascertain what parts of it were put in place by a person on an item-by-item basis and which parts of it were put in place by automated programs. As to those parts that were put in place by a person, the person is not disclosed. For those parts created automatically, authentication has even more severe defects. As stated in *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 545-546 (D. Md. 2007):

<< Although Rule 901(b)(1) certainly is met by the testimony of a witness that actually drafted the exhibit, it is not required that the authenticating witness have personal knowledge of the making of a particular exhibit if he or she has personal knowledge of how that type of exhibit is routinely made. WEINSTEIN at § 901.03[2].[22] It is necessary, however, that the authenticating witness provide factual specificity about the process by which the electronically stored information is created, acquired, maintained, and preserved without alteration or change, or the process by which it is produced if the result of a system or process that does so, as opposed to boilerplate, conclusory statements that simply parrot the elements of the business record exception to the hearsay rule, Rule 803(6), or public record exception, Rule 803(8).>>

[[22] "Oftentimes a witness need not be familiar with specific exhibits to be sufficiently knowledgeable to authenticate or identify them. Business records and records of government agencies, for example, are frequently authenticated by witnesses who have never seen the specific records that comprise the exhibits and know nothing about the specific information they contain. Their authentication is accomplished when a witness identifies the exhibits as documents of a type that the organization typically develops, and testifies about the procedures the organization follows in generating, acquiring, and maintaining documents of that type, and explains the method by which the specific exhibits were retrieved from the organization's files. Similarly, exhibits that are automatically produced upon the occurrence of specified events may be authenticated by the testimony of persons with knowledge of the system or process that results in the production of the exhibit." (footnote omitted)).>>

See also *In Re Vee Vinhnee*, 336 B.R. 437 (9th Cir. BAP (Cal.) 2005) (American Express did not properly authenticate computerized information).

c. Defendants further object to the information in Exhibit 1 on the grounds that such information appears to be based on hearsay that is inadmissible under Federal Rules of Evidence 802 and 803. The data in Exhibit 1 is based on information provided to Pozza by unnamed and unidentified "colleagues or other personnel working under my supervision on this case" that are the subject of Objection 2. Such persons appear as sources throughout the Pozza Declaration. e.g. at 2:17, 3:8-9, 4:3-5 and 6:24-25. It is impossible to ascertain what other unnamed and unidentified sources are responsible for the "Seeder - Leecher Sums" on which Plaintiffs rely.

d. Exhibit 1 is not based on the Complaint and no amendment to the Complaint has been sought. Plaintiffs cannot proceed as if they had amended to Complaint to allege infringement of 3699 copyrights when they have not amended the Complaint. Fed. R. Civ. P. 54(c), provides: 'A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment." The judgment sought here differs in kind and amount from that prayed for and should not be entered. See *Fong v. United States*, 300 F.2d 400 (9th Cir. 1962); Silge v. Merz, 510 F.3d 157 (2d Cir. 2007); *Growth Properties, Inc. v. Klingbeil Holding Co.*, 419 F. Supp. 212 (D. Md. 1976).

e. Exhibit 1 is not relevant to prove copyright infringement. Federal Rule of Evidence 402 provides that evidence that is not relevant is not admissible.

Exhibit 1 is intended by Plaintiffs to serve as the factual predicate for the following proposition from Plaintiffs' Motion for Entry of Default Judgment at 15:18-21:

> "the undeniable fact that dot-torrent files corresponding to the Claimed Works were publicly available through TorrentSpy is sufficient as a

matter of law to establish direct copyright infringement."

That is, the function of Exhibit 1 in Plaintiffs' case is to establish that there are 3699 Claimed Works where filenames on dot-torrent files indexed by Defendants appeared to Plaintiffs' agents to suggest that the dot-torrent file led to infringing materials. However, even if one were to concede, for the sake of argument, that such were the case, there is a leap seven leagues long that Plaintiffs must make from such a position before they can reach the conclusion they consider "undeniable," with a certainty that is "sufficient as a matter of law," namely that, in each case, there was direct copyright infringement for which Defendants are responsible in a secondary way.

To prevail in this action[2] for secondary copyright infringement, plaintiffs "must establish that there has been direct infringement by third parties." To prevail in this action for secondary copyright infringement, plaintiffs "must establish that there has been direct infringement by third parties." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001); *Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (failure to identify any direct infringer other than plaintiffs' counsel). Plaintiffs must also establish that any direct infringments were not extraterritorial and occurred in the United States and that there is subject matter jurisdiction regarding such infringments. Subafilms, Ltd. v. MGM-PatheCommunications Co.,24 F.3d 1088 (9th Cir.) (enbanc), cert. denied, 513 U.S. 1001 (1994). It is axiomatic that subject matter jurisdiction could never be waived and indeed could be raised for the first time on appeal.

Plaintiffs fail to connect the downloading of a dot-torrent file from Defendants'

---

[2] Defendants incorporate by reference as though fully set forth herein their arguments regarding plaintiffs' failure to state a claim set forth in defendants opposition to plaintiffs motion for permanent injunction.

website and server located in the Netherlands with any actual infringement. Nor do they have a proper foundation or any admissible evidence of substantial similiarity to works allegedly registered with the US Copyright office. (Nor did they plead a Lanham Act claim that may apply to file names or marks.)

Indeed, given that the only attempt at "evidence" in the motion papers are the names of torrent files such has not been shown to be "Federal Intellectual property". Torrent files listed by Torrentspy.com were created by third parties, and thus claims as manifested in the motion for default related to such Torrent files are preempted by the immunity provided by the Communications Decency Act (CDA). The CDA prohibits suits against interactive service providers for content created by third parties - except for claims involving Federal Intellectual property (which intellectual property or relation to a copyright infringing work in the US has not been put into evidence in the motion).. To get from downloading such a file from Defendants' website to actual content requires a sequence of acts whose success depends on the activities of third parties and the availability of the desired download. The user downloading the file must have a BitTorrent client application like Azureus or µTorrent running; the client application must load the dot-torrent file and the dot-torrent file must have valid information; at least one of the trackers listed in the dot-torrent file must be in touch with a swarm that is, at that moment, exchanging files containing the desired content; the user's BitTorrent client application must make contact with a tracker in touch with a swarm and return a list of Internet Protocol addresses of other users participating in the swarm; the user's BitTorrent client application must establish a peer-to-peer relationship with at least one other user in the swarm and such other user must send content to the user who is seeking content. Of course, Defendants have no part in the sequence of action that occurs subsequent to the downloading of a dot-torrent file.

Plaintiffs' approach simply jumps over all the intermediate steps. There is no

precedent for such a jump. There is nothing but inadmissible conjecture that would support an inference of direct infringement from the act of downloading a dot-torrent file and the court should deny admission to such evidence. It is in the nature of expert testimony and Pozza does not attempt to qualify as an expert. Federal Rules of Evidence 701 and 702; *United States v. White*, 492 F.3d 380 (6th Cir. 2007) (review of authorities, including *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005), where the court ruled: "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life"). See Objection 4(c) infra for further discussion of lay opinion and expert opinion. In fact, the individual plaintiffs presented as their expert, Prof. Ellis Horowitz, testified at deposition to the fact that torrentspy.com does not host or link to content and that defendants have in place systems to block links to torrents claimed by copyright owners to be associated with their copyrighted content. (see Excerpts of Professor Ellis Horowitz, set forth in paragraph 2 and attached as Exhibit A to the Declaration of Jared R. Smith.)

It is known from statements of Plaintiffs' counsel in this case that Plaintiffs put counterfeit dot-torrent files, called "spoofs," into circulation. "Spoofs" are files promulgated by Plaintiffs that purport to lead users to infringing materials but are really designed to disappoint and frustrate the would-be copier. The problem such tactics present to this litigation, as stated by Plaintiffs' counsel during a discovery hearing, was that "we're claiming that they are infringing the full run feature motion picture of the Godfather but at the same time the copyright owner has put out a fake version of the Godfather." (Transcript of Hearing Before the Magistrate Judge of February 13, 2007 (11:25 a.m. to 1:05 p.m.) - copy attached hereto as Exhibit A - at 56:19-21.) According to Plaintiffs' counsel:

> "copyright owners across the entertainment industry have been reported to put out fake files, files that are not what they purport to be. It might be

> something that is trying to look just like the real thing, labeled just like the real thing, but it will have -- maybe start with five seconds of the real thing and then be white noise or be an anti-piracy message." (*Id.*, at 43:14-20.)

Counsel for Plaintiffs declared: "Copyright owners don't allege infringement for what is sometimes colloquially referred to as spoofs. That's an anti-piracy measure, your Honor." (*Id.*, at 44:19-21.) "We are not claiming that the spoofs, to the extent they are distributed, are copyright infringement." (*Id.*, at 49:7-9.)

Apparently, Plaintiffs are now doing what Plaintiffs' counsel declared they would not do. "Spoofs" have been promulgated but there has been no attempt to check the listings in Exhibit 1 for spoofs. The Exhibit is unreliable as to the most important point in issue and it should not be admitted into evidence.

The defects in plaintiffs' proof have nothing to do with any of Defendants' discovery misconduct. Defendants' discovery misconduct should not be a basis for findings in favor of Plaintiffs when there is no connection between such misconduct and the finding Plaintiffs desire. For example, Defendants' discovery misconduct does not establish that Defendants willfully infringed copyrights. Even as portrayed by Plaintiffs, Defendants' discovery misconduct was based on the determination of Defendants to preserve the privacy of its visitors and its own privacy. (See Plaintiffs' Motion at 3:10-25, 12:15-13:18.) But this is very different from saying that "defendants acted 'with knowledge that the defendant's conduct constitutes copyright infringement.' *Peer Int'l v. Pausa Records, Inc.* 909 F.2d 1332, 1335-36 & n.3 (9th Cir. 1990) (quoting 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 1404[b] at 14.40.2-3 (1989)." Plaintiffs' Motion for Entry of Default Judgment at 5:22-25. Defendants' position, stated in their accompanying Declarations, is that they have never known that running a torrent site constitutes copyright infringement and they do not know it now.

Plaintiffs insist on finding a basis for their damages claims in the findings of the Court as to discovery misconduct. But they have never explained, despite repeated demands by Defendants, how "server log data" would have spanned the seven-league jump from the downloading of a dot-torrent file to proof of direct infringement. All that 'server log data" would have established is that dot-torrent files were downloaded, which is assumed in this Objection.

f. Defendants especially object to the "Seeder - Leecher Sums" that are incorporated into Exhibit 1. See Objection 4, infra. Pozza does not authenticate such evidence or provide a foundation for its admission. Yet "Seeder - Leecher Sums" are the pivot of Plaintiffs' evidence, on which they particularly rely in their argument about direct infringement. (Plaintiffs' Motion for Default at 10:20 - 12:14.) Defendants also object to testimony about "categories" that are incorporated into Exhibit 1. See Pozza declaration at 6:20-23 and Objection 7, infra.

**Objection 4.**

Defendants object to all testimony involving "seeders" and "leechers," namely, the following portions of the Pozza Declaration: 3:7-11 and 4:4-5:22 and as incorporated in Exhibit 1.

**Grounds for the Objection**.

a. The testimony about "seeders" and "leechers" at 3:7-11 and 4:4-5:22 of the Pozza Declaration and incorporated in Exhibit 1 lacks foundation in that the sources of information and the methods used to assemble the information are not stated. See Objections 2 and 3(a), supra. As before, Plaintiffs provide not the slightest bit of information about the identity of the persons who extract, interpret and prepare the information for presentation to the Court.

Statements about the "Seeder-Leecher Sum" (Pozza Declaration at 4:10) are

without foundation. For example, there are four distinct Searched Databases Plaintiffs obtained from TorrentSpy. (See Pozza Declaration at 2:17-3:3.) But the only reference for supposed data about the "seeders" and "leechers" is that these are "associated with the content file at or near the time of the database capture." (*Id*., at 3:7-8.) Even if the vagueness of "associated with" and "at or near" are ignored, there remains the questions of WHICH database? There remains the question of whether data from one database was preferred over that from another. When Plaintiffs say that "seeder/leecher statistics represent a snapshot at a given moment in time of users currently online..." (Pozza Declaration at 4:23-24), they create ambiguities as to "which moment in time" and how the "representation" is constructed.

Without establishing a foundation, introducing evidentiary support or offering any showing of expertise, Pozza renders opinions about complex factual matters, e.g., "Generally, the more seeder and leechers that are online and distributing all or pieces of the content file associated with the dot-torrent file – *i.e.*, the more 'sources' that are online offering the distribute the content file – the faster and more reliably the content file would be expected to download." (Pozza Declaration at 4:18-22.) Defendants object thereto. Defendants also object to conclusions that lack foundation, namely, "associated with" (Pozza Declaration at 3:7-8). "Defendants gathered and published" (*Id*., at 4:11 and 4:15-16), "business purposes" (*Id*., at 4:16), "TorrentSpy website explained" (*Id*., at 4:17), "generally reflected what was called" (*Id*., at 4:17-18), "would vary, perhaps considerably" (*Id*., at 4:25), "might have" (*Id*., at 4:26-27), "Defendants' website encouraged users" (*Id*., at 5:4-5)

b. The testimony about "seeders" and "leechers" at 3:7-11 and 4:4-5:22 of the Pozza Declaration and incorporated in Exhibit 1 is not properly authenticated as required by Federal Rules of Evidence 901. See discussion in connection with

Objection 3(b) and *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 545-546 (D. Md. 2007), supra.

c. The testimony about "seeders" and "leechers" at 3:7-11 and 4:4-5:22 of the Pozza Declaration and incorporated in Exhibit 1 is "based on scientific, technical, or other specialized knowledge" and requires testimony by a qualified expert under Federal Rule of Evidence 702, not lay testimony under Federal Rule of Evidence 701. Pozza does not attempt to qualify himself as an expert.

The distinction between lay testimony and expert testimony was analyzed in the light of numerous authorities in *United States v. White*, 492 F.3d 380 (6th Cir. 2007), which noted that:

> <<In 2000, the drafters amended Rule 701 to foreclose lay witness testimony "based on scientific, technical, or other specialized knowledge" -- testimony more properly given by a qualified expert. In amending the Rule, the drafters intended to preclude a party from surreptitiously circumventing "the reliability requirements set forth in Rule 702 . . . through the simple expedient of proffering an expert in lay witness clothing" and to "ensure[] that a party will not evade the expert witness disclosure requirements set forth in . . . Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson." Fed. R. Evid. 701 advisory committee's note (2000).>> 492 F.3d at 400-401.

The *White* court held that evidence about the Medicare system must be given by an expert:

> "The Medicare program operates within a complex and intricate regulatory scheme and we cannot say that the average lay person, including any Medicare beneficiary, commands a working knowledge of Medicare reimbursement procedures." *Id.*, at 403.

Likewise, here, it cannot be said that the average lay person commands a

working knowledge of “seeders” and “leechers” in BitTorrent technology and about the ways those concepts are organized to provide meaningful data.

The court in *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd*., 2007 U.S. Dist. LEXIS 16356, CASE NO. 02 CV 2258 JM (AJB) (S.D. Cal. Mar. 7, 2007) rejected an expert’s opinion as being without foundation and stated:

> <<Under the Federal Rules of Evidence,
>
>> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> Fed. R. Evid. 702. Before admitting expert testimony, the trial court must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The *Daubert* analysis applies to all experts, not only scientific experts. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). The proffered expert must be "qualified . . . by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702. The party offering the expert bears the burden of establishing that Rule 702 is satisfied. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 592, n.10)).

The testimony about “seeders” and “leechers” is inadmissible either as lay opinion or as expert opinion. But opinion it certainly is. Such testimony ought to be excluded.

d. Defendants further object to the the testimony about “seeders” and “leechers” at 3:7-11 and 4:4-5:22 of the Pozza Declaration and incorporated in Exhibit 1 on the grounds that such testimony appears to be based on hearsay that is inadmissible under Federal Rules of Evidence 802 and 803. The data in Exhibit 1 is based on information provided to Pozza by unnamed and unidentified “colleagues or other personnel working under my supervision on this case” that are the subject of Objection 2. It is impossible to ascertain what other unnamed and unidentified sources are responsible for the “Seeder - Leecher Sums” on which Plaintiffs rely.

**Objection 5.**

Defendants object to all of paragraph 5 of the Pozza Declaration at 3:12-26 with the exception of the introductory clause, namely, “Each dot-torrent file listed on Exhibit 1 has a title that matches a Claimed Work.”

**Grounds for the Objection**.

a. The testimony is in the nature of opinion evidence governed by Federal Rule of Evidence 702 and Pozza is not qualified as an expert. See Objection 4(c), supra. and Objections 6(b) and 6(c), infra.

b. The testimony appears to be hearsay that is inadmissible under Federal Rules of Evidence 802 and 803. Because of the opacity of the testimony, it is impossible to ascertain the sources of information. Opinions and hearsay terms at issue are expressed in such words as “indicates,” “metadata indicating,” “or otherwise corresponds,” “a large number,” “using terminology that indicates their source,” [numerous examples omitted], “commonly recognized video file formats,”

and "also often contain information."

**Objection 6.**

Defendants object to testimony in the Pozza Declaration at 6:7-12, beginning with "For most, if not all,..." through to the end of the paragraph and the testimony at 6:14-19, beginning with "Typically, motion pictures have file sizes over 500 MB..." through to the end of the paragraph.

**Grounds for the Objection**.

a. The testimony is irrelevant. It is ironic that Plaintiffs refer to the "time constraints of putting Exhibit 1 together" at 6:8-9 when all other facts and details about "putting Exhibit 1 together" have been withheld. Testimony about "likely additional dot-torrent files" that would have been uncovered if Plaintiffs had sufficient time has no bearing on Plaintiffs' present claims. Are Plaintiffs suggesting that their claims constitute some sort of lenity on their part?

The testimony at 6:14-19 is also irrelevant. There is no suggestion that file length was one of the "compelling indicia" that caused a dot-torrent file to be identified as one where a copyright was infringed and for which infringement Defendants are to be held liable. See Pozza Declaration at 3:8-11.

The testimony is refuted by Plaintiffs' own offered evidence. Contrary to Pozza's testimony about what a file length indicates, review of Exhibit 1 shows wide divergences in file lengths. "Disney's 101 Dalmations" (Exhibit 1, p. 8) has two entries with file lengths of 734 MB and 4429 MB. "13 going on" (*Ibid*.) has 12 entries with 1 entry of length 571 MB, 8 entries of length 734 MB, 1 entry of length 745 MB, 1 entry of length 1469 MB and 1 entry of length 4736 MB.

b. The testimony is in the nature of opinion evidence governed by Federal Rule of Evidence 702 and Pozza is not qualified as an expert. See Objection 4(c), supra. and the discussion of Exhibit 1 re file lengths in sub-objection (a) supra.

c. The testimony appears to be hearsay that is inadmissible under Federal Rules of Evidence 802 and 803. Because of the opacity of the testimony, it is impossible to ascertain the sources of information. Opinions and hearsay terms at issue are expressed in such words as "most, if not all," "non-exhaustive," "unable," "likely additional dot-torrent files," "many of the Claimed Works that are not listed in Exhibit 1," "corresponding," (by measurement or by report of Torrentspy?), "Typically," "in some cases – for example," "depending on the format used," "quality of the encoding" and "indicates that the content file is of a size."

**Objection 7.**

Defendants object to testimony in the Pozza Declaration at 6:20-23 and to the incorporation of the subject matter of the testimony in Exhibit 1.

**Grounds for the Objection**.

a. There is no showing of personal knowledge on the part of the affiant. See Objection 2, supra.

b. The testimony lacks foundation. The Exhibit does not comply with the requirements of Federal Rule of Civil Procedure 1006. See *United States v Johnson* (1979, CA9 Ariz) 594 F2d 1253, cert den (1979) 444 US 964, 62 L Ed 2d 376, 100 S Ct 451 in connection with Objection 3(a), supra. The key phrases in the challenged testimony are "were sorted on TorrentSpy" and "categories by TorrentSpy to organize dot-torrent files." As noted above in connection with Objection 4(a), there are four distinct Searched Databases Plaintiffs obtained for TorrentSpy. (See Pozza Declaration at 2:17-3:3.) The testimony does not explain which of the four Searched Databases provided the categories which, it is asserted, TorrentSpy used. As the Court will recall from the Order Granting Plaintiffs' Motion for Terminating Sanctions at 13:17-19, plaintiffs asserted prejudice arising

from the deletion of directories so it will be significant to ascertain what was actually deleted and, if categories were deleted, how Plaintiffs made the determinations set forth in the "main categories and sub-categories into which dot-torrent files were sorted by TorrentSpy." (Pozza Declaration at 6:20-21.)

c. The testimony is not authenticated as required by Federal Rule of Evidence 901. See Objection 3(b), supra. It cannot be ascertained from the testimony whether the assignment of categories was done by a natural person or by an automated process. Nor can it be ascertained how the assignment was carried out.

**Objection 8.**

Defendants object to testimony in the Pozza Declaration at 6:24-7:6.

**Grounds for the Objection**.

a. There is no showing of personal knowledge on the part of the affiant. See Objection 2, supra.

b. The testimony lacks foundation. The Exhibit does not comply with the requirements of Federal Rule of Civil Procedure 1006. See *United States v Johnson* (1979, CA9 Ariz) 594 F2d 1253, cert den (1979) 444 US 964, 62 L Ed 2d 376, 100 S Ct 451 and other cases cited in connection with Objection 3(a), supra. The key phrases in the challenged testimony are "a sample of TorrentSpy user comments," "additional indications," "corresponded," "correlate to," "corroborated" and "torrent databases." Plaintiffs state that, if TorrentSpy user "comments reviewed [by the unnamed 'persons under my direction'] in any way suggested that the dot-torrent file was not what it purported to be, plaintiffs simply excluded it from Exhibit 1." Plaintiffs certainly did not specify such comments or such exclusions to Defendants or to the Court.

As noted above in connection with Objection 4(a), there are four distinct Searched Databases Plaintiffs obtained for TorrentSpy. (See Pozza Declaration at 2:17-3:3.) The testimony does not explain which of the four Searched Databases were the basis for the "indications," "correspondences," "correlations" and "corroborations."

c. The testimony is not authenticated as required by Federal Rule of Evidence 901. See Objection 3(b), supra. It cannot be ascertained from the testimony how the "sample" was selected or criteria for any of the other vague terms used by Plaintiffs in this testimony

**Objection 9.**

Defendants object to Exhibit 2.

**Grounds for the Objection**.

a. Exhibit 2 lacks foundation in that the derivation of that information is not disclosed. The Exhibit does not comply with the requirements of Federal Rule of Civil Procedure 1006. Please see *United States v Johnson* (1979, CA9 Ariz) 594 F2d 1253, cert den (1979) 444 US 964, 62 L Ed 2d 376, 100 S Ct 451 and other authorities cited in support of Objection 3, supra. As before, Plaintiffs provide no clue as to who the individuals are who gathered and assembled Exhibit 2. Plaintiffs do not even provide the witnesses' names.

b. Exhibit 2 is not properly authenticated as required by Federal Rules of Evidence 901. It is impossible to ascertain what parts of it were put in place by a person on an item-by-item basis and which parts of it were put in place by automated programs. As to those parts that were put in place by a person, the person is not disclosed. Authentication for automated creation suffers from even more severe defects. See *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 545-

546 (D. Md. 2007) quoted supra in connection with Objection 3;

c. The materials set forth in Exhibit 2 have been selected on the basis of criteria that are biased and the results are not representative of any true character of the underlying databases. See Objection 8, supra.

Dated: April 28, 2008

Respectfully submitted,
ROTHKEN LAW FIRM

Ira P. Rothken, Esq.,
Attorney for Defendants

EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC, ET AL, | ) | CASE NO: CV 06-1093-FMC(JCx) |
| Plaintiffs, | ) | CIVIL |
| vs. | ) | Los Angeles, California |
| JUSTIN BUNNELL, ET AL, | ) | Tuesday, February 13, 2007 (11:25 a.m. to 1:05 p.m.) |
| Defendants. | ) | |

HEARING ON (1) PLAINTIFFS' MOTION TO COMPEL DOCUMENT PRODUCTION AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES (MOTION #1);
(2) PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES AND COSTS (MOTION #2);
(3) DEFENDANTS' REQUEST FOR ATTORNEYS' FEES AND COSTS (MOTION #3);
(4) DEFENDANTS' MOTION TO COMPEL RESPONSES TO INTERROGATORIES AND FOR SANCTIONS (MOTION #4);
(5) PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES AND COSTS (MOTION #5);
(6) DEFENDANTS' MOTION TO COMPEL FURTHER RESPONSES TO DEFENDANTS' REQUEST FOR PRODUCTION OF DOCUMENTS, SET 2 AND RE DEFENDANTS' REQUEST FOR SANCTIONS (MOTION #6);
(7) PLAINTIFFS' MOTION FOR PROTECTIVE ORDER ON DEFENDANTS' SECOND SET OF DOCUMENT REQUESTS (MOTION #7);
(8) PLAINTIFFS' REQUEST TO DELAY RULING (MOTION #8)

BEFORE THE HONORABLE JACQUELINE CHOOLJIAN,
UNITED STATES MAGISTRATE JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC, ET AL, Plaintiffs, | CASE NO: CV 06-1093-FMC(JCx) |
| | CIVIL |
| vs. | Los Angeles, California |
| JUSTIN BUNNELL, ET AL, Defendants. | Tuesday, February 13, 2007 (11:25 a.m. to 1:05 p.m.) |

HEARING ON (1) PLAINTIFFS' MOTION TO COMPEL DOCUMENT PRODUCTION AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES (MOTION #1);
(2) PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES AND COSTS (MOTION #2);
(3) DEFENDANTS' REQUEST FOR ATTORNEYS' FEES AND COSTS (MOTION #3);
(4) DEFENDANTS' MOTION TO COMPEL RESPONSES TO INTERROGATORIES AND FOR SANCTIONS (MOTION #4);
(5) PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES AND COSTS (MOTION #5);
(6) DEFENDANTS' MOTION TO COMPEL FURTHER RESPONSES TO DEFENDANTS' REQUEST FOR PRODUCTION OF DOCUMENTS, SET 2 AND RE DEFENDANTS' REQUEST FOR SANCTIONS (MOTION #6);
(7) PLAINTIFFS' MOTION FOR PROTECTIVE ORDER ON DEFENDANTS' SECOND SET OF DOCUMENT REQUESTS (MOTION #7);
(8) PLAINTIFFS' REQUEST TO DELAY RULING (MOTION #8)

BEFORE THE HONORABLE JACQUELINE CHOOLJIAN,
UNITED STATES MAGISTRATE JUDGE

Appearances: (See next page)

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES FOR:**

| | |
|---|---|
| Plaintiffs: | STEVEN B. FABRIZIO, ESQ<br>Jenner & Block<br>601 13th St., N.W., Suite 1200<br>Washington, DC 20005<br><br>- And -<br><br>GREGORY P. GOECKNER, ESQ<br>Motion Picture Association of America<br>15503 Ventura Blvd.<br>Encino, CA 91436 |
| Defendants: | IRA P. ROTHKEN, ESQ<br>Rothken Law Offices<br>Three Hamilton Landing, Suite 224<br>Novato, CA 94949 |
| Court Reporter: | Taped; No(s) 7-005; 7-006 |
| Deputy Clerks: | Nancy Hackney, Marine Pogosyan |
| Transcribed by: | Exceptional Reporting Services, Inc.<br>14493 S. Padre Island Drive<br>Suite A-400<br>Corpus Christi, TX 78418-5940<br>361 949-2988 |

**Los Angeles, California; Tuesday, February 13, 2007; 11:25 a.m.**

**(Call to Order)**

**THE COURT:** All right. Let me ask the clerk to call to call the other case.

**MR. ROTHKEN:** Thank you, your Honor.

**THE CLERK:** Calling Case Number CV-06-01093 FMC(JC), *Columbia Pictures Industries, Inc. versus Justin Bunnell.*

Counsel, please make your appearances for the record.

**MR. FABRIZIO:** Your Honor, Steven Fabrizio for the Plaintiffs.

**MR. ROTHKEN:** Good afternoon, your Honor. Ira Rothken for the Defendants.

**THE COURT:** I know it seems like the afternoon by now, Mr. Rothken, but it's actually still morning.

Good morning to you both.

First we're going to turn to Plaintiffs' Motion to Compel Document Production and Supplemental Responses to Plaintiffs' First Set of Interrogatories. I start with this one because it is very similar to -- pretty much the flip side of the same issues we've just talked about in the related case.

So let me inquire of counsel, any further argument in connection with this?

**MR. FABRIZIO:** On behalf of Plaintiffs, your Honor, no, just if I may just make the same clarification we made in the *Bunnell v MPA* case, that our motion didn't request you to

overrule objections, as you point out in your Order, just simply to produce the responses to those requests, which they indicated they would produce, and notwithstanding objections to preserve.

**THE COURT:** All right. You're saying basically you were only speaking that which I granted --

**MR. FABRIZIO:** Exactly --

**THE COURT:** All right.

**MR. FABRIZIO:** Exactly, your Honor. I don't to create the impression that we were asking for -- we were overextending in our Motion to Compel. We were -- they had identified certain categories which they said, "We will produce," and they have stated objections to those, but they said, "We will produce."

**THE COURT:** Right. I understand that. My problem was that I didn't know what those categories were and whether there were other categories where there were other bases, and I think on this one you might also have been asking for a privilege log and I didn't have anything before me to suggest that anybody had actually made a privilege objection. So, again, I just would appreciate counsel assisting the Court by giving me the full documentation so that I have context.

All right. Mr. Rothken, anything further on this motion?

**MR. ROTHKEN:** This is the one related to

interrogatories, your Honor, or production of documents?

**THE COURT:** Production of Documents and Supplemental Responses to Plaintiffs' First Set of Interrogatories.

**MR. ROTHKEN:** Excuse me just one second.

**THE COURT:** Sure.

**(Pause)**

**MR. ROTHKEN:** Your Honor, we don't have any. I'm going to submit on this. I just wanted to say, every time I say something I'm sure I'm inviting more argument, but it's easier for me to sort of make the point and hopefully see whether or not everyone, especially your Honor, agrees. And there may be disagreements related to -- we're going to make a production, but there may be disagreements over what we believe the fair scope of a production is for this particular case and therefore undue burden, as well as privacy issues.

**THE COURT:** Okay. Again, I would note, as with the last motion, this Order is directing you to produce documents that have been withheld solely on the basis that --

**MR. ROTHKEN:** Okay.

**THE COURT:** -- they asked for a protective order, because that's all the motion seeks. All right?

**MR. ROTHKEN:** Okay. Thank you.

**THE COURT:** So to the extent again you are withholding some documents based on privilege, you know, it requires you to do a privilege log by the 25th. To the extent

you are withholding documents on some other basis, this Order does not direct you to produce those documents and the parties would need to meet and confer.

Mr. Fabrizio?

**MR. FABRIZIO:** Sorry, your Honor.

**THE COURT:** It's okay.

**MR. FABRIZIO:** Clarification. There are a number of categories where, and this happened on both sides, where the parties stated objections but the parties then said, "We'll produce all non-privileged responsive documents." And that is certainly the case with Defendants' responses -- written responses to our document requests. We view those, where Defendants said, "We will produce all non-privileged responsive documents," to be the requests that your Honor is ordering a complete production to.

**THE COURT:** That's correct.

**MR. FABRIZIO:** Okay. I don't want Mr. Rothken or his colleagues to be able to claim, "I'm now not producing for a particular category because I also stated an objection."

**THE COURT:** No.

**MR. FABRIZIO:** Okay.

**THE COURT:** What I'm saying is -- the parties constantly include all of these in large part boilerplate objections and then there's a sentence at the end that says, "Okay, subject to all of that we will produce everything we

have once there's a protective order," or "except to the extent it's privileged." I'm talking about what's in the last sentence is you've represented you will produce irrespective of the objections, and those things need to be produced. Is that clear?

**MR. ROTHKEN:** It is. Typically when we write these things we say "subject to our objections."

**THE COURT:** Right.

**MR. ROTHKEN:** And therefore it's likely that we're going to produce subject to our objections, because as a practical matter we're not going to produce every document the entire company has ever had in a particular category or hand over the keys to the business, there's going to be --

**THE COURT:** I don't understand what you mean. Because when someone says "subject to --

**MR. ROTHKEN:** Yes.

**THE COURT:** -- objections we're going to produce everything called for by the requests," what that means to me is okay, they're preserving that for admissibility purposes at some other point, but they're producing all the documents. That's how I interpret that.

**MR. ROTHKEN:** Well, hopefully our way of interpreting it is not different. We basically interpret it to mean that we're not waiving any objections related to things like privacy, scope, undue burden.

**THE COURT:** If you said you're producing --

**MR. ROTHKEN:** Right.

**THE COURT:** -- you're producing. Okay? I don't know how to make it any -- I mean I have indicated the numbers. I'm not going to go through it number by number again.

**MR. ROTHKEN:** Right.

**THE COURT:** Right.

Paragraph 3 of the submitted order on this -- the Tentative on this one represented that these are non-privileged documents responsive to those requests. So the only thing outstanding in the Court's mind is things that are withheld based on privilege. You do not indicate you're withholding documents. So this Order does require you to produce those.

**MR. FABRIZIO:** Thank you, your Honor. That's exactly the issue.

**MR. ROTHKEN:** Well I suppose, I'm just going to give an example, even though I can't point to it because of all these documents in front of me, but if there's been a request that asks for deeply intrusive privacy things, it was certainly not our intention to waive them by indicating subject to our objections we'll produce documents. We may create a privilege log. We may also meet and confer. We may also redact. But I don't know whether or not -- I know it wasn't our intention to say we're just going to go over and hand over every single document, no matter how sensitive it is and --

**THE COURT:** Well --

**MR. ROTHKEN:** And so I --

**THE COURT:** But you don't indicate you're withholding any documents on a -- I mean we're talking about this in the abstract, so --

**MR. ROTHKEN:** We are indeed. And I apologize for that.

**THE COURT:** -- let's go to a particular request then.

**MR. ROTHKEN:** All right.

**THE COURT:** Okay?

**MR. ROTHKEN:** Yeah.

**THE COURT:** Paragraph 2 of the Tentative ruling --

**MR. ROTHKEN:** Right.

**THE COURT:** -- on this particular motion relates to your responses to Request Number 1 and portions of Request Numbers 6 and 10. And I'm going to look at Exhibit 4 to the February 8th -- no, the Declaration, the Fifth Declaration with exhibits by Mr. Fabrizio.

**MR. FABRIZIO:** Your Honor, for the record, it's February 6th.

**THE COURT:** You know, it has a file stamp of February 8th --

**MR. FABRIZIO:** Does it? Okay.

**THE COURT:** -- even though I know the service is --

**MR. FABRIZIO:** That's all right, your Honor.

**THE COURT:** -- maybe earlier.

All right. And at the bottom penciled in Number 117. Do you have that in front of you, Mr. Rothken?

**MR. ROTHKEN:** I'm trying to find it, your Honor.

**THE COURT:** Okay.

**(Pause)**

**MR. ROTHKEN:** Your Honor, if you'd be kind enough, maybe you could just read it to me while I'm looking for this --

**THE COURT:** Okay.

**MR. ROTHKEN:** -- and that way I could begin to answer the question.

**MR. FABRIZIO:** Your Honor?

**THE COURT:** In response to Interrogatory Number 1 -- I'm sorry, Document Request Number 1. The question is:

> "For all entities and individuals listed in response to Interrogatory Number 1 provide all documents relating to each entity's and each individual's ownership, lease, control, or operation of TorrentSpy."

Your response includes a litany of objections, and the last sentence is:

> "Without waiving these objections responding party will produce all responsive non-privileged documents responsive to this request."

On that the order is that you produce all responsive non-privileged documents responsive to this request.

**MR. ROTHKEN:** And we will. The issue that's sort of come up in the trenches is -- and I want to avoid this, I've never been sanctioned by a Court and, thank God, I'm not yet. I have years --

**THE COURT:** It's the early days in the case, Mr. Rothken.

**MR. ROTHKEN:** I know that. I know that. And fortunately that's been -- knock on wood.

Many times during the meet and confer process somebody will say, "Well, I thought you meant this," and "I thought you meant that," and the word "vague," the objection "vague," is important here, and then somebody says, "Here is my interpretation," and someone else may say, "No, this is mine." And so we may not have been responsive, because there may be a misinterpretation because it's vague or ambiguous. There may be times when these things are so overbroad. And so we're definitely going to produce responsive non-privileged documents, but somebody may say, "I want to go back to 1920," or "Here I want to go back," and you have to out and get these backup tapes, and that may then invite a whole other situation where we've got to start going into discovery and burden shifting and costs and things like that.

And so I didn't want to make this complex or show

disrespect to you, your Honor, by saying, “Oh, we’re not going to comply.” Of course we’re going to comply. But I also out of caution want to say that, especially given the posture of this case, that I’m just concerned that there may be arguments later on that now we’re bad because we’re not complying after we said we would when we’re taking a different position on undue burden, vagueness, ambiguity, and overbreadth, for example, that may differ from the other side. And the Court may also come up with a different view on its own. And that doesn’t mean we didn’t comply, we want to comply, it just may mean that we’re all human and we may just differ on how we interpret these things. Especially, you know, if we look at some of these other requests. I think that this request is a pretty good example of one we probably won’t have a problem complying with, but there may be other ones in this packet that as you get further into it become extremely burdensome.

**THE COURT:** Well, I’m not going to go through these on a request-by-request basis. I’ve explained to you how I read your responses. I expect you to comply with the Court’s Order. And that’s all I’m going to say about it at this point. If there’s some dispute that arises, I am sure you will make whatever argument you want to make in that regard. But that’s the Court’s Order on this.

Mr. Fabrizio, did you want to add anything?

**MR. FABRIZIO:** I think your Honor just covered it.

**THE COURT:** Pardon me?

**MR. FABRIZIO:** I think you just covered it.

**THE COURT:** Okay. Anything further on this issue?

**MR. FABRIZIO:** Not from Plaintiffs, your Honor.

**MR. ROTHKEN:** No, not from --

**MR. FABRIZIO:** Oh. I'm sorry.

**MR. ROTHKEN:** Not from us, your Honor.

**THE COURT:** Okay.

**MR. FABRIZIO:** Your Honor, I'm just going to -- I assume we're in the same position on our request for fees that we were in the *Bunnell v MPA* case?

**THE COURT:** I'll repeat it, since we called a new case. The Court's denial of the request for sanctions with respect to the making of motions to compel under opposing motions to compel without substantial justification, the Court is denying those motions today without prejudice to motions for reconsideration if there are ongoing issues with respect to compliance with discovery obligations and orders vis-à-vis those six or seven issues.

All right. The next motion is Defendants' Motion to Compel Responses to Interrogatories and Request for Sanctions. This one, again -- this one really stems from my desire that the parties try to meet and confer on more specific issues raised by these requests.

And let me inquire, is there any reason you all can't

meet and confer on this today so we can move this along, since you're both here?

**MR. ROTHKEN:** Your Honor, just so you know our point of view on it, we typically -- I mean we have done this in this situation; we did meet and confer. We met and conferred a number of times. And we were so interested in meeting and conferring on these things that I even wrote a very robust email that went through every single request that's at issue right here in an email before the call and gave our view on it. And that's in one of the exhibits that were attached.

**THE COURT:** I mean I looked -- I mean I looked at the correspondence, especially before --

**MR. ROTHKEN:** Yes.

**THE COURT:** -- to deny something without prejudice, to see if in fact the parties did meet and confer. I understand that there was -- there were communications and I think it's at the bottom of the email that you're pointing to, it's that lengthy one. There is a reference to the numbers in issue and to I think -- is it Plaintiffs -- Defendants in this case -- Defendants in this case's view that the responses were largely just not responsive --

**MR. ROTHKEN:** Right.

**THE COURT:** -- without really meeting and conferring, though, about each objection. So because -- particularly I think it's Interrogatory Number 1 had so many subparts --

**MR. ROTHKEN:** Right.

**THE COURT:** -- I just -- even though there were a couple of paragraphs, they did not really go into the objections and issues kind of on an objection by objection issue by issue basis. Look, I'm not unsympathetic. And frankly I didn't think your responses were all that great on this, so we're going to talk about that in a moment. I'm not ruling on them yet. But that is nonetheless the Court's concern. I think these issues can be narrowed -- please have a seat for the moment. I think these issues can be narrowed and before I spend the time to go through this and hear extensive arguments from the parties, I think it would behoove everyone to try and narrow these disputes.

Now, again, although I'm not ruling on the merits, and I'll hear from the parties on the motion, I do think it might facilitate, a meet and confer, to share some tentative thoughts on some of the issues in dispute. Again, with respect to the general objections issue, I'm not going to rule on those in the abstract. I'll consider them as it relates to the requests in dispute.

With respect to contention interrogatories, since the discovery cutoff has been extended now I'm not certain they make much practical sense at this stage before the document production is complete. It probably makes most sense and it would be most efficient to agree that responses be made a set

number of days after the document production is complete, because the Court would in any event allow a supplement to the responses. But having said that, if the Defendants, despite acknowledging there’s inefficiencies and the fact that they’re not likely to get complete responses at this stage, wants to pursue these contention interrogatories at this time, the Court is going to be treating them like every other kind of an interrogatory and require the responding party to respond with information reasonably available to it at the time of the response. So facts currently known, docs currently in their possession, witnesses currently known, and just liberally allow supplementation. Again, that may well not be terribly efficient, but that would be how the Court would be tentatively inclined to treat that issue if it went back to the Court again.

To the extent Plaintiffs responses cross-reference the Complaint and the initial disclosure statements, as I said at the beginning, that really is insufficient. I mean I think the response has to be self-contained and so I would expect that that would be the Court’s tentative view on that point.

In terms of non-testifying experts, Rule 26(b)(4)(A) and (B) govern that. And it does provide for discovery, at least generally, facts and opinions of non-testifying experts. It does require a showing of exceptional circumstances. And even in some circumstances fee sharing if a non-testifying

expert assists is providing responses. While the Court recognizes that there are some cases that suggest there remains some sort of privilege with respect to non-testifying experts, having said that, and I know those cases state the modifications to Rule 26, but the advisory committee notes Rule 26 indicates the privilege work product doctrine no longer protects the facts and opinions of non-testifying experts. This may be a very fact specific inquiry, depending upon what facts and opinions we're talking about, you know, with respect to the non-testifying experts, but that's how the Court interprets the law at this point. Again, tentatively.

Next, privilege logs in the context of interrogatory responses. Look at Rule 26(b)(5). That governs parties' obligations when information is withheld based on a privilege. It's not limited to document requests. It requires the party exerting the privilege to describe nature of documents, communications, or things not disclosed in a manner that enables the other party to accept the applicability of privilege or protection. Rule 26 is broader; it's not just documents. So that's the Court's view on the privilege issue.

Those are my tentative views on the merits that were presented by the motion, which I hope -- again, I share hoping that it facilitates the meet and confer process.

With that in mind, does either party wish to address the Court with respect to Defendants' Motion to Compel?

Yes. Mr. Fabrizio?

**MR. FABRIZIO:** I seem to be on the other side of this one.

**THE COURT:** That’s fine.

**MR. FABRIZIO:** Two issues, your Honor, that I’d just like to get further clarification or maybe try an argument.

The contention interrogatories, I understand your Honor’s point that you’d allow supplementation. Of course, your Honor, that just multiplies the burden. And the Courts that have looked at this have generally said that’s one of the good reasons to put these off until after some substantial discovery has happened. Because Defendant is not going to be satisfied with our half answers which we have now, he’s going to come back at the end of discovery and say, “Okay, now do it again.”

**THE COURT:** I’ve looked at all of the cases you all cited on this, along with some others. And I understand the Judge out of the Northern District of California issued a very extensive well-reasoned opinion on this point that seems to require a justification by the propounding party, though in another case one of you cites or that I looked at, another Judge in this District has indicated she would treat them much like she treats other interrogatories, and in fact that Northern District Judge has refined his earlier view and thinks this might be a way to narrow and define the issues at an

earlier point in time. So it seems to me it's somewhat discretionary.

**MR. FABRIZIO:** The Central District case came subsequent to the --

**THE COURT:** Northern District.

**MR. FABRIZIO:** -- *Conversion Technologies* (phonetic), the Northern District case. That was on the burden shifting, your Honor. The Northern District had shifted a burden --

**THE COURT:** Correct.

**MR. FABRIZIO:** -- back to the propounding party.

**THE COURT:** Right.

**MR. FABRIZIO:** In the Central District, when the Court said that Judge Hensley (phonetic), the Judge in the Northern District, sort of reversed thinking on that, that was just on the burden issue, not on the general philosophy that contention interrogatories have to be measured by whether they serve a valuable purpose at this stage in the proceeding. I mean the comment by the -- in the *Conversion Technologies* in the Northern District that early contention interrogatories that merely track the ultimate issues and allegations of the complaint, there's substantial authority that it's just a discovery abuse, your Honor. I mean at this stage in the game it is simply an effort to get at our work product, which does tie to point number two.

Rule 26 does exactly provide what your Honor says it

provides, of course, but the burden of showing substantial justification is a very heavy one and the sorts of circumstances that Courts have -- or Courts have allowed it are where there is an experiment on something and the something no longer exists after one expert had a chance to examine it. And the example Mr. Rothken uses in his brief there was a roof, but the roof was then fixed, so the only person who got a chance to observe, physically observe, the roof was the other party's expert. Situations where there's only one expert in the field --

**THE COURT:** Let me --

**MR. FABRIZIO:** Okay.

**THE COURT:** -- stop you, just because if I didn't make it clear let me make it clear. I'm not saying one way or the other whether I think the non-expert issue in this case, how I would rule on it.

**MR. FABRIZIO:** Okay.

**THE COURT:** I don't think there has been the showing that is called for by Rule 26 at this point in time. So I don't have enough facts before me to really even give you my tentative views as to how I would come out on that issue. I'm really just explaining to you my understanding of the law on this issue and letting you all discuss amongst yourselves whether you, Mr. Rothken, can make that type of showing that's required under Rule 26 and whether if you do so you really want

to require that, because there is a potential fee shifting issue involved, and I wanted to make sure you understood that. As far as the advisory notes are concerned, there are some at least limitations on the work product privilege. So that really is just I wanted to explain my understanding of the law on that issue to help you for your meet and confer.

On the contention interrogatories, again I'll state my own view is that I'm not sure how efficient or practical it is and that what would make the most sense in this case is to key the deadline to respond to these to the date -- a date that is "X" number of days after the document production is complete. That's what makes the most sense to me. I am going to, again, leave it to the parties in the meet and confer process to try to resolve that issue on that.

**MR. FABRIZIO:** Okay.

**THE COURT:** Okay?

**MR. FABRIZIO:** Thank you, your Honor.

**THE COURT:** All right. Anything, Mr. Rothken, further on that?

**MR. ROTHKEN:** No. Submitted, your Honor.

**THE COURT:** Okay. All right. Then the Tentative will be the order of the Court on this motion as well.

And in case I didn't say that with respect to the other motions, just for the Court's purposes, that is the case with respect to the other Tentative rulings, as well they

should just be attached to the minutes of these proceedings and will be deemed the order of the Court.

All right. Last motion, which I saved for last because it is the most tentative of the Tentative rulings, and it is the one that is the most factually complex. Let me just ask the parties if they want to address the Court on it with that understanding in mind, that the Court's mind does remain more open on this one than on the others. Okay. I did find these issues to be somewhat difficult, and I base this, certainly with respect to the last few, I guess 27 to 28 and 39 to 40. I was just simply having trouble understanding how the things called for by these requests are relevant. So in the absence of such an understanding this is the Court's Tentative.

**MR. ROTHKEN:** Your Honor, may I be heard?

**THE COURT:** Yes.

**MR. ROTHKEN:** Thank you.

And I do -- we do appreciate your view that this is complex issue and also to some extent understand how one may even consider some of these to be overbroad. And -- I have to go through your Tentative ruling, just so I can make sure --

**THE COURT:** Okay.

**MR. ROTHKEN:** -- I make argument efficiently here. I apologize. I want to just basically see which ones you didn't order a response to and I can address those.

**MR. FABRIZIO:** Other than 24 and 26.

**THE COURT:** Well I narrowed some of them, yeah.

**MR. ROTHKEN:** Yeah, you narrowed some of them so I'm just trying to see that.

**THE COURT:** Let me just inquire, since we've been at this for a while. Does either party desire a short break or you just want to plow though?

**MR. ROTHKEN:** I would defer to the Court.

**MR. FABRIZIO:** We're on the last one, your Honor.

**THE COURT:** Okay.

**MR. FABRIZIO:** If the Court is fine.

**THE COURT:** Okay. Let me take a moment to inquire if --

**MR. FABRIZIO:** Check with the others.

**THE COURT:** -- whether anybody needs a short break?

**MS. SPEAKER:** No, we're good to go.

**THE COURT:** Everybody okay?

All right. Let's just proceed then.

If you need a moment to --

**MR. ROTHKEN:** Thank you, your Honor.

**THE COURT:** -- to review the Tentative, go ahead.

**MR. ROTHKEN:** Yeah, I do appreciate that.

**(Pause)**

All right. In the first category, it's denied as moot. Obviously this is going to be without prejudice to at

some point come back and say they may have documents and they're not giving them to us, I'm assuming.

**THE COURT:** Well, this is based on their representation that they've given you everything except that which is privileged.

**MR. ROTHKEN:** Right. Okay.

**THE COURT:** I actually wasn't certain, because no party indicated, whether there has been a privilege log with respect to the second set, which have already been produced. So I don't mean to order you to do something you've already done, I just didn't know one or the other.

**MR. FABRIZIO:** And that was my one point of clarification. There hasn't. We have produced all -- these categories were completely overlapping of categories in the first request, at least what we --

**THE COURT:** Yes. I'll have to take your word for that, because nobody gave me the first requests --

**MR. FABRIZIO:** I'm sorry, your Honor.

**THE COURT:** -- so that I could check that.

**MR. FABRIZIO:** I'm --

**THE COURT:** Go ahead.

**MR. FABRIZIO:** We are very sorry about that, your Honor.

**THE COURT:** It's okay.

**MR. FABRIZIO:** But they are completely overlapping of

at least our interpretation of what the first requests were and what we had our clients search for in response to the first requests. So we have produced all documents in response to the Category A document request in your Order and we've already produced a privilege log and the parties --

**THE COURT:** Now, are you saying -- what I'm trying to -- I understood you have already produced a privilege log which related to the first requests, and in fact there was probably a copy of that attached to one of Mr. Rothken's declarations. I just didn't understand if there had to be another privilege log or whether it was your position that the privilege log previously produced encompassed everything that you would be claiming privilege to with respect to this request as well.

**MR. FABRIZIO:** Because it was our view that the categories were the same and we produced those documents that were not privileged, and for any document responsive that we believed was privileged we put that on our log, there's nothing --

**THE COURT:** The original log.

**MR. FABRIZIO:** The original log. There's nothing further to put on a privilege log.

**THE COURT:** All right.

**MR. FABRIZIO:** It is -- the privilege log with respect to all the Plaintiffs' responses to the first request

for documents as it relates to the Category A subjects in your Honor’s Order is complete. And the parties are currently discussing issues related to that.

**THE COURT:** Okay. So you’re saying there is no further privilege log that would be the subject of Paragraph 1 of the Tentative?

**MR. FABRIZIO:** Exactly, your Honor.

**THE COURT:** It’s already been produced.

**MR. FABRIZIO:** It has already been produced.

**THE COURT:** And is that your understanding, Mr. Rothken?

**MR. ROTHKEN:** There has been robust meet and confer on the quality of the privilege log, but we will take their word, you know, by their representations here and, you know, just assume that their responses to the first set are the responses to the second set. And so I suppose by taking their word --

**THE COURT:** All right.

**MR. ROTHKEN:** -- that’s it for this category.

**THE COURT:** All right. I’ll tell you what I’m --

**MR. FABRIZIO:** I can so represent.

**THE COURT:** -- what I’m going to -- just I will -- we’re going to get into this a little bit more, but what I would end up doing is modifying the Tentative to just include at the tail end of the second sentence “to the extent such

documents are not already referenced on a previously produced privilege log."

So that means you don't have to produce anything if you're, you know, a hundred percent sure everything was on there.

And that gives you the protection just in case there's something that slips through the cracks.

**MR. FABRIZIO:** I've inquired. I believe that to be the case. We'll double check.

**THE COURT:** Okay.

**MR. FABRIZIO:** And if we need to supplement, we will.

**THE COURT:** All right.

**MR. FABRIZIO:** But I don't think we do.

**MR. ROTHKEN:** Okay. Request Number 24. And basically what we have with the TorrentSpy site is a situation where -- at least we cited the *Perfect 10 v Google* case, which is here in this District --

**THE COURT:** Yes.

**MR. ROTHKEN:** -- and in that case the distillation of it was, at least for the facts in that case, that directly linking to an infringing picture file was not secondary copyright infringement; that was Google's search engine links to a picture file.

**THE COURT:** Well, the standard wasn't met for purposes of a preliminary injunction and the Court assumed

knowledge, and I think its ruling was predicated on some of the other elements.

**MR. ROTHKEN:** Right.

**THE COURT:** But in any event --

**MR. ROTHKEN:** Yeah, I was careful --

**THE COURT:** -- I appreciate you citing it, because I did look at that case closely.

**MR. ROTHKEN:** Okay. And now, here we have claims of secondary copyright infringement. We have vicarious and contributory, the typical ones. And then we have the new one that arose out of this District to the Supreme Court of the United States, which is inducement. Okay?

**THE COURT:** Okay. That’s not covered -- I thought that was encompassed with contributory.

**MR. ROTHKEN:** Well, it’s a form of secondary liability and I look at it as a third arm. I suppose one could also look at it as part of contributory.

**THE COURT:** Well, if it’s a third arm that’s distinct from contributory, then you need to tell me what you think the elements are, because it’s not one I have a little cheat sheet for.

**THE COURT:** Well, I think for purposes of this discussion I’m happy to say it’s part of contributory.

**THE COURT:** Okay.

**MR. ROTHKEN:** I didn’t want to --

**THE COURT:** Then we'll proceed on that --

**MR. ROTHKEN:** I'm just trying to go ahead and lay down the predicate for my argument right here. And that is this: The Plaintiffs in this case have already indicated to you as part of argument today that they are somewhat interested in having TorrentSpy track what users do on the site and to make this information available to them. And I'm assuming the reason why they'd want to do this is to make an argument about inducement, namely that the site has some statistical number of torrents that link to infringing works, therefore the site is bad.

**THE COURT:** Well, that may be, and I am not going to read their mind. Mr. Fabrizio can answer the question himself. I thought it was more to establish actual infringement. I mean that -- which is a predicate for either of the secondary liability issues.

But you tell me, Mr. Fabrizio.

**MR. FABRIZIO:** You're actually both right.

**THE COURT:** Okay. How about that?

**MR. FABRIZIO:** It is to establish direct infringement and we believe that the best evidence of how the site is in fact used is the data that we have asked for and that that would demonstrate an overwhelming use to infringe.

**THE COURT:** All right. So you're saying that it induced, caused, or materially contributed to the activity,

that this would be the means of demonstrating that element of contributory infringement?

**MR. FABRIZIO:** Your Honor, the inducement theory is somewhat of a separate arm. The Courts have not yet addressed exactly how it fits into the constellation of secondary liability, but the Courts that have looked at it have looked at it as a separate arm. The standard is whether the Defendant has acted with an object to foster infringement. And an object to foster infringement is essentially a totality of the circumstances test. And Judge Wilson very recently in the *Streamcast* case, the *Grokster* case on remand, issued a decision that goes through quite extensively some of the factors that he found important based on the evidence in that case.

But I don't want the parties or the Court to leave this argument thinking that we agree that there's just two theories.

**THE COURT:** Okay.

**MR. FABRIZIO:** So the traditional word -- what's sometimes referred to as traditional contributory infringement involves a knowledge of the infringing activity, either actual or constructive, and a material contribution to that infringement.

**THE COURT:** And you're saying that --

**MR. FABRIZIO:** All three.

**THE COURT:** Yeah, I know, I understand that. But

we’re talking about development of particular information.

**MR. FABRIZIO:** Right. Okay.

**THE COURT:** So tell me --

**MR. ROTHKEN:** Thank you.

**THE COURT:** -- the information we’re talking about and you tell me -- and I’m trying to figure out the relevance of the particular information itself.

**MR. ROTHKEN:** Okay. So basically the point here is that armed with this, now we’re looking at it from our side by saying, “Okay, they want to be able to show that torrents located on TorrentSpy link to their clients copyrighted works through some process.

**THE COURT:** Right.

**MR. ROTHKEN:** And that it’s not authorized.

**THE COURT:** Right.

**MR. ROTHKEN:** Okay.

**THE COURT:** Well, that the downloads that result --

**MR. ROTHKEN:** The third party stuff is not authorized, that’s correct.

And so armed with that, and armed with the notion that you can’t have secondary liability unless you have primary infringement, we then constructed this document request to say, “Okay, give us the stuff, the documents, that allow us to test the integrity for each of the primary infringements that arise out of TorrentSpy dot com’s so-called linking to torrent files.

Now, this --

**THE COURT:** Step behind that. Test it by finding out what?

**MR. ROTHKEN:** If this --

**THE COURT:** And --

**MR. ROTHKEN:** If this was a case -- let’s just look at one link, okay, because that makes everything really simple. If this was a case where TorrentSpy was sued for having a torrent file that linked -- let’s say two torrent files, one which said Batman Begins, which links to -- the torrent links to a server in Liechtenstein that houses a file that’s ten seconds long that includes a trailer for Batman Begins. Okay? And another one where it links to a -- the torrent file links to a file on servers in Hollywood, California for a file that was put out there by the MPAA’s anti-piracy department to provide noise in the torrent file network so that people would get frustrated. Okay?

**THE COURT:** So it’s the whole movie or it’s not the whole movie?

**MR. ROTHKEN:** No, it’s not the whole movie.

**THE COURT:** So it’s --

**MR. ROTHKEN:** It’s just this little sample of it --

**THE COURT:** Okay. A sample.

**MR. ROTHKEN:** -- but it says Batman Begins and if you download it you don’t know it until after you load it up.

**MR. FABRIZIO:** Your Honor, it's sometimes referred to as a spoof.

**MR. ROTHKEN:** Okay --

**THE COURT:** Okay.

**MR. ROTHKEN:** -- so spoof. All right? But a spoof that contains copyrighted content. So now we have a situation where we would have to go ahead and find out what the work is, what jurisdiction it's located in, what is the use and is there a license, and if there's not a license is there fair use, and if it's not fair use is it -- you know, is it public domain, whatever.

So here in this situation we're trying to do the same thing. They're going to come and ask -- and analyze all of the torrent files on the site and say that because of this there should be knowledge or whatever and have someone come and take the stand and say, "I downloaded 450 torrent files and they each linked to an infringing work," we're in the position of either saying oh, okay, sure, we take your word on it, or doing a good job as defense lawyers, and that is to say okay, prove it. You know, give us the site information. Give us the name of the copyrighted work. Give us the agreements related thereto. If you decided to allow a movie company, a movie theater company, to have a trailer up there and it was just on a handshake agreement, could that be collaterally attacked if they were to go ahead and make it into a torrent? And those

sorts of things.

**THE COURT:** Let me ask you this, because the point they made related to whether it was generally unrestricted access and they're saying that torrent files simply can't link to things that are restricted. I may have misstated that terribly, but the upshot is, is that a torrent file's not going to link you to something that you have to pay for. So at least to the extent it's restricted in that basis, you won't get it with a torrent file. Do I have that right at least?

**MR. ROTHKEN:** I understand what their argument is and I understand -- and I do understand what you are saying. But our argument is who guards the guards on this issue.

**THE COURT:** I'm sorry; you're going to need to --

**MR. ROTHKEN:** Who guards the guards?

**THE COURT:** Okay.

**MR. ROTHKEN:** Okay? Because just because they say it doesn't make it so. So, for example, I mean unfortunately I spend a large part of my time doing IP deals and IP litigation and I spend a lot of time in court and in arbitration wondering whether or not, you know, a particular screenshot on the back of a playing card is authorized or not if it comes from a movie. I mean there's so many iterations of all this that you have two things here. One, how is a search engine supposed to know whether or not a link arising out of a dot torrent file is authorized or not? I mean you can make the assumption that

everything's copyrighted once it gets into a tangible form. But, I mean, you know, is Batman Begins in Russia or China, you know, if the link goes there, so I mean it gets very, very complex.

And so our document request in this case is indicative of two things. One, the manifest frustration for a search engine to be able to know this, the legal status of a particular work on a particular server in a particular jurisdiction in a particular amount in a particular time. And so we're basically saying okay, for the works that you're claiming are infringed in this case give us all the paperwork on them. You know? Tell us. I'm going to get the sense probably they're going to write back and say, "We don't have all the paperwork." I mean that would be what my expectation would be. And then we may have another issue here.

But to the extent that they have all the paperwork, provide it. I'm assuming they probably have agents and agents and agents of those agents who probably do deals with other agents and then we have a big issue right here, because if my clients knew where they could find real time authorization status they would probably go ahead and avail themselves of it, if it were to be done in an automated process. And so -- and then with the MCA, and they're not complying with the MC -- well, they're not complying with the MCA, that's --

**THE COURT:** Well, they both say the other isn't,

so --

**MR. ROTHKEN:** Yeah, exactly. And we've asked for the URL.

So this is a very important document request for us, because we don't want to have a situation where they have their cake and eat it too, where they want to come in and analyze all these torrent files, analyze all these links, and then say everything's infringing and then not give us all the data that we need to be able to test the integrity of their assessment as to whether it's infringing or not. And we also don't want to have a situation where they're selective in the torrent files issues. You could have a Batman Begins torrent going to the full thing or part of it, and you could have it going to a five or ten second clip. And in the latter scenario it could very well be that five or ten second clip may not be infringing because someone made a deal with some site somewhere saying, "Okay, as a teaser you can go ahead and put this up on your site, it can't be more than ten seconds." I don't know. I wish I did.

And so this is an important request and we need to be able to get more documents than just sort of their assessment of general or unrestricted distribution. We need to get all the agreements they have for distribution so we can read them and say hey, wait a second, there's a clause in here which says if you use less than ten seconds or less than 30 seconds you

can go ahead and do it, or you could put a watermark on it, or use it for commercial purposes. I know I've seen some things on U2 on the Net where they show a scene from something where they then say, "See the rest on David Letterman tonight," you know, for the whole show. And so, you know, they'll show like ten seconds.

**THE COURT:** But even if that person has the right to disseminate it, why does that mean -- well, I guess you're saying if that person has the right to disseminate it, then the other person has the right to receive it.

**MR. ROTHKEN:** Well, my clients just link into things. If somebody has a right to make it into a torrent file or freely distribute it over the Net and they choose to make it into a torrent file -- I'm sorry, into a -- and it's linked to a torrent, then my client could use arguably their license and their fair use to defend against the secondary copyright infringement.

**THE COURT:** Okay. Would -- I'm not sure if it's you who should be answering this question. Let me see if I can formulate it in a way that makes sense to you. But if -- it sounds like there may be some deals going on where the studios are making some agreements with some distributors that would perhaps permit these files to be distributed via a torrent file of some kind, perhaps -- I don't know. But I'm trying to understand (a) whether that's right, and (b) how -- well, what

he’s saying somewhat resonates it. In other words if there’s a torrent file on his site that is one of those torrent files, how do you exclude that? I’m --

**MR. FABRIZIO:** Well, your Honor --

**THE COURT:** -- this is the part I’m having the most difficulty with understanding.

**MR. FABRIZIO:** Your Honor, the order, the Tentative Order --

**THE COURT:** Yes.

**MR. FABRIZIO:** -- gives him that. That’s --

**THE COURT:** See, I’m not sure it does, because he’s saying the general and -- well, unrestricted. Let’s look at -- why don’t we just look at what I had kind of crafted, and it was in large part based on Plaintiffs’ sort of backup suggestion.

Non-privileged documents regarding whether -- or reflecting whether Plaintiffs have authorized the general unrestricted distribution or availability over the Internet of all or part of the copyrighted works at issue, basically; why doesn’t that, Mr. Rothken, give you what you say you need?

**MR. ROTHKEN:** I think in the end it -- we would certainly want that category of documents, but I’m afraid that it’s precluding us from getting other categories of documents that the adversary concludes from a legal perspective doesn’t fit this and we disagree with their legal view. I have seen so

many agreements --

**THE COURT:** Give me an example.

**MR. ROTHKEN:** All right. I'll give you an example. Well, first of all, there may just be emails that go back and forth, and that's an agreement, and it's ambiguous. But let me think of some other agreements. Agreements like "Okay, movie company -- I'm sorry, movie house, you can go ahead and display with no restrictions a ten second clip of any movie we have that's showing at your theater."

**THE COURT:** Okay. Why isn't that an unrestricted distribution that's encompassed?

**MR. ROTHKEN:** They may argue that just the movie house's website could show it. We may argue after looking at the agreement that they didn't have that kind of restriction in there. They may decide to either imply it or make their own legal judgment. And in the hands of a good lawyer they would construe everything in a way that was against us. And since we have no way to know at the threshold what these agreements say we would be in the position of being totally subordinated to whatever their argument was.

**THE COURT:** So if it -- just to make sure I understand your argument. Are you saying that really what is relevant is what I've narrowed the scope of the request to seek, but that your concerned that they're going to withhold things that are within this category based on some legal

analysis they conduct?

**MR. ROTHKEN:** Correct. And I'll --

**THE COURT:** Okay.

**MR. ROTHKEN:** And I'll be able to prove it to you. Because if you gave us a document request saying provide to them everything that is copyright infringing, we would say we have nothing. And that's because my clients honestly believe under their interpretation of the law they're not infringing. And so they may believe under their interpretation of the law that whatever agreements that they have don't allow for -- you know, for someone to make a torrent out of it.

**THE COURT:** There's a little bit of a difference, and I don't mean to pick at your example, but --

**MR. ROTHKEN:** I understand.

**THE COURT:** -- but copyright infringement is a tad more complex, at least in my view, than the term "general and unrestricted distribution." Now, you all are in this industry and maybe that term is more complex than I'm understanding, but what --

**MR. FABRIZIO:** It's not, your Honor.

**THE COURT:** Mr. Fabrizio?

**MR. FABRIZIO:** It's not. And this is -- your Honor, after full briefing the only issue that Mr. Rothken's been able to identify that's remotely relevant here is the issue that your Honor identified in her Tentative ruling.

The notion that we get to play games would justify a document request that says please give us every piece of paper with writing on it, because once we start to narrow down what the categories are any good lawyer can say something's inside and outside a category. But that's counter to our obligations to proceed in good faith, and the system has checks and balances. He's going to get documents, he's going to ask for the depositions of the people that have information about the company policies for authorization, and he's going to get to probe these things. There's no reason to believe, and there certainly has been none shown, as to why we couldn't completely comply with your Honor's Order.

**THE COURT:** Okay.

**MR. ROTHKEN:** I'm just concerned --

**THE COURT:** Go ahead.

**MR. ROTHKEN:** -- that they're going to construe general or unrestricted in a way that is so broad that we'll get nothing, because they may just say, "Well, we never really -- we never overtly authorized the use in a dot torrent system," even though legally if we got all the documents we may be able to show the Court that they didn't say you couldn't do it. And then we could make argument over it. I think that's really what it comes down to.

**MR. FABRIZIO:** That's what the meet and confer process is for, your Honor.

**MR. ROTHKEN:** Well, we can't meet and confer if we never see the agreements in the first instance.

**THE COURT:** Well, let me -- reflecting whether Plaintiffs have authorized general or unrestricted distribution or availability, is there a way we can include the converse of that as well? By that I mean exclude the converse of that as well to the extent there's some gap that you're concerned about?

**(No audible response)**

You're probably not tracking my thought process on that. All right. It's not only what you have authorized, but what you haven't authorized. So excluding some categories that you have not authorized? Is that --

**MR. FABRIZIO:** Your Honor, discovery in this case has already established that the Plaintiffs have not authorized any of their movies or television shows for distribution to the BitTorrent network. I know the reports Mr. Rothken is referring to. I've read the same reports. None of that has happened. All of the -- this case involves conduct that has occurred through the Complaint filing, through today, basically what he's arguing is that at some point in the future when we come to an injunctive phase these issues may be relevant. But, your Honor, Courts continuously assess what's relevant at an injunction phase and if they think this issue is relevant for an injunction phase they'll order the discovery of it then.

But right now it’s all still hypothetical future activity.

**MR. ROTHKEN:** It is not hypothetical future activity. It has already occurred. They have already distributed torrent files and they have already distributed other works that have the exact names of copyrighted works that include parts of them.

**MR. FABRIZIO:** Can I --

**THE COURT:** On a general and unrestricted --

**MR. FABRIZIO:** Can I --

**MR. ROTHKEN:** Yes, they have, your Honor.

**MR. FABRIZIO:** That is -- let me address that, because Mr. Rothken is just blowing a little smoke here.

There is a concept, there is an anti-piracy concept, and copyright owners across the entertainment industry have been reported to put out fake files, files that are not what they purport to be. It might be something that is trying to look just like the real thing, labeled just like the real thing, but it will have -- maybe start with five seconds of the real thing and then be white noise or be an anti-piracy message. It is intended to combat the piracy that Mr. Rothken’s clients facilitate, not to be a use of their system.

I think Mr. Rothken is saying that because the copyright owners are engaged in measures to try and prevent the bleeding from piracy, that that in itself is a defense for

them. No Court has ever begun to comment such a theory.

**THE COURT:** Well, let me ask you this: Do you have anything responsive to the request as tentatively narrowed by the Court? Is there anything that you would be producing or is it, as Mr. Rothken saying he fears, that there is nothing and his view is it would be --

**MR. ROTHKEN:** Your Honor, may I just add one thing to that? And I want to -- can I?

**THE COURT:** Yes.

**MR. ROTHKEN:** Because this says "I've authorized general unrestricted distribution or availability over the Internet of all or part of Plaintiffs' copyrighted works." I take the five second so-called file that Mr. Fabrizio just mentioned as part and therefore I'm assuming hopefully that he's going to say that they do have documents responsive, at least those documents.

**MR. FABRIZIO:** Your Honor, the Tentative Order says, "part of Plaintiffs' copyrighted works alleged in the Complaint or for which we allege infringement." Copyright owners don't allege infringement for what is sometimes colloquially referred to as spoofs. That's an anti-piracy measure, your Honor.

**THE COURT:** All right, but let's --

**MR. FABRIZIO:** So the answer --

**THE COURT:** -- what's the answer to my question?

**MR. FABRIZIO:** The answer to your question is I do

not know because I have not checked with the client, but if we don't it is certainly not for the reason that Mr. Rothken has fostered. If we don't, it's because these deals have not come to fruition, they were never going to come to fruition, or as of the dates indicated there just are no such agreements. We have told Mr. Rothken in discovery that it has been verified that no such authorizations exist.

Now, it may very well be that the world changes a year from now or six months from now or even three weeks from now, but the Court will have plenty of opportunity in an assessing an injunction, and what's key is the injunction that's at issue, to determine whether Mr. Rothken's arguments warrant discovery into this issue to craft the appropriate injunction. It certainly cannot affect the behavior that's happened from today going backwards.

**MR. ROTHKEN:** I don't think we're going to get to an injunction, because I think that my clients are going to prevail. And I think as part of that we need to be able to get access. If they're going to allege their copyrighted works and they're going to go beyond the 10 or 12 or 14 that are alleged in the Complaint and they're going to have to produce all of their copyrighted works, certainly these five second or ten second so-called spoofs have to be produced, especially if my clients' site is indexing them, because they can't possibly be infringing. And it would be unfair for them to sort of --

**THE COURT:** You said because they can't be infringing?

**MR. ROTHKEN:** They cannot be infringing if they --

**THE COURT:** Right. So they're not then encompassed within this Complaint.

**MR. ROTHKEN:** Correct.

**MR. FABRIZIO:** And wouldn't be --

**MR. ROTHKEN:** No, no, they would be --

**MR. FABRIZIO:** -- subject to any claim for damages.

**MR. ROTHKEN:** -- they would be encompassed in this document request. And I'll explain why. The Complaint alleges around a dozen works --

**THE COURT:** Right.

**MR. ROTHKEN:** -- and then through argument Counsel has been making they're sort of claiming any and all copyrighted works, these are just representative ones. And our document request is asking in essence for all copyrighted works that you're alleging are infringing, give us files -- give us, you know, paperwork and deals related to distribution over the Internet that contain all or part of that copyrighted work. If there's five seconds that they've authorized of one of their works, we should be entitled to get the paperwork on that so we can make argument that we are linking to things that are authorized, even if it's five seconds.

You see, if you really distill it down to its

essence, they're not suing -- this is my argument, I think one day hopefully everyone will agree, but they're not suing TorrentSpy dot com really for copyright infringement, or even for secondary liability, they're suing them over having file names that sound like copyrighted works. And if they're putting into distribution file names that sound like copyrighted works, I don't know what you call it but it's relevant to this case. And if my clients' indexing file names that sound like copyrighted works that they put out there, that's also relevant to this case, especially if they put them out there and by doing it it's a de facto authorization. We've already got that sort of --

**THE COURT:** I guess I don't necessarily agree with you, though. That's not going to be up to me to decide. It seems to me that the ones that are in issue are the ones that they're alleging are infringing, not everything else that may be on there and may not be infringing, because everybody agrees that -- well I think everybody agrees there's lots of stuff on there that would not be infringing. So --

**MR. ROTHKEN:** Your Honor, if that was your view, not that you'd need this, but you'd have no greater advocate than me to embrace that point of view. If we could limit this case to just their alleged infringing works in the Complaint then we would narrow the request to only ask for those alleged infringing works and any portions of them that they went ahead

and allowed for --

**THE COURT:** Like I said, not exactly what I said.

**MR. ROTHKEN:** Oh, okay.

**THE COURT:** But --

**MR. ROTHKEN:** I just don't to have a -- I don't want to have this thing where --

**THE COURT:** Yeah. Here's --

**MR. ROTHKEN:** -- they get both.

**THE COURT:** Yeah. Here's sort of a quandary in my own mind and it's more of a cart before the horse and I'm not sure we're supposed to put the cart first.

**MR. ROTHKEN:** Right.

**THE COURT:** This is how I -- again, understanding that I may have an incorrect understanding, but --

**MR. ROTHKEN:** Right.

**THE COURT:** -- it seems to me that you want to find out who's infringing first. And you want to find out who has a license first. And who has -- if somebody is allegedly infringing and they have a license, he says that's why he needs the licensing. And you're saying I need the licensing first because then I know whether any of these people who are downloading are actually infringing that.

**MR. FABRIZIO:** But, your Honor, your Tentative Order puts the horse and the cart like on equal tracks. It would require us to provide documents reflecting authorization for

the works to be generally distributed to the BitTorrent network. That's the only thing Mr. Rothken's ever been able to identify as potentially relevant. We could make the argument that it's not. But we never have right now. And for discovery purposes we've urged that it be narrowed to that. Drafting arguments that spoofs are part of our copyright case is nonsensical. That is an anti-piracy measure. We are not claiming that the spoofs, to the extent they are distributed, are copyright infringement.

Every -- your Honor, I've been involved in these Internet PDP (phonetic) cases since the outset, so I've been involved in pretty much almost every one that's ever been litigated. And --

**MR. ROTHKEN:** It's not a PDP case now, but I can wait.

**THE COURT:** No, no, no.

**MR. FABRIZIO:** And every one to my knowledge that has ever been litigated as proceeded on the basis of illustrative works that are identified in the Complaint against which the claims of liability can be tested. After that, there are potentially thousands, maybe tens of thousands, of Plaintiffs' copyrighted motion pictures and television programs that are at issue in this case and when we eventually get the data from Defendants as to which ones of those have been -- which dot torrent files have been downloaded to initiate the infringement

of those works there will be a phase later in this case which the Court will sit down with the parties, as all the Courts have, and say okay, now, how do we want to proceed on determining -- now we’ve determined liability, how do we want to efficiently determine which of your works are to be considered for damages phase, and at that point in time of course we’re going to have to provide evidence sufficient to the Court of copyright ownership and that the works are not authorized. That’s the nature of proving direct infringement.

**THE COURT:** Let me ask you this: Has anybody discussed with either -- well, in this case Judge Cooper doing some sort of two-tiered discovery?

**MR. FABRIZIO:** Explicitly with Judge Wilson, and frankly I think we got of Judge Cooper’s chambers without reaching it. But, your Honor, it has always been our understanding, because it’s virtually impossible to proceed with an Internet case --

**THE COURT:** Well, I agree, it actually makes sense. It’s just not --

**MR. FABRIZIO:** We would be happy to have --

**THE COURT:** -- the way Judge Cooper has ordered at this point.

**MR. FABRIZIO:** We would be happy to have a case management conference with Judge Cooper or I don’t know if your Honor raises the issue of it. But it is a judicial

impossibility and it serves no purpose --

**(Electronic beep heard)**

Oops, I will be back.

Is that going to -- are they connected?

**THE COURT:** Have we switched to a digital system yet?

**(Court confers with clerk)**

**MR. ROTHKEN:** It's decidedly analog.

**THE COURT:** Okay. Next time we have a hearing hopefully we'll be on a digital system.

All right.

**MR. FABRIZIO:** In any event, your Honor, it is -- there is virtually no way to do it otherwise without wasting enormous amounts of court time, discovery time, and parties' time. When the Court finds liability these issues tend to work themselves out.

**MR. ROTHKEN:** Your Honor --

**THE COURT:** Look --

**MR. ROTHKEN:** I'm sorry.

**THE COURT:** Go ahead. I mean that makes sense to me. But -- go ahead.

**MR. ROTHKEN:** Here is our view of things. Okay? Dot torrent search engine gets sued. We want to know which are the dot torrent files that link to allegedly infringing works. They can download whatever they think are the third party works that are allegedly infringing and they could tell us what they

are.  And the problem that we have right here is this, everyone would have to be really intellectually honest about it, is that I’m finding, at least from my view, that the Plaintiffs do not want to tell us what they are because they’re so concerned that we’ll then remove them, that we’ll destroy their case.  I know that’s an irony.  We have the DMCA policy up there; the RRA has used it, the MPA has not.

The problem that we have in this case is that if they were to go ahead and identify what the works are they believe are infringing, which they have a complete control over, because they can go and use that site anytime they want, they can click on a dot torrent file, they can go ahead and have their experts listen to whatever works they want, and they could tell us in discovery this is an alleged infringing work that we believe is infringing --

The hash value and then compare it against this one?

**MR. ROTHKEN:**  We would love to have that.  And every time they’ve given a hash value the work’s been taken down. And then at least we would have an organized process.  And I think that a wonderful way to go about doing this would be for them to be ordered to provide to the Defendants, so that we don’t have a moving target, all the alleged primary infringing works for which secondary liability they’re trying to establish and the dot torrent files that lead to those works and the hash values.  And I’ll tell you what will happen.  They’d have a

de facto injunction, because they'll be removed immediately so there's no need for an injunction. There's a DMCA policy. And number two, we could then test, we don't think we'll have to because we don't think there's secondary liability, but assuming we want to be good lawyers we would then test for each of those works the rights of the primary infringer to see what their fair use rights were, because we can benefit from them if they had fair use and if they had a license, implied or otherwise, and that would be the best way to go about doing this.

The irony of this whole thing -- you got it, okay.

**THE COURT:** That motion's not before me.

**MR. ROTHKEN:** Right. So we need to get --

**MR. FABRIZIO:** And, your Honor --

**MR. ROTHKEN:** So we need to get -- we need to get -- if they're going to allege secondary infringement arising out of primary infringement, then they've got to give us the documents related to the works that they're claiming primary infringement over so that we can go ahead and look at the agreements related to licensing over the Internet and see whether we agree or disagree about authorization and fair use and any other illegality --

**MR. FABRIZIO:** Your Honor?

**MR. ROTHKEN:** -- that's reasonably calculatory to admissible evidence, certainly at least for the works they

mention in the Complaint.

**MR. FABRIZIO:** Your Honor?

**THE COURT:** Okay.

**MR. FABRIZIO:** Excuse the smirk and the sarcasm, but we have now seen the last refuge of the pirate scoundrel. Every pirate at some point, and I don't mean Mr. Rothken and his clients, comes back to the argument that Mr. Rothken just gave, is that if you just tell us what it is that we're infringing upon is, we'll take it down.

I promise you the Defendants didn't think American Idol was a public domain work, or Alias, or any of the other works here, but they created special categories to organize their name ranges.

**MR. ROTHKEN:** They did not create special categories.

**MR. FABRIZIO:** Your Honor, Congress has already spoken to that issue. We don't have that obligation. We don't have it because it is a cynical effort to have the copyright owners chase their tails until they get dizzy and fall down, because as quickly as we can identify individual line item works, Mr. Rothken's clients' machinery will add two. So we'll find one on day one, it will take them three days to take it down, on day two there will be 20 more. We will spend our whole life chasing down pirated works and never catch up and that's exactly what every defendant wants in these cases. But Congress already spoke to that with DMCA and it said the safe

harbor only applies to innocent service providers, and the moment you lose that innocence you lose your safe harbor. And we believe the Defendants lost their innocence a long time ago and that's one of the issues in this case.

**THE COURT:** All right --

**MR. FABRIZIO:** But it is not a discovery issue, your Honor.

**THE COURT:** Yeah, that's not an issue that's before me, so you only have to produce this. We'll conclude on that.

I'm going to stand by the Tentative with respect to 24. I understand your argument, Mr. Rothken. I suppose I go back to when I asked you the question about are you saying that what's here is really what's relevant and that the other you're talking about needing for purposes of verifying that they've given you what's covered by here? That's what I keep coming back to in my mind. So I'm going to stand by 24.

Do you want to address -- does either party want to address the other requests?

**MR. ROTHKEN:** Yes. Very quickly.

As far as your standing by this Order, though, is it the Court's view that if it's a copyrighted work they're claiming infringement of and it's five seconds in a so-called spoof that we'd at least be entitled to get that as well?

**MR. FABRIZIO:** We're not claiming infringement of that, your Honor.

**THE COURT:** That's right. I don't think they're claiming infringement of that.

**MR. ROTHKEN:** Of that file. But of the work and that's part of the work.

**THE COURT:** But I thought it was -- well --

**MR. ROTHKEN:** You see it says --

**THE COURT:** -- let me look at it. Hold on.

**MR. FABRIZIO:** Your Honor, if I may, to clarify?

**THE COURT:** Let me read it again, please.

**MR. FABRIZIO:** Sure.

**(Pause)**

**THE COURT:** I understand his interpretation. Go ahead.

**MR. FABRIZIO:** You understand what --

**THE COURT:** I understand --

**MR. FABRIZIO:** Okay.

**THE COURT:** -- I understand his interpretation.

**MR. FABRIZIO:** I understand Mr. Rothken to be saying if we're claiming that they are infringing the full run feature motion picture of the Godfather but at the same time a copyright owner has put out a fake version of the Godfather and has a two second clip in it that we either have to produce related to the spoof or no longer claim infringement of the Godfather full length feature. And that's --

**THE COURT:** Well -- no, no --

**MR. FABRIZIO:** -- not how the copyright law works.

**THE COURT:** I guess what I'd be -- let me ask you this question then. Are you claiming -- because defining what a part is is where we come to, because are you claiming infringement with respect to parts of copyrighted works?

**MR. FABRIZIO:** No, your Honor. And your Order leaves it to us to decide we're either claiming infringement and we have to produce the documents or we're not and we don't. So your Order is self-executing on that issue.

**THE COURT:** But you're saying you're not.

**MR. FABRIZIO:** We are not claiming -- no. This whole concept of spoofs, whether it's five seconds --

**THE COURT:** No, no, no, no. I'm not saying spoofs --

**MR. FABRIZIO:** -- ten seconds, or 30 seconds.

**THE COURT:** -- spoofs. I'm just saying parts of Plaintiffs' copyrighted works. It's a little more broad there.

**MR. FABRIZIO:** Your Honor, the only things we allege in the Complaint are full length motion pictures and full length television shows. Now, I don't want to get into the subtlety of what happens if four seconds are cut off at the end because it's a bad stolen copy.

**THE COURT:** That's why I say the term "parts" is --

**MR. FABRIZIO:** But these are full length motion pictures, full length or substantially full length motion pictures and television programs. That is what is at issue in

this suit.

**MR. ROTHKEN:** Your Honor? This is an important point.

And I appreciate you, by the way, taking all this time. It's unprecedented and I appreciate that.

If they are putting out five second or two-second clips of Godfather and TorrentSpy is indexing it, not only does that go towards -- well, actually it goes towards knowledge. How could TorrentSpy have knowledge of infringement when it's indexing through its own process these things that stink, things that have absolutely no usefulness? It would actually be more than relevant; it would be downright persuasive evidence that they're not inducing infringement. So I think it's very relevant and very reasonably calculatory to lead to admissible evidence and I think it should be produced. Because they shouldn't be allowed to come in and say, "You're really bad because you're trying to induce people to download Godfather, the movie, and not produce Godfather, the two second non-infringing thing that they're indexing as well. So I think we need to be able to get that to show that automated systems are copyright agnostic.

**MR. FABRIZIO:** Your Honor --

**MR. ROTHKEN:** And certainly the jury would be, you know --

**THE COURT:** All right. Let me -

**MR. FABRIZIO:** Can I --

**THE COURT:** -- I understand your point, but here’s how I’m going to modify this. Because if there’s a part that you’re going to claim infringement of at some point, then I think it should be covered, but only to the extent you’re going claim infringement. If you’re saying you’re not going to claim infringement with respect to --

**MR. FABRIZIO:** Your Honor, that’s how I read your current Order, but --

**THE COURT:** Okay. But I don’t think -- I think it is capable of being read more broadly, as Mr. Rothken has just said. General or unrestricted distribution or availability over the Internet of -- let’s see -- of those of Plaintiffs’ copyrighted works or parts thereof alleged in the Complaint or listed in the attachment for which you are claiming that they’ve infringed. So I’ve modified, instead of “over the Internet all or part of Plaintiffs’ copyrighted works alleged” to “those of Plaintiffs’ copyrighted works or parts of such works alleged in the Complaint or listed in the attachment and any others for which they’re claiming infringement.” So that if there is a part of a copyrighted work that you are preserving your ability to complain about, then this would require you to produce the information about it. Okay? Does that make sense?

**MR. FABRIZIO:** It makes sense, your Honor. I

understand what you’re saying.

**THE COURT:** All right. And does that address your concerns?

**MR. ROTHKEN:** Yes, it does --

**THE COURT:** Okay.

**MR. ROTHKEN:** -- and we appreciate it.

**THE COURT:** All right.

**MR. FABRIZIO:** I think 26 is the exact same issue, your Honor.

**THE COURT:** Yeah, 26, I would make a similar step. I haven’t really let you argue on it, but my inclination if it’s a comparable issue would be to modify it in the same respect. Those of -- so on Paragraph 4, fourth line, “Available on a general or unrestricted basis those of Plaintiffs’ works or parts thereof alleged in the Complaint or listed in the attachment to the Complaint,” et cetera.

All right. Anything further?

**MR. FABRIZIO:** For which Plaintiffs are asserting or preserving a right to assert copyright infringement.

**THE COURT:** Right. I just didn’t finish -- yes.

**MR. FABRIZIO:** Okay.

**THE COURT:** The sentence continues on.

**MR. FABRIZIO:** Okay.

**THE COURT:** I just stopped reading at that point.

**MR. FABRIZIO:** Thank you, your Honor.

**MR. ROTHKEN:** Your Honor, with respect to BitTorrent, Incorporated --

**THE COURT:** Okay, so we're on Request 26?

**MR. ROTHKEN:** Yeah. I thought that's where you went just now --

**THE COURT:** Yes.

**MR. ROTHKEN:** -- I apologize. Number 26, we would like to be able to get any and all agreements between the Plaintiffs and BitTorrent, Incorporated and not just related to authorizations for copyrighted works. BitTorrent, Incorporated has a competing search engine that competes with TorrentSpy. I think maybe the first torrent search engine. And we believe that it's quite likely that one or more of the Plaintiffs has an ownership interest in BitTorrent, Incorporated's search engine and we believe that that would at least be reasonably calculatory to lead to admissible evidence.

**THE COURT:** Tell me why.

**MR. ROTHKEN:** Well --

**THE COURT:** What's it relevant to show?

**MR. ROTHKEN:** I think it's relevant to show that, at least for a number of affirmative defenses, that there is some inequitable behavior, there may be copyright misuse, and --

**THE COURT:** Okay. But point me to -- again, the standard for relevance is it is, and I put it in here I think, it makes a fact that is in issue more or less likely. So what

fact in issue would that information tend to make more or less likely?

**MR. ROTHKEN:** I think it would make more or less likely that the Plaintiffs that have agreements for ownership interest in a search engine that does relatively the same thing as TorrentSpy dot com, that they're engaged in copyright misuse.

**THE COURT:** Okay. And why is that relevant?

**MR. ROTHKEN:** If a Plaintiff owns part of a search engine that competes with TorrentSpy that does the exact same thing, then I think that an argument could be made that they're leveraging a large number of copyrights they own to essentially try to monopolize the entire torrent spy system. So it's --

**THE COURT:** Okay. That --

**MR. ROTHKEN:** And the torrent file format.

**THE COURT:** Okay. That might be relevant to some sort of antitrust lawsuit. Why is it relevant in this?

**MR. ROTHKEN:** I think it may also be relevant that by taking some copyrights they own they're trying to make it so in relation to copyrights they don't own TorrentSpy dot com may not be allowed to even search those because it's copyright agnostic. You can't know ahead of time when it's linking to a particular dot torrent file what its legal status is. And --

**THE COURT:** I'm sorry, you're going to have to -- I didn't track that.

**MR. ROTHKEN:** All right.

**THE COURT:** I think because we've been here a while, but --

**MR. ROTHKEN:** I understand. In looking at some of their remedies they're looking in essence to shut down TorrentSpy dot com. They're not looking to provide information to TorrentSpy dot com so that they could filter its torrent files, because if they did it would happen; in other words, if they gave us the torrent files that we're infringing. So they're trying to stop TorrentSpy dot com from being able to crawl the Net to look for dot torrent files under the risk that some of them may ultimately link to their infringing works. And so they're leveraging a large amount of their copyrights to say, "Gee, TorrentSpy, since you can't through automated processes do anything but statistically likely, you know, every now and then link to our infringing works, therefore you can't have a search engine at all unless you do it manually." And yet they own all or part of a competing search engine that BitTorrent has. I know that Time Warner owns AOL dot com and they use Google, which has dot torrent search results in it.

And so we're just trying to go ahead and get this information. It's no burden whatsoever for them to give us this probably very few agreements with BitTorrent, Incorporated and so we should be allowed to be evaluate them --

**THE COURT:** Well, what I hear you saying basically is

that you think one of the parties may have a bias because of some business ownership interest in some competing torrent site and that that is driving the litigation.

**MR. ROTHKEN:** Bias may be too kind. I think --

**THE COURT:** Well, bias has resulted in some litigation --

**MR. ROTHKEN:** Yeah, bias --

**THE COURT:** -- and that's why I --

**MR. ROTHKEN:** -- bias -- bias -- bias as a witness, certainly. I mean that would be wonderful use for impeachment. But even more so, we believe they're trying to leverage their copyrights, because they own lots of them, so that -- and I could actually prove this to you right now, that they're leveraging --

**THE COURT:** But -- yeah, I mean I understand your point, but I come back to it's not clear to me how, even assuming that were true, that it's relevant to the merits of the litigation.

**MR. ROTHKEN:** Well, I would have to say that if a witness from this particular Plaintiff or Plaintiffs took the stand I think it would be relevant to a jury --

**THE COURT:** So that's why I asked you the bias question.

**MR. ROTHKEN:** Yeah. I mean certainly it does show bias.

**THE COURT:** Okay. Any other way that it would be --
**MR. ROTHKEN:** I believe --
**THE COURT:** -- relevant for purposes of this litigation?
**MR. ROTHKEN:** -- copyright misuse. I also think that --
**THE COURT:** I'm still not -- you keep using that term, and I guess I'm not --
**MR. ROTHKEN:** Copyright misuse is where you try taking your copyrights that you own and leverage them to stop somebody from doing things that go beyond the copyrights.
**THE COURT:** Okay. And how is -- is that an affirmative defense that is recognized in the law? I mean how is that relevant for purposes of the litigation?
**MR. ROTHKEN:** All right.
**THE COURT:** That's what I'm really just trying to understand.
**MR. ROTHKEN:** Okay. Two things. Okay? I'm making argument. I'm going to acknowledge to this Court that I have not seen it succeed yet in one of these cases. I have seen it raised in almost every case. Okay?
**MR. FABRIZIO:** And rejected in almost every case.
**THE COURT:** Well, as a matter of law or as a matter of fact?
**MR. FABRIZIO:** Judge Wilson just rejected this

defense as a matter of law.

**MR. ROTHKEN:** So that's my first thing. I didn't know about that case, I was thinking of another case. So that's the first thing.

Secondly, I think that we have a different situation right here. I don't know about Judge Wilson's thing, but --

**THE COURT:** Neither do I.

**MR. ROTHKEN:** Okay. But if I could just reverse it for a second, in thinking about this case I say to myself under the Plaintiffs' view of this case, how would we make a legal dot torrent search engine? How would we do it? You send out a spider. It indexes dot torrent files. It's statistically likely it's going to index infringing ones. Therefore if that's the standard, you lose. You can't --

**THE COURT:** So do you -- or do you before you post them clear it with the copyright owner?

**MR. ROTHKEN:** Then you cannot have a search engine that has automated processes. It would bring -- if you have to do that for PDF files, for dot HTML files, like the Web, you know, or any other type of file search, it would make it impossible to search for things. You would be limited to a warehouse full of people, and then I could promise you one thing, your Honor, those people in the warehouse are going to make wrong decisions.

**MR. FABRIZIO:** Your Honor, Mr. Rothken's arguing as

if there’s a strict liability statute that applies here. We have a burden. And it’s our burden. We have to show that they acted with an object to foster the infringement. We have to show that they had knowledge of the infringement and with that knowledge contributed to it. We have to show that under circumstances where they have the right and the ability to supervise and control that infringement, instead of stopping it they went ahead and received profit directly attributable to that infringement. Everything Mr. Rothken just said is handled by the burden.

What this is, your Honor, is this is an attempt to get at the most sensitive -- commercially sensitive documents that his clients might want to understand what business deals are being tracked in this phase. Every Plaintiff is a competitor of each other in this regard. One Plaintiff doesn’t know what another one is doing, and I promise you, your Honor, they don’t tell for that reason, since I represent all of them.

**THE COURT:** Well, let me ask you this: Do you think it would be relevant if you called a witness to the stand who is part of a company that has an ownership interest in BitTorrent, Inc.?

**MR. FABRIZIO:** Your Honor --

**THE COURT:** Do you think it would be relevant to bias for that witness?

**MR. FABRIZIO:** Your Honor, I think the answer is no,

but there's a safety. If Mr. Rothken's clients are engaged in copyright infringement, then the law provides remedies against them. If one of the companies has an ownership interest in a company that is using bit torrent technology lawfully --

**THE COURT:** And how is that --

**MR. FABRIZIO:** -- that's exactly how the copyright laws are supposed to work. They're supposed --

**THE COURT:** So you're saying there's no improper motive.

**MR. FABRIZIO:** Of course there's no improper motive.

**THE COURT:** So it would be irrelevant if there was some other bias.

**MR. ROTHKEN:** The Plaintiffs have asked for any and all documents related to litigation --

**MR. FABRIZIO:** What do you mean?

**MR. ROTHKEN:** -- from the Defendants.

**MR. FABRIZIO:** You've got that backwards.

**MR. ROTHKEN:** The Plaintiffs have asked in their document --

**THE COURT:** You're saying the picture industry has asked --

**MR. ROTHKEN:** Correct. And the picture industry sued BitTorrent, Incorporated. And certainly we're entitled to the settlement agreement that they reached in those cases. It's reasonably calculatory to lead to admissible evidence on what

they could --

**THE COURT:** Okay, now we're on Request Number 38, which you did not meet and confer on.

**MR. FABRIZIO:** It's another request. And --

**THE COURT:** Okay.

**MR. ROTHKEN:** No, no, no, no, no.

**MR. FABRIZIO:** -- as far as I know, and I've represented the studios in all of their bit torrent litigation, there's never been a suit against BitTorrent dot com.

**THE COURT:** Okay --

**MR. ROTHKEN:** Request Number 26 references agreements involving BitTorrent, Incorporated. It would also reference settlement agreements.

**MR. FABRIZIO:** Okay. I can represent there is no settlement agreement of a litigation with BitTorrent dot com, Inc.

**THE COURT:** Okay. All right. I haven't heard anything that causes me to modify the Tentative with respect to Request Number 26, other than as I've already modified it. So why don't we move on.

**MR. FABRIZIO:** Your Honor? Can I --

**THE COURT:** Yes.

**MR. ROTHKEN:** Number 20 --

**MR. FABRIZIO:** Can I ask a quick question on both 24 and 26? I understand exactly what your Honor is saying and

it’s clear on the record, but I noted that the modifying clause “for which Plaintiffs are claiming Defendants infringed,” is inside a parentheses and might not actually modify the entire “alleged in the Complaint or in the attachment to the Complaint or any others” --

**THE COURT:** So you’re proposing to leave in the parentheses?

**MR. FABRIZIO:** Yes. Or making clear that the “for which Plaintiffs are claiming Defendants infringed” modifies all that comes before it.

**(Pause)**

**THE COURT:** All right. Any other works or parts of works -- after the words “and any other works or parts of works for which Plaintiffs are claiming Defendants infringed.” Does that address the ambiguity?

**MR. FABRIZIO:** I think so, your Honor, but I wasn’t -- I didn’t exactly where you began so I wasn’t exactly sure where it ended.

**THE COURT:** Okay. Let me --

**MR. FABRIZIO:** I’m sorry.

**THE COURT:** -- let me read the sentence:

“The Court narrows the request” --

And this is Paragraph 4.

“The Court narrows the request to documents reflecting whether Plaintiffs have authorized

BitTorrent, Inc. to distribute or to make available on a general or unrestricted basis those of Plaintiffs' copyrighted works or parts thereof alleged in the Complaint or listed on the attachment to the Complaint and any other works or parts of works for which Plaintiffs are claiming Defendants infringed,"

and then the sentence goes on.

**MR. FABRIZIO:** As long as your Honor is comfortable with the interpretation that "for which Plaintiffs are claiming Defendants infringed" modifies "any other works or parts of works" as well as "copyrighted works or parts thereof alleged in the Complaint or listed in the attachment to the Complaint."

**MR. ROTHKEN:** Then we have a moving target if that's the case. You have only alleged the ones -

**MR. FABRIZIO:** No, no, no.

**MR. ROTHKEN:** -- that don't have those five-second spoofs. We want to be able to get it all.

**THE COURT:** No, no, no. But --

**MR. FABRIZIO:** We've already been though this.

**THE COURT:** No, no, no.

**THE COURT:** This is just to clarify that the -- your Honor has already explained exactly what she wants on the record. I just want to make sure that the language of the Order makes clear that the works that are subject to the Order

are those works that are in the Complaint, those works that are attached to the Complaint, or any other works or any other parts of works for which the Plaintiffs are claiming Defendants have infringed.

**THE COURT:** That's how I understand it. And I'm not including spoofs, because they're not claiming infringement with respect to spoofs.

**MR. ROTHKEN:** But the works that they're claiming infringement of, let's just say Godfather, for example, if there's a three or five second spoof of that, that's part of the Godfather and we --

**THE COURT:** But it's not a part that they're claiming infringement of.

**MR. FABRIZIO:** Exactly, your Honor.

**MR. ROTHKEN:** But that would go -- I'm sorry, your Honor. I mean we argued this already, I thought I actually prevailed on it. But that would go to whether or not my clients have knowledge, because if their linking to part of a Godfather work that they authorized and it's only five seconds long, that's relevant to this case.

**MR. FABRIZIO:** Your Honor --

**THE COURT:** But this doesn't include --

**MR. ROTHKEN:** It's relevant to inducement --

**MR. FABRIZIO:** It's not --

**MR. ROTHKEN:** -- which is -- it's more of a gestalt-

type theory.

**THE COURT:** Okay. I've ruled on this. I'm just going to leave it as it is. Okay?

Let's move to Subparagraph D, Request Numbers 27 to 28 and 39 to 40.

**MR. ROTHKEN:** Well, Number 27 again relates to BitTorrent and --

**THE COURT:** Well, bit torrents in general, not a particular entity I didn't think.

**MR. ROTHKEN:** That's correct, but that would also include the entity I suppose arguably. But the -- so we're just asking them for documents related to the bit torrent, which is a technology, and we believe it's relevant to this litigation.

**THE COURT:** Well, I guess I'm trying to figure out why? I mean one can hit bit torrents and torrents bit on the Internet and get, you know, multiple Encyclopedias' worth. I'm trying to figure out what precisely is relevant about this and --

**MR. ROTHKEN:** Well, I would agree with you -- I would agree with you that there could be some overbreadth to this. But by the same token I suppose we would be interested in documents that weren't otherwise publicly available related to BitTorrent and their suing my client over their implementation over their implementation of torrent file search. And if they

have documents, for example, related to filtering technologies, related to substantial non-infringing uses, all those things would be helpful.

**MR. FABRIZIO:** Your Honor?

**THE COURT:** Okay. If you think there are ways you can narrow these, then you are free to try to work that out with that. But at this point all I have before me are these requests, which seemed incredibly broad to me, and I guess which I come back to I'm just simply not persuaded at this point --

**MR. ROTHKEN:** All right.

**THE COURT:** -- how relevant they are. So I will make -- these rulings are without prejudice. If you all, you know, want to talk and try to narrow this and come up with something, so be it, but right now they're just too broad.

**MR. FABRIZIO:** We talked about these second requests several times and, your Honor, this is the equivalent -- if I start a business where I am providing getaway cars for bank robbers, you don't get discovery of automotive technology.

**THE COURT:** No, I understand that. And that's why I've ruled the way I've ruled.

**MR. FABRIZIO:** Okay. Defendants have briefed this and they admitted that it was based -- this is only on speculation, they admitted that in their papers at our Joint Stip at 24, Line 6.

**MR. ROTHKEN:** I don’t agree that we admitted on speculation. That means torrents --

**THE COURT:** But, as I said, I’m not sure there’s anything more to say at this point.

**MR. FABRIZIO:** Your Honor, thank you.

**MR. ROTHKEN:** Torrents --

**THE COURT:** I am granting the Protective Order on this point. I’m denying the Motion to Compel on this point. If you’re able to narrow these and refine them --

**MR. ROTHKEN:** Okay.

**THE COURT:** -- in some way that they do call for relevant things then, you know, I’m happy to look at it again.

**MR. ROTHKEN:** All right. I appreciate it. I know it’s getting late --

**THE COURT:** Yeah. So as to --

**MR. ROTHKEN:** -- and we will try to narrow them.

**THE COURT:** All right. Request Number 38 again, there wasn’t a Motion to Compel; it was in the Protective Order. There’s nothing more to say on this one I don’t think.

**MR. ROTHKEN:** Right.

**MR. FABRIZIO:** Yeah.

**THE COURT:** All right. And anything further then on any matters raised at this time?

**MR. ROTHKEN:** Yes. Now that we’re at the end I want to make one last-ditch attempt, and I -- you know, and I

apologize for doing it. But my last ditch attempt is this: If they're going to raise an inducement theory, which is like a gestalt theory, it's like you are linking to lots of Plaintiffs' copyrighted works and therefore you're inducing. And there are many factors. One of those facts is possibly the number of infringing works you're linking to. We believe that we should be entitled to get those so-called five second files that they put out there. It is absolutely critical to this case that we get what they themselves are doing. If they are authorizing even spoofs, even calling it anti-piracy, and search engines like my clients, maybe even Google and others, are picking them up, that's very important for us to be able to raise on state of mind, which is part of the inducement theory, because if anyone had a really bad state of mind then you wouldn't have these spoofs manifested on TorrentSpy dot com, or at least arguably it would be an argument that we could make. Okay? And that is directly relevant.

And so for us to be able to get this information allows us to show this is the result of automated processes. They're copyright agnostic and they're going to get maybe possibly a copyrighted cartoon and they're going to get absolute junk and that's the nature of it. And we can't construct a search engine for dot torrent files any other way.

**THE COURT:** Let me ask you this: If there is an anti-piracy spoof out there, is it fair to say that that's

something that the maker of that work has authorized?

**MR. FABRIZIO:** No.

**THE COURT:** Not with the anti-piracy work?

**MR. FABRIZIO:** Not on the -- the fact that a copyright owner whose works are being infringed by the thousands or the hundredfold, thousandfold, tries to have an anti --

**THE COURT:** No, I don't think -- I don't my question was clear.

**MR. FABRIZIO:** Okay.

**THE COURT:** I'm not saying you've authorized the work.

**MR. FABRIZIO:** Okay.

**THE COURT:** I'm saying you've authorized the spoof.

**MR. FABRIZIO:** Like the white noise?

**THE COURT:** Yes. That's the whole point of it, right?

**MR. FABRIZIO:** I think the only part of the spoof that would be relevant to the copyright case is the part that may or may not be a snippet of the actual movie.

**THE COURT:** Exactly.

**MR. FABRIZIO:** And, your Honor, that's done so that people that start downloading it see a second or two so that they will continue downloading.

**THE COURT:** Yeah, I understand that.

**MR. FABRIZIO:** It's for anti-piracy purposes, your Honor. It's not an entertainment value.

**THE COURT:** No, I understand that exactly. But I suppose what I'm trying to get to is if they're going to find a spoof anti-piracy on the website it's probably safe for them to assume, exactly because of that, that it is an anti-piracy tool, that it was something that you all authorized.

**MR. FABRIZIO:** We're certainly not claiming infringement based on it. Your Honor, this is -- these are the most highly secret anti-piracy measures. And what Defendants want is a look-see at how we are conducting anti-piracy operations as to their specific site. It doesn't relate to any issue in this case. The notion that it relates to knowledge because somehow it would reflect on innocent knowledge that they were facilitating the downloading of a work that looks like the <u>Godfather</u>, smells like the <u>Godfather</u>, feels like the <u>Godfather</u>, and everyone that downloads it thinks, unless they get the full result, is the <u>Godfather</u>, it doesn't show an innocent intent, it shows the same guilty intent as if it were the real <u>Godfather</u>.

**THE COURT:** Let me --

**MR. ROTHKEN:** If you want to make argument over that, I would argue that if they're going to go on an inducement theory and claim that because these link names are all bad and they say the word -- like he started off today with this

category -- which by the way these are all automated and created by users, not my clients.

**MR. FABRIZIO:** That is not true --

**MR. ROTHKEN:** Okay.

**MR. FABRIZIO:** -- as far as I understand.

**MR. ROTHKEN:** Okay.

**THE COURT:** Okay.

**MR. ROTHKEN:** That if they're going to go ahead and say, "Okay, having the name Godfather in a string in a file name means that you know that it's Godfather, the movie, then certainly it's relevant for us to get in discovery times when Godfather is used in a string in a file name where they put it out into the public and authorized it.

**THE COURT:** Okay. I'm not sure we're going anywhere on that. And I think I'm done for the day.

**MR. ROTHKEN:** Thank you.

**THE COURT:** Thank you, Counsel. It's been very enlightening.

**MR. FABRIZIO:** Thank you, your Honor.

Your Honor?

**THE COURT:** Yes.

**MR. FABRIZIO:** Just to wrap up?

**THE COURT:** Yes.

**MR. FABRIZIO:** I realize that a number of the documents that you wanted were not filed with you and as I went

back over our motions I realized that there were some other errors in complying the Rules.

**THE COURT:** Well, I figured that's why suddenly I was seeing Fabrizio declarations instead of Pozza declarations --

**MR. FABRIZIO:** No, no, no, no --

**THE COURT:** Okay.

**MR. FABRIZIO:** -- any mistakes that I made, your Honor, are mine, not Duane Pozza's.

**THE COURT:** Okay.

**MR. FABRIZIO:** He keeps me honest, not the other way around.

**THE COURT:** Okay.

**MR. FABRIZIO:** I just wanted to let the Court know that we don't find that acceptable, we know you don't, and we are going to make sure it doesn't happen.

**THE COURT:** Okay. I appreciate that.

Just lastly, sorry, we all want to go, but think about whether you want to regular set-up conferences in this case, whether you want the Court to be involved wherever you're going to a stipulation to extend a deadline, you may want to talk about that amongst yourselves, but --

**MR. FABRIZIO:** Some of the --

**THE COURT:** -- as wonderful as you gentlemen are, I'd rather see less of you than more of you, but I also want this to proceed expeditiously and I want to minimize disputes and if

it’s a question of doing that by being more regularly involved, then I will do that. Okay?

**MR. ROTHKEN:** Your Honor?

**THE COURT:** All right.

**MR. ROTHKEN:** I have one question for you. There’s -- I saw a Motion to Admonish that’s been put on file.

**MR. FABRIZIO:** Yes, sir.

**MR. ROTHKEN:** Is there any way we can appear by telephone for any of these things? I’m up in Northern California.

**THE COURT:** Yeah, I haven’t -- other than seeing it’s volume, I have not looked at that.

**MR. ROTHKEN:** Right.

**THE COURT:** So let me look at that. Given what it seeks, it’s the kind of thing where -- who knows, I may end up just submitting it on the papers.

**MR. ROTHKEN:** Right.

**THE COURT:** But I’ll ask the law clerk to remind me that you’ve made a request to do that telephonic if we do in fact need one. Okay?

**MR. ROTHKEN:** Okay. I appreciate it, your Honor. Thank you.

**THE COURT:** All right. Nothing further?

**MR. ROTHKEN:** Nothing further.

**THE COURT:** All right.

**MR. FABRIZIO:** Nothing further. Thank you very much, your Honor.

**MR. ROTHKEN:** Thank you very much for your time.

**THE CLERK:** Court is adjourned.

**(This proceeding was adjourned at 1:05 p.m.)**

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

| | |
|---|---|
| _______________________________ | February 23, 2007 |
| Signed | Dated |

***TONI HUDSON***

**FEDERALLY-CERTIFIED TRANSCRIBER**