Columbia Pictures Industries Inc v. Bunnell Doc. 389

**Ira P. Rothken (SBN #160029)**
ROTHKEN LAW FIRM LLP
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 924-4250
Facsimile: (415) 924-2905

**Kirk J. Retz (#170208)**
LAW OFFICES OF KIRK J. RETZ, APC
21535 Hawthorne Blvd., #200
Torrance, CA 90503
Telephone: (310) 540-9800
Facsimile: (310) 540-9881

Attorney for Defendants
Justin Bunnell, Forrest Parker, Wes Parker and Valence Media, Ltd.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>JUSTIN BUNNELL, et al.,<br><br>Defendants. | **Case No. 06-01093 FMC (JCx)**<br><br>**DECLARATION OF WES PARKER IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT BY THE COURT**<br><br>Date: May 5, 2008<br>Time: 10:00 a.m.<br>Judge: Florence Marie Cooper<br>Ctrm: 750 |



Dockets.Justia.com

I, Wes Parker, declare:

1. I am a defendant in this action and have at all material times been a principal of defendant Valence Media, Ltd. I make this declaration in opposition to plaintiffs' Motion for Default Judgment. All statements made herein are on personal knowledge unless otherwise stated. If called as a witness, I could competently testify as to the facts herein stated.

2. I have re-read both my Declaration in Opposition to Plaintiffs' Motion for Terminating Sanctions, which was filed on September 11, 2007, and the Court's December 13, 2007 Order Granting Plaintiffs' Motion for Terminating Sanctions.

3. In retrospect, it is clear to me that I exercised poor judgment in connection with matters identified in the Court's Order Granting Plaintiffs' Motion for Terminating Sanctions. I made errors that suggested that I did not respect the Court and its processes. I certainly understand now the consequences of my errors and poor judgment.

4. I have worked in small technology businesses with people who are without experience in high-stakes litigation. There is no way to explain to a new litigant what litigation is like and we were confused while trying to find a proper approach, like any newcomer. We feel that we were targeted for unrelenting attack by the MPAA and Plaintiffs herein, industrial giants who were determined to control a vital area of new technology and to destroy us in the process. As we see it, Plaintiffs and the MPAA recognize no limits and their methods included a direct attack on the integrity of our business and invasions of our privacy for which they paid $15,000 and that was illegal but for which we have no redress. In this litigation, cost is no factor for them, which is our misfortune. We are now and have always been opposed to the plans of Plaintiffs and the MPAA but, during the litigation, we feared their attacks and we feared that we did not have the resources to withstand their attacks. In responding to the attacks, I wanted to minimize vulnerabilities that would subject us to further attacks. Consequently, I sometimes

acted impulsively and without sufficiently holding in mind what ought to be done.

5. I do not believe that there was discovery obstruction. The reason is that there is nothing on TorrentSpy to be hidden and there is no discovery to obstruct. Everything we do that could make us liable for copyright infringement is public because it is only by involvement of third parties through public messages that anything in BitTorrent technology can be accomplished. It seemed clear to me at the time the lawsuit was filed that Plaintiffs had all the public messages and dot-torrent files on TorrentSpy. We produced voluminous discovery, as shown by Exhibit 1 to this Motion that shows all that Plaintiffs could ever have hope to show at trial, no matter how perfectly we had responded to their discovery requests except for specific instances of downloading. But downloading a dot-torrent file is far from engaging in copyright infringement. A dot-torrent file is a piece of data that a person who wants to exchange files can use to meet like-minded persons if such persons are inhabiting the Internet when the attempt is made.

6. In our view, Plaintiffs' continuing demands for discovery were for purposes of wasting our resources and obtaining benefits other than evidence. In our view, benefits other than evidence were behind Plaintiffs' Motion re Server Log Data that erodes privacy on the Internet. It is also noteworthy that, at all times material hereto, our Internet servers were located in the Netherlands so that Plaintiffs and the MPAA were able to extend their reach into other jurisdictions. These benefits did not depend on getting evidence from the Server Log Data and there was no evidence to be obtained from the Server Log Data. Plaintiffs cannot make a genuine connection between Server Log Data and relevant evidence in this case but Plaintiffs were able to obtain a ruling that, in my view, simply did not fit the facts. In fact, even if the Plaintiffs knew the Internet Protocol address of every person who downloaded a dot-torrent file, it could benefit them only if they obtained subpoenas to examine the hard drives of such persons, which the Court's

order prohibits, at least “at this juncture.”

A sequence of acts is required for a user to go from downloading a dot-torrent file from a torrent site like TorrentSpy to actually getting content. Actually getting content depends on third parties and the availability of the desired download. The user downloading the file must have a BitTorrent client application like Azureus or µTorrent running; the client application must load the dot-torrent file and the dot-torrent file must have valid information; at least one of the trackers listed in the dot-torrent file must be in touch with a swarm that is, at that moment, exchanging files containing the desired content; the user’s BitTorrent client application must make contact with a tracker in touch with a swarm and return a list of Internet Protocol addresses of other users participating in the swarm; the user’s BitTorrent client application must establish a peer-to-peer relationship with at least one other user in the swarm and such other user must send content to the user who is seeking content. Of course, Defendants have no part in the sequence of action that occurs subsequent to the downloading of a dot-torrent file.

7. I ask the Court not to interpret my errors and poor judgment in connection with discovery in this case as reason to believe that I intended to induce or encourage copyright infringement or that I had specific knowledge of copyright infringement taking place for which we have liability as a contributor or vicariously.

8. Our business is Internet advertising. We chose BitTorrent as the focus of our business activity because there is a thriving independent community with tremendous mass-marketing appeal that makes Internet advertising in the independent BitTorrent community profitable now and with possibly greater profits in the future. We wanted to support the independent efforts of people to distribute their own works. BitTorrent is used by hundreds of companies and millions of people for the distribution of their creative works that include

software, music, games, and video media. Indeed, even the Studios have allowed and encouraged distribution of their copyrighted works using BitTorrent, e.g., distribution available at BitTorrent.com. However, there will be no profits for independent developers in the future unless the independent community survives the attacks of Plaintiffs. If historical patterns continue as before, the preferred medium for infringing file-exchanges is "moving on" to the "next thing" and perhaps then BitTorrent will be left in peace.

9. Under our direction, TorrentSpy instituted a robust administration of copyright protection under the Digital Millennium Copyright Act("DMCA") and Notices thereunder. We also deployed DMCA Notification tools that allowed content owners to easily remove torrent files that, in their determination, could be used by persons to exchange infringing copies of their copyrighted works. Our tools were actively utilized (and praised) by companies including some of the Studios, the RIAA, Microsoft, IFPI, and other anti-piracy organizations.
It was always our stated and actual policy to oppose use of BitTorrent technology for purposes of copyright infringement.

10. Other than through DMCA Notices, I had no knowledge of specific materials on TorrentSpy that could be used by a visitor to find infringing materials. I certainly understood that there were dot-torrent files on TorrentSpy that could lead a searcher to persons who would exchange infringing materials with the searcher, but I did not feel obligated to become a monitor for and a judge on copyright infringement because, under the DMCA as I understood it, that responsibility rested with the copyright owners. In any event, I could only speculate about copyright status. Torrent files posted or listed on Torrentspy.com were at all relevant time herein created by third parties. There is no authorized source of information about copyrights and I would have had to assemble all the information myself. Moreover, the nature of the system is that the only way I could investigate the actual facts about the connection between a dot-torrent file

and infringement was by using a BitTorrent application client like Azureus and participating in file exchanges. As a matter of fact, I did not try to speculate and I did not try to participate in file exchanges.

11. It was and is my understanding that, given the nature of the technology, an operator of a BitTorrent site like TorrentSpy that has a robust DMCA Notice and no specific knowledge of copyright infringement and that offered information location tools accessible to the public would not be held liable for secondary copyright infringement.

Accordingly, I have never known that operating TorrentSpy constitutes copyright infringement.

I declare under penalty of perjury under the laws of California that the foregoing statements are true and correct. I execute this declaration at Los Angeles, CA on April 28, 2008.

Wes Parker