1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3      WESTERN DIVISION

4      THE HON. FLORENCE-MARIE COOPER, JUDGE PRESIDING

5

6  Columbia Pictures Industries    )
   Inc., et al.,                   )
7                                  )
                    Plaintiffs,    )
8                                  )
            vs.                    ) No. CV 06-01093-FMC-JC
9                                  )
   Justin Bunnell, et al.,         )
10                                 )
                    Defendants.    )
11 _____)

12

13

14      REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16      Los Angeles, California

17      December 10, 2007

18

19

20

21                        Wil S. Wilcox, CSR 9178
                          Official Federal Reporter
22                        e-CourtReporter, LLC
                          312 North Spring Street
23                        Room 430
                          Los Angeles, California 90012
24                        Phone:(213) 894-2849
                          Fax:  (818) 286-3910
25                        Email: wswilcox@pobox.com

```
 1   APPEARANCES OF COUNSEL:

 2

     FOR THE PLAINTIFFS:    Jenner and Block
 3                          Steven B. Fabrizio
                            601 13th Street NW
 4                          Suite 1200 South
                            Washington, DC 20005
 5                          202-639-6040
                            sfabrizio@jenner.com
 6
     FOR THE DEFENDANTS:    Rothken Law Firm
 7                          Ira P. Rothken
                            Jared Robinson Smith
 8                          Three Hamilton Landing
                            Suite 280
 9                          Novato, CA 94940
                            415-924-4250
10                          jared@techfirm.com
                            ira@techfirm.com
11
     FOR THE DEFENDANTS:    Law Offices of Kirk J Retz APC
12                          Kirk J. Retz
                            21535 Hawthorne Boulevard,
13                          Suite 200
                            Torrance, CA 90503
14                          310-540-9800
                            kretz@etzlaw.com
15

16

17

18

19

20

21

22

23

24

25
```

1     LOS ANGELES, CA.;  MONDAY, DECEMBER 10, 2007; 10:12 AM

2                              -oOo-

3          THE CLERK:  Calling item No. 4, Civil Case

4   No. 06-0193, *Columbia Pictures Industries, Inc., et al. v.*

5   *Justin Bunnell, et al.*

6          Counsel, please state your appearances for the

7   record.

8          MR. FABRIZIO:  Good morning, Your Honor.  Steven

9   Fabrizio for the plaintiffs.

10         MR. SMITH:  Good morning, Your Honor.  Jared Smith

11  for the defendants.

12         MR. ROTHKEN:  Ira Rothken for the defendants as

13  well.

14         MR. RETZ:  Good morning, Your Honor.  Kirk Retz

15  for the defendants.

16         THE COURT:  Good morning.

17         THE COURT:  The matter is on calendar on

18  plaintiff's motion for terminating sanctions.  I issued a

19  tentative to deny.  Who would like to be heard?

20         MR. FABRIZIO:  Your Honor, I would.  Thank you.

21         THE COURT:  Okay.

22         MR. FABRIZIO:  May it please the Court, Your

23  Honor's tentative set two issues for discussion at this

24  hearing.  One of them was whether lesser sanctions than

25  terminating would be appropriate under the circumstances,

1 and the second was if that was the case, what would those

2 sanctions be.

3       I'd like to address those in turn, Your Honor,

4 because on these facts plaintiffs do believe that anything

5 less than terminating sanctions would not cure the

6 plaintiffs -- the prejudice to the plaintiffs, would

7 actually reward defendants for their misconduct and would

8 send a message to other defendants that these sorts of

9 litigation conducts can result in an advantage in

10 litigation.

11       Your Honor, from the moment these defendants

12 learned about this case they engaged in a widespread and

13 systematic effort to destroy evidence.  This is seen in

14 their cleansing -- I believe was their word -- of the forum

15 posts, all of the official guides and facts and all of the

16 site directory titles.  That effort, which began again at

17 the moment the complaint was served, continued throughout

18 the litigation.

19       We see the destruction of IP addresses during the

20 course of the litigation, during the pending motion to

21 compel those IP addresses, and we have the concealment of

22 information about their administrators and moderators who

23 the Court noted are well placed to provide critical

24 testimony and that was throughout the litigation.

25       Your Honor, the defendants also repeatedly gave

false testimony under oath to conceal their efforts. There is no other way to say it other than the defendant outright lied about destroying the IP addresses, and defendants signed false verifications of interrogatories under oath three times, and there are others that we will talk about.

In addition to prejudicing the plaintiffs, Your Honor, the misconduct of defendant strikes at the very heart of the integrity of these proceedings. Importantly, the efforts to despoil evidence here are not aberrational or isolated. The provable spoliation, Your Honor, goes to almost all the core issues in the case and is widespread, and it comes in the context, Your Honor, of what can only be described as persistent efforts throughout the course of this case to delay discovery and obstruct discovery and delay the merits. We've seen that both in this case and in the related case of Bunnell v. the MPAA. The defendants have stonewalled discovery. They've forced repeated motions to compel documents that should have been produced without incident. They have been admonished by the magistrate judge. They have been sanctioned by the magistrate judge. They have been ruled in violation of multiple Court orders by the magistrate judge.

Destruction of evidence, particularly when you are talking about computerized evidence, Your Honor, is inherently difficult to uncover and to prove. In this case

1  we have unusual direct proof.  In part, that's because we

2  got lucky.  We were able to track down a couple of the

3  administrators that defendants did not disclose, and we were

4  able to get their testimony.  And it is telling, Your Honor,

5  that in every area where those administrators would have

6  visibility into the conduct of defendants, they testified

7  about destruction of evidence and improper conduct.

8       Under the Ninth Circuit authorities and other we

9  believe persuasive authorities, the destruction of evidence

10  here and the threat to the integrity of the judicial process

11  is as great or far greater than those cases granting

12  terminating sanctions or affirming terminating sanctions.

13       The destruction of evidence and the obstruction of

14  discovery from the outset has been willful, as Your Honor

15  found.  It has been calculated, and it has been systematic.

16  And in defendant's own words, it has been designed to

17  prevent plaintiffs from getting the proof they need for this

18  case.

19       Defendant Wes Parker said it himself, if the

20  evidence comes to light, we will lose this case.

21       Two particular Ninth Circuit cases I believe are

22  instructive, Leon v. IDX at 464 F.3d 951.  It's a 2006 case,

23  Your Honor.  It dismissed all of Leon's claims.  They were

24  whistle blower claims.  Leon had deleted 2200 files from a

25  laptop that he had that was a company laptop before he

1   returned it.  He didn't lie about it.  His excuse was that

2   they were personal files, some of them related to his

3   downloading of pornography.  The Court ruled that those

4   personal files, and I will quote here, "could be relevant

5   to" -- "could be relevant to the ADA employment claims at

6   issue," and ruled that terminating sanctions were the only

7   sanctions that were appropriate under those circumstances.

8         And what the Ninth Circuit said in affirming that

9   was, "Plaintiff's spoliation threatened to distort the

10  resolution of the case because any number of the 2200 files

11  could have been relevant to defendant's claims or defense's,

12  although it is impossible to identify which files and how

13  they might have been used."

14        That's the nature of evidence destruction is you

15  don't know what you don't know.  Here the destruction of

16  evidence is far greater in volume than we saw in the Leon

17  case and it more clearly relates directly to core issues in

18  the case.

19        The other case that I would like to talk about is

20  Valley Engineers v. Electric Engineering.  That is at

21  158 F.3d 1051.  Here defendants withheld one document.  It

22  was an exceedingly important document, but it was a single

23  document.  And when asked about that document in their

24  deposition, they denied memory of it.  They eventually

25  produced that document on the eve of the sanctions hearing,

1   so the other side had the document.

2        The Ninth Circuit in affirming terminating

3   sanctions in that case emphasized that the five factors that

4   Your Honor considered in your tentative are not a mechanical

5   test, and they said, I'll quote, "The list of factors

6   amounts for a way for the district judge to think about what

7   to do, not a series of conditions precedent before the judge

8   can do anything."

9        And what they said was most critical regarding the

10  prejudice and lesser sanctions is whether the discovery

11  violations threatened to interfere with the rightful

12  decision of the case, not whether it's certain that it will,

13  not whether the prejudice can be largely cured, but whether

14  there is a risk of prejudice.  The Court will focus on a

15  pattern of deception and discovery abuse which is present in

16  this case and probably far more so.

17       The Court in the Ninth Circuit in affirming

18  specifically looked at defendant's conduct in concealing

19  that memo, testifying that there was no recollection.  What

20  the Court said there is equally applicable here, and I will

21  quote it, "Considering how Electrical Engineering acted

22  regarding the Carol memorandum, it was a reasonable

23  inference that if there was other discoverable material

24  harmful to its case that its adversary did not know about it

25  would be hidden forever."

1          So the Court and the Ninth Circuit looked not just

2     at the acts of spoliation but the acts to hide the

3     spoliation, or in that case the refusal to produce, and they

4     said those acts so undermined the integrity of the process

5     that the Court could not be assured that the truth would

6     come out.  They said the natural inference from all this is

7     that of course if there is other incriminating evidence it's

8     likely not to have been produced, and that is exactly the

9     case here, Your Honor.  In this case we have calculated

10    deceptions and lies and with each of the four categories of

11    the spoiled evidence that the Court has ruled on.

12         As to the IP addresses, these IP addresses were

13    destroyed days before the server log hearing before the

14    magistrate judge when a motion to compel the very data was

15    pending before the magistrate judge in a separate motion.

16         Defendant Wes Parker then took the stand at an

17    evidentiary hearing during the server log motion and

18    testified under oath that defendants only collected the

19    truncated IP addresses.  I then had the opportunity to

20    depose Mr. Parker, Wes Parker, and he testified repeatedly

21    and unequivocally at his deposition that defendants never,

22    never collected full IP addresses.  He knew that to be a lie

23    because he himself had despoiled those IP addresses.

24         Then defendants tried to influence the testimony

25    of the two administrators or two of the administrators that

1   we deposed.  Your Honor, there is essentially no other way

2   to view the conversations that defendant Bunnell and Parker

3   had with the administrators known as Cabana Bob and Maggie

4   Pixel in the days before their deposition.

5           When defendants asked Cabana Bob who has just been

6   told that he has the money to hire a lawyer because they

7   just told him that they would pay for their lawyer and he

8   was anxious to go get his lawyer because he was actually

9   scheduled to talk to me in a few hours -- or maybe the next

10  day.  He says, all right, let me go.  And they say, wait,

11  before you go we have one question for you.  You never

12  banned users by full IP address, right?

13          He testified, that made me very uncomfortable.

14  Why?  Because he knew he had banned users by full AP address

15  and so did these defendants.  And he told them that it made

16  him very uncomfortable, and he tried to get off the phone

17  again.  And they said all right, all right, fine, fine, but

18  just one last question, and they repeated the same question.

19          Your Honor, when you ask somebody, you never

20  banned users by full IP address when you know full well they

21  did, that is not a question.  That is not an inquiry.  That

22  is a suggestion.  And in context it is a suggestion that

23  since we've just told you we will pay for your lawyer, we

24  expect you to testify in a certain way.

25          With regard to the forum post cleansing, Wes

1  Parker -- the forum post cleansing begins with a post by Wes

2  Parker, which I'm sure the Court is aware of, it's the post

3  where Mr. Parker says we have to clean these forums because

4  we may lose the case and nobody wants that.  So when

5  presented with his own post calling for the cleansing of the

6  forum posts, he claimed to have absolutely no recollection

7  of any of them.  Now, this is in context of the moderator or

8  the administrator known as Maggie Pixel testifying

9  unequivocally and repeatedly that she was in constant

10  contact with Mr. Wes Parker during this process, that he was

11  urging her to treat this as a matter of the highest priority

12  and to get the other administrators to even move more

13  quickly.

14         With regard to the administrators and moderators,

15  three times, three times these defendants signed false

16  verifications that under oath swore they didn't have any

17  further information as to their identities or the contact

18  information for their administrators and their moderators.

19  Those were clearly false as the Court has indicated.

20         They communicated with some of the moderators

21  using their real names.  They collected postal addresses for

22  their moderators to mail them T-shirts as a thank you for

23  their work on the site.  And they took a trip to Las Vegas

24  that included some of the moderators where they bought the

25  plane tickets for them in the moderators' real names.  Some

1    of this was during the course of the litigation.  So it's

2    not as if we are talking about an event that happened five

3    years ago that one could credibly say, oh, I forgot.

4            As with site directory titles, Mr. Parker

5    testified at his deposition when presented with a version of

6    the site as it looked pre-spoliation from one of the

7    Internet archive organization files, he testified that he

8    couldn't recall specifically whether any of the

9    subcategories were on the actual Torrentspy site.  He

10   refused to formally authenticate the document.

11           Even when we put to him over and over again, can

12   you tell us any of these categories that you can recall were

13   on your site?  Your Honor, before him was an exhibit, I

14   believe it's Exhibit 122, that listed television

15   subcategories which probably listed 2-, maybe 300 television

16   subcategories, most of them blatantly infringing by their

17   name.

18           They had the names of the television series that

19   would be collected under that subcategory.  Mr. Parker

20   looked up and down the list and said no.  I said you can't

21   recall and testify that any single one of these was on your

22   site?  And he said well, I recall the category unsorted, the

23   default category that was at the top.  The only thing he

24   would actually testify to remembering was unsorted.

25           In Valley Engineers, the Ninth Circuit said there

1   is no point to a lawsuit if it merely applies law to lies.

2   The true facts must be the foundation for any just result.

3   That applies here, Your Honor.  These defendants have

4   destroyed an awful lot of evidence, evidence that they knew

5   to be incriminating, evidence they knew we would want,

6   evidence that in some cases was the subject of pending

7   motions, and they did it because they knew that the evidence

8   would be harmful to their case.  And there are indications

9   that the destruction of evidence was far more widespread

10  than those four categories, that we have provable,

11  irrefutable evidence.  And again, in Valley the Ninth

12  Circuit concluded that it was reasonable to infer from

13  defendant's conduct that there was other evidence they were

14  hiding.

15          Here, the scope of what we know about is itself a

16  strong indicator that despoliation was not limited.  The

17  despoliation here covered the whole panoply of sources of

18  evidence.  But we actually have strong inferences and in

19  some cases direct proof in other cases or in other

20  instances.

21          In the related case of Bunnell v. MPAA which this

22  Court can consider in this motion, perhaps the critical set

23  of documents was withheld after a court order to produce

24  them.  The key set of documents in that case would have been

25  the contents of a Gmail e-mail account that was set up by

1  the alleged hacker Mr. Robert Anderson.  These documents

2  were requested at the outset of the case.

3          We did not know that the Bunnell parties, the

4  plaintiffs in that case, had possession, custody and control

5  of that Gmail account.  We were under the impression that

6  Mr. Anderson had those Gmail accounts, and we were

7  attempting to engage international process to get discovery

8  from Mr. Anderson.  Those documents were ordered to be

9  produced along with a whole lot of other documents.  They

10  were clearly covered by a court order, as the magistrate

11  judge later found.

12          Defendants never -- the Bunnell parties, the

13  plaintiffs in that case, the defendants here -- never

14  produced those critical documents.  We only found out about

15  them because by happenstance, during the deposition of

16  Mr. Bunnell, we asked the questions that required them to

17  admit that they had them.  But even then we had to file a

18  motion to compel to get them.  The magistrate judge found

19  that they had violated the court order and ordered them

20  produced.

21          Another indicator, Mr. Bunnell testified at his

22  deposition that he had an unfortunate computer hard drive

23  crash in December of 2005.  What this means, Your Honor, is

24  that all of the e-mails and all of the evidence on

25  Mr. Bunnell's personal computer from which he conducted most

1    of his business, from December 2005 and earlier, meaning

2    basically right at the time we filed the suit, no longer

3    existed.

4              And we have also received significant documents

5    from third parties that we have not received from

6    defendants, documents that were communications with the

7    defendants or from the defendants.  So one would have

8    expected that we would have received these, e-mails between

9    Wes Parker and the moderator or administrator Maggie Pixel

10   showing defendant Parker adding subcategories for the

11   televisions that were clearly infringing, e-mails between

12   Mr. Bunnell and a potential acquirer, a Mr. Gots, promoting

13   some features that Ms. Pixel, Maggie Pixel, had recommended

14   to them, which in Wes Parker's deposition he tried to

15   distance himself from; oh, Maggie Pixel was just sending me

16   things that I didn't pay any attention to them because they

17   were incriminating.  But yet, we get a document from a third

18   party that shows that not only did they pay attention to

19   them, but they proffered them to potential acquirers as

20   demonstrating how they were making advances with their site.

21             Defendants can and probably will try and explain

22   those away as all having possible innocent explanations, but

23   in light of the proven spoliation, Your Honor, it is at

24   least a reasonable inference and we believe highly likely

25   that the reason we didn't get that information is because it

1  was despoiled or otherwise concealed.

2         Despoliation continued even after we filed this

3  motion.  Your Honor will recall that you affirmed the

4  magistrate judge's order granting or compelling access to

5  the server logs.  That was an order to preserve and produce

6  server log data.  It was litigated intensely for six months.

7         While that order was under review by this Court,

8  apparently defendants took action to divest themselves of

9  that data, so that after this Court affirmed the magistrate

10  judge's ruling, defendants rather than produce the data

11  submitted a statement saying, oh, we have no data to produce

12  after six months of intense litigation.  There is currently

13  pending before Magistrate Judge Chooljian a motion for

14  sanctions related to that, and we've asked her to issue a

15  report and recommendation to Your Honor based on that.

16         Obtaining proof in these sorts of Internet piracy

17  cases is a difficult thing.  Defendants always try and hide

18  the truth.  Lesser sanctions here we believe would reinforce

19  the belief among the pirate community that they can escape

20  liability by gaming the system.

21         We understand that terminating sanctions are a

22  harsh remedy.  We understand they are not to be granted

23  lightly.  But, Your Honor, it's fair to ask I believe that

24  if the conduct of these defendants don't warrant permanent

25  sanctions, then what does a defendant have to do in order to

warrant such sanctions?  Here, we believe termination would

be required even if there was no prejudice to the

plaintiffs.  Recall in the Valley Engineers case, they

actually produced the single document.  So arguably there

was no prejudice in the sense that the party had the

evidence.

So even if there was no prejudice, we believe that

terminating sanctions would be warranted here, but here it

is clear that there is prejudice.  Your Honor, found

prejudice and that because despoliation is so widespread it

can't be cured by lesser sanctions.

Now, the Court has tentatively indicated that you

believe that there was prejudice, but you questioned the

level of prejudice in light of what we were able to uncover.

When you consider prejudice to the plaintiffs here, we

believe you need to consider the extensiveness of the

despoliation that happened here.  We believe you need to

consider that despoliation was not of marginal evidence but

of core sources of evidence.  We believe you need to

consider that despoliation affected virtually all of the

core issues in the case.  It was not limited to a single

issue where an evidentiary sanction or a lesser sanction

could make us whole and punish the defendants and deter

those who would do the same thing.

We also ask that you consider that we cannot know

1  the full extent of what defendants have done, but it is

2  perfectly clear, Your Honor, from the course of this

3  litigation, from the course of the Bunnell v.

4  MPAA litigation that there has been more.  Proving these

5  sorts of things is nearly impossible.  Because we happened

6  to find two administrators we were able to come up with

7  irrefutable proof, but that doesn't mean that there wasn't a

8  lot more.

9        Your Honor said in her tentative ruling at

10  page 12, "Plaintiffs have suffered prejudice but not to the

11  extent that a rightful decision is not possible."

12  Respectfully, Your Honor, I think that puts a higher burden

13  on plaintiffs than the law requires.  The standard is

14  whether despoliation threatens to interfere with the

15  rightful decision, not whether the Court can conclude that

16  enough lesser sanctions can largely cure the prejudice.  The

17  focus is on the risk of prejudice, and here there can be

18  very little doubt that there is a high risk of prejudice

19  even if the Court were to grant extensive lesser sanctions.

20        In another Ninth Circuit case, the Anheuser-Busch

21  v. National Beverage Distributors case, this is at 69 F.3d

22  337.  The Ninth Circuit in affirming terminating sanctions

23  of the counterclaim said, and I will quote, "Whether or not

24  the documents would have changed the outcome of the trial is

25  not the issue in determining prejudice.  It is sufficient

1  that defendant's concealment of the documents clearly

2  impaired the plaintiff's ability to go to trial and

3  threatened to interfere with the rightful decision of the

4  case."

5          In cases where despoliation is discreet or

6  isolated or perhaps where despoliation is limited to limited

7  or specific merits issues, lesser sanctions can make a

8  plaintiff whole and accomplish the other objectives of

9  sanctions which is to punish the defendants and to deter

10  others.  But here we submit to you that is just not the

11  case.  Spoliation was widespread.  It touches almost every

12  issue.  The scope is not fully known, but there are strong

13  indications that it's not limited to what we've uncovered.

14          The fact that plaintiffs have uncovered enough to

15  still have a powerful case against defendants doesn't lessen

16  their prejudice.  It doesn't excuse defendant's willful

17  conduct, and it doesn't -- and plaintiffs are entitled to

18  all of the best evidence.  We are not entitled to enough

19  evidence to win.  We are entitled to all of the evidence

20  that will prove our case.

21          Your Honor, we believe very strongly that this

22  case can and will and should be decided on a motion for

23  summary judgment.  One of the theories of liability that we

24  have and will present to Your Honor is under the recent

25  Supreme Court roster decision, inducement of copyright

infringement.

Under the inducement standard, it's plaintiff's burden to demonstrate to Your Honor that these defendants acted with an object to foster copyright infringement. Defendants will deny that. That's a given. It is then our duty to come to Your Honor with sufficient proof, overwhelming proof, such that no fair-minded juror could conclude otherwise.

And that is what we did in the case of the Grokster case before Judge Wilson. We were able to demonstrate that under the totality of the circumstances, under the totality of the evidence, notwithstanding defendant's denials and excuses, no fair-minded juror could conclude other than that the defendants operated their system with the object to foster copyright infringement.

We are entitled to all of the evidence to make that case to you, the volume and the quality of the evidence that we don't have. If this Court were to somehow find that the evidence we presented on summary judgment was insufficient, it would clearly be because in our mind defendants have hidden or destroyed that evidence. That's prejudice, Your Honor.

If I can turn to the specific known categories of spoliation and the prejudice from each of those, the forum posts known as perhaps one of the more important areas.

1    Your Honor, at your tentative at page 4 says that, "Most of

2    the piracy-related threads were closed and removed from

3    public view, leaving their contact intact rather than

4    modify."  Well, in a numeric sense that may be true.  Your

5    Honor may misapprehend the extent of the cleansing in

6    defendant's terms that happened.

7            If I can by way of background, there are a couple

8    of categories, different categories, of evidence here.

9    There were actual forum posts themselves.  These forum posts

10   come in what are known as threads.  A thread is sort of a

11   topic, and under a thread there may be one post by a user or

12   by an administrator or by a defendant.  There may be dozens

13   of posts.  It's a continuing dialogue, and that topic makes

14   up a thread.

15           There were official guides.  There were facts,

16   frequently asked questions, question and answer series.

17   There were what were known as sticky posts.  Now, these may

18   have been regular posts that in the normal course would have

19   worked their way down as other posts came ahead of it, but

20   because they were deemed by the defendants or their agents,

21   the site administrators, as particularly important or

22   informative, they were made sticky, which means they always

23   held a position of prominence on the side, up high, so they

24   would be of value to users who came later.

25           All of the guides, all of the FAQs, all of the

1   sticky posts were the subject of spoliation.  They were all

2   cleansed without date restriction.  They were edited to

3   remove the incriminating statements, and in some cases they

4   were deleted entirely.

5           Now, we know about two particularly incriminating

6   guides that were deleted.  We don't have the guides, but we

7   know that they were done.  Those were one that talked

8   about -- defined and talked about terms that were obviously

9   and exclusively related to piracy and another would talk

10  about cracks, a way of circumventing copyright protections

11  on software and games.  We have testimony from an

12  administrator about that.

13          There were other administrators that probably and

14  likely deleted other posts that we just don't know about.

15  You can't know what's not there anymore.  There are no

16  archive sources that we know about for these posts.

17          Then there were the forum posts themselves.  Now,

18  the defendants despoiled all current posts and I think

19  that's significant, remembering that the posts are messages

20  within a thread.  What Maggie Pixel testified is that they

21  picked January 1, 2006 as a date.  And if the thread, the

22  latest post in that thread had any message dated January 1,

23  2006 or later, that whole thread was deemed current enough

24  and the whole thread was reviewed and cleansed.  So when we

25  talk about thousands of threads, we may be talking about

1   tens of thousands of posts.  Each one of those is a message.

2   Each one of those could at any moment have been dispositive

3   of the case.  We don't know what was in them.

4          What we do know is that the administrator Maggie

5   Pixel testified that she worked around the clock for days

6   doing it, living on caffeine and sugar, and that she was

7   urged to keep doing it and doing it faster and faster by

8   defendant Parker.  We do know because there were forum posts

9   that other moderators commented about what a monumental task

10  it was.

11         The forum post and FAQ and guide evidence would be

12  directly related to showing direct infringement by

13  defendant's users.  These posts talked about specific

14  copyrighted works that were infringed by name.  It would be

15  directly related to showing defendants or their

16  administrators had actual knowledge of specific

17  infringements, that defendants or their administrators

18  actively encouraged infringement, that defendants or their

19  administrators provided active assistance to users who were

20  engaged and admitted to being engaged in copyright

21  infringement.

22         It would go directly to defendant's DMCA defenses.

23  They were defensing the Digital Millennium Copyright Act,

24  Your Honor, that they are entitled to some form of safe

25  harbor.  These are safe harbors granted to quote/unquote,

"innocent service providers" or "innocent operators." Any form of knowledge, any actual knowledge, any red flags that were ignored all immediately disqualify for DMCA safe harbor.

All of these sorts of posts where their administrators are actually helping users engage in infringement uses are admitting it. These are heavily moderated forums, Your Honor. They are administrators who participated in them regularly and defendants themselves participated in them.

And it would be relevant to defendant's material contribution to the infringement, the instruction manuals, the guides, the FAQs on issues basically instructing people how to engage in copyright infringement. These are all directly relevant to the evidence that was destroyed. And again, to our knowledge, there are no Internet archive sources for any of this stuff.

The IP addresses, much is irrefutable. For uploaders, people who were posting bit torrents for infringing works, people who would be guilty of direct copyright infringement. Defendants collected and stored full IP addresses for those users, and they did so from the inception of the site in 2004, and they did so until a few days before that hearing before Magistrate Judge Chooljian when that issue would have been relevant at the hearing and

then they despoiled them.  They despoiled them while a motion was pending for that data, and then they testified that they only collected truncated.  Again, they lied repeatedly in their deposition saying they never collected the full IP addresses.

That's not a mistake or an oversight, Your Honor.  Somebody had to configure their entire system to go back through all of their databases and delete that last octet to make the IP addresses useless.  You can't forget that, Your Honor.  That evidence would be directly related to showing direct infringement by defendant's users, the uploaders.

It would be directly relevant to showing that the defendants themselves are direct infringers.  Now, as an aside, it's a curious fact that defendants operated their site for three years, and Wes Parker has a number of contemporaneous postings, public postings, talking about how much he downloads and how fast he's able to get things to download.  But yet, in his deposition he testified that he barely downloaded anything and certainly nothing that was copyrighted.

Defendants allow users to upload.  And if they are registered, their user name might be associated with that uploading, and we know defendant Crocker's user's name is Zanthus and all of the defendants had their own user names.

1          The defendants also allow users to upload

2    anonymously.  So if you are not registered when you upload,

3    it just shows up as an anonymous upload.  But the IP

4    address, before it was destroyed, would have allowed us to

5    try and correlate that to see whether we could prove

6    defendants themselves were uploaded as we suspect, as has

7    been the case in almost every other prior Internet piracy

8    case, but we will never know in this case because defendants

9    deny it, as they have denied destroying the IP addresses, so

10   that denial is not worth a whole lot.  And now we don't have

11   the IP addresses to go back and check.

12          It's also relevant, that evidence that was

13   despoliated is relevant to defendant's right and ability to

14   control the users infringing activities, that defendants and

15   their administrators were routinely banning users based on

16   these IP addresses is at least relevant to that question.

17          And the third category, administrators and

18   moderators, we requested this information in August of 2006.

19   We didn't stop asking for it.  We were fortunate to track

20   down a couple of moderators and administrators through an

21   independent investigation with no help from defendants.

22          There are several other key administrators and

23   moderators that we were not able to depose or track down.

24   As Your Honor noted, they are well placed to be key

25   witnesses on a number of issues.  The following are the

1   topics and areas where the administrator testimony would be

2   expected to be directly relevant to showing:

3           First, it's clear to us and it's clear from the

4   depositions that were taken of administrators that these

5   administrators are agents of the defendants for purposes of

6   the federal rules of evidence.  The testimony that we didn't

7   get would have further reinforced that.  It's relevant to

8   admissions of intent to foster copyright infringement.

9   Statements made by the administrators would be relevant.

10  Actual knowledge of specific infringements, active

11  encouragement of infringement, active assistance to users

12  engaged in infringement, right and ability to control the

13  infringement, defendant's efforts to impede enforcement

14  efforts by copyright owners, which is a factor considering

15  whether defendants have induced copyright infringement.

16          The administrators worked tirelessly to remove

17  files that they thought were placed there as spoofs by

18  copyright owners, fake files that were being tracked from

19  would-be infringers' enjoyment of their site.  And also,

20  again, the defendant's DMCA defense for the same reasons

21  discussed before.

22          These are all core merits issues. It's not an

23  isolated issue.   To illustrate the importance of the

24  administrator testimony, we are before you on this motion

25  with conclusive evidence of despoliation that occurred only

1  because we were able to track down Maggie Pixel, Cabana Bob

2  and a couple of other administrators.  Without that evidence

3  this would be a he said, she said and it would be a much

4  different situation.

5           Defendant Parker again denied any memory of the

6  cleansing.  They denied the IP spoliation.  They denied

7  memory of what used to be on the site.  Under these sorts of

8  circumstances, the testimony from these agents of defendants

9  who don't have the same incentives as defendants to have

10  spotty memories can't be underestimated.  We will never know

11  what additional evidence and incriminating evidence would

12  have been provided, but the few that we did contact and we

13  did depose provided highly incriminating evidence, and that,

14  of course, leads to the strong inference that the others

15  would have too.

16          There are indications, but I won't take the time

17  to go through item by item, but there are posts from any

18  number of these administrators that are incriminating, any

19  number of these administrators that are posted to indicate

20  they were involved in despoliation.  The despoliation

21  relates to the merits, obviously, Your Honor, so being

22  involved in despoliation means you are also well placed to

23  provide testimony on the merits of this case.

24          If I can sum up, this is not a case of spoliation

25  on a limited basis or isolated to specific evidence or

1    issues.  It goes to the core issues in the case, nearly all

2    the issues in the case.  In some cases the destroyed

3    evidence is the only or best evidence.  It's reason to

4    believe that it's far more widespread than we have been able

5    to prove conclusively.  Your Honor has found the destruction

6    was willful.  It's clearly part of a calculated strategy.

7    It's clearly because these defendants knew that the evidence

8    was harmful.

9            Terminating sanctions are necessary here to assure

10   that the plaintiffs are not prejudiced, that there is no

11   risk of prejudice, and to ensure the defendants don't

12   benefit from their conduct.  It's necessary to punish the

13   defendants.  They've already been admonished.  They've been

14   sanctioned.  They've been ruled being in violation of

15   orders.  They've been warned specifically about terminating

16   sanctions.

17           And importantly, Your Honor, the pirate community

18   is a small one.  Everybody watches this case.  Everyone sees

19   the tactics of these defendants.  If these sorts of tactics

20   can succeed, everybody is going to think that that is the

21   litigation strategy of the future in these anti-piracy

22   cases.

23           Now, Your Honor also asked that we be prepared to

24   talk about lesser sanctions.  It's probably pretty clear at

25   this point that I don't believe lesser sanctions are an

1    accurate remedy.

2          I don't know how Your Honor would like to proceed.

3    Would you like me to talk about some of the sanctions?

4          THE COURT:  No.  There's no need.

5          MR. FABRIZIO:  Okay.  Thank you, Your Honor.

6          THE COURT:  Let me take ten minutes and then I

7    will hear from the defense.

8                    (Recess.)

9          THE COURT:  Let's hear from the defense.

10         MR. SMITH:  Good morning, Your Honor.  Jared Smith

11   for the defendants.  I wanted to address some of the issues

12   that Mr. Fabrizio addressed this morning, but I know Your

13   Honor counseled us against histrionics and rhetoric.  And so

14   I'm going to try to get to the facts, because I think the

15   facts of what has gone on in the discovery of this case is

16   revealing to the tension between the privacy concerns that

17   the defendants have and the discovery concerns that the

18   plaintiffs have.  And it's not a matter of spoliation of a

19   case like Enron where people are running to the shredders to

20   hide evidence.

21         And I think in particular if we look at the

22   specific data that is at issue here, and first of all, with

23   the IP address issue that has to do with the defendants

24   website.  The IP addresses for the website, they have

25   been -- the whole website database that was backed up on

1    January 31st, 2007 was produced on November 11th of this

2    year and contains full IP addresses and it's a fact that

3    plaintiffs have not sought to address at this hearing.  And

4    so as far as IP addresses from January 1st back, plaintiffs

5    do have that data.

6          The IP addresses that were truncated began after

7    that January 1st, 2007 backup.  And so that when defendants

8    produced a database, a full database, in May of this year,

9    that database backup contained truncated IP addresses which

10   was a concern for plaintiffs.  But I wanted to be clear that

11   it wasn't a matter of redacting the entire database and

12   never producing it.

13         There was a motion pending which Your Honor may

14   recall defendants appealed regarding the user registration

15   tables which Judge Chooljian had ordered defendants to

16   produce unredacted user registration tables.  Defendants had

17   appealed that, and prior to this motion being filed had

18   agreed with plaintiffs to withdraw the portion of the appeal

19   that dealt with unredacted user registration tables, and, in

20   fact, produced the unredacted user registration tables on

21   August 29th.  This motion was filed on August 30th, I

22   believe.  And the stipulation withdrawing that issue from

23   the appeal was filed on September 1st.  So all of those

24   matters are a matter of record.

25         So it's not true that plaintiffs do not have full

1     IP addresses of the Torrentspy website users.  It is true, I

2     believe, that they do not have full IP addresses for the

3     period from January 31st to the present.  As of that time,

4     the defendants did have a policy of only retaining truncated

5     IP addresses, because for their purposes to block a user who

6     is misusing the site it was more effective to block an

7     entire three portion IP address than the specific IP address

8     that that user uploaded from.

9             I also think we need to be clear that defendants

10    operate two separate sites.  One is the Torrentspy website

11    which is really at issue in this case which involves a

12    search engine for dot-torrent files.  The other site which

13    has become a major issue in this hearing is the Torrentspy

14    forum site which is purely a place where people on the

15    Internet can engage in conversations about whatever they

16    want to.  And to address the issue of the cleansing of that

17    site, the defendants have always had a policy of taking out

18    references to potentially copyrighted materials, names of

19    movies, names of TV shows, for the very purpose that they

20    don't want to foster copyright infringement.

21            The entire database on the forum site was backed

22    up and removed from circulation in January of 2006, and then

23    at that time the testimony of Maggie Pixel that plaintiffs

24    are harping on as an indication of a desire to spoliate

25    evidence was just a reaffirmation with the site moderators,

1    the forum site moderators, to go back over those postings to

2    make sure that everything is removed according to the policy

3    that had been in place all along.

4             Now, the benefit of that for plaintiffs is that

5    the site is not fostering copyright infringement naming

6    plaintiff's copyrighted works.  And so to have them being

7    faced with sanctions for spoliation for doing something that

8    was intended to be beneficial or to combat copyright

9    infringement puts them in a catch 22.

10            So there was nothing done to the forum data

11   existing prior to 2006.  So it can't be seen as a spoliation

12   issue as far as that data.  It shouldn't be seen as a

13   spoliation issue going forward because the defendants were

14   just continuing with their policy.

15            And beyond the spoliation issue though, the amount

16   of redactions or cleaning that was done on these threads is

17   really numerically minimal.  Defendants -- or plaintiffs

18   have focused and blown up a few instances to make it seem

19   like there was a great purge of website postings.  But the

20   fact is that Maggie Pixel testified that she reviewed about

21   3,000 threads, and that 3,000 threads it amounts to possibly

22   about 30- to 35,000 individual posts.  And as an analysis of

23   these postings, and the -- I would ask the Court for an

24   opportunity to provide a declaration to support these facts,

25   but as an offer of proof the percentage of postings that

1  were actually edited out of the 36,000 posts or individual

2  posts that were edited or reviewed only 782 of those were

3  actually edited.  So it is only 2 percent of the actual

4  posts of those reviewed were edited.

5          And you could bring that down to it shows what

6  country those came from and under the Subafilms case, if we

7  applied that there would only be actionable if they came out

8  of the U.S, the U.S. is about a third less than those.  And

9  so it's even a smaller percentage of actual posts that were

10  actually edited, and that's for any purpose.  Whether it was

11  for potential copyright infringement, profanity, spam, all

12  of these things were edited.

13          We are not talking about a huge purge.  We are

14  talking about a small number with the intent to keep out

15  anything that would foster copyright infringement and which

16  defendants feel is a laudable goal until they are in a

17  position of being accused of spoliating evidence.  Perhaps

18  they should have done something differently with the

19  knowledge of the case.  But that part is unfortunate that

20  there wasn't a way to copy that or implement it.

21          The other side of that is the moderators that were

22  performing this, they weren't employees.  Plaintiffs beat

23  the drum of they are agents of defendants, but the fact is

24  they had very little control of them.  Maggie Pixel was a

25  very driven women.  Even reviewing her testimony in the

1   transcript it will show that she was very active and very

2   involved in her testimony.  She's stated that Wes Parker

3   with whom she had contact wouldn't respond to her often

4   because it just wasn't important.  It was a community unto

5   itself.  And so it's not a means for defendants to drive a

6   concerted effort to infringe on copyrights.

7           The issue of the identities of the moderators.  On

8   that issue we need to clarify again the two websites

9   involved.  One is the Torrentspy website involved in

10  searching for dot-torrent files.  The other is the forum

11  site.  The e-mail that plaintiffs say was hidden, destroyed,

12  and had identities of moderators is an e-mail that Maggie

13  Pixel sent out to Wes Parker to ask that he send out

14  T-shirts.  It wasn't a big issue for Wes Parker, and the

15  fact that those identities may have been on there, we don't

16  know where that e-mail went to, but it is hardly an issue of

17  spoliation.  And even if those identities were lost, they

18  were lost to moderators of the forum website, not to the

19  TorrentSpy website involved in the dot-torrent file issue.

20  So that it wouldn't have been identities of people that had

21  an intimate knowledge of how the dot-torrent file system

22  worked.  It would be a matter of editing forum posts and

23  that type of issue which plaintiffs had as much information

24  on locating those individuals as defendants have.

25          Regarding the issue of official guides, again we

1    are talking about the TorrentSpy forum site that plaintiffs

2    have chosen to call post official guides, because the

3    moderators have chosen to flag them so that they are easy to

4    access.  But there is nothing official about them.  They are

5    posts just as any other post would be on the site.

6              Again, if some have been lost, that is an

7    unfortunate thing, and I think all of us would like to have

8    them back if they exist.  But it wasn't a matter of purging

9    the site of things that were related to the TorrentSpy

10   website in its operation.

11             Plaintiffs have brought in the subject of the case

12   of Bunnell versus MPAA which is also before Your Honor, and

13   as evidence of similar devious conduct on the part of the

14   defendants here and the plaintiffs there.  Again, there was

15   an issue with these Gmail accounts.  The fact is that the

16   Gmail account was owned by Robert Anderson who was the

17   hacker in the case that the MPAA hired to steal the

18   plaintiff's, our client's, materials, their e-mails.  And

19   the fact is also that the entire Gmail account was

20   ultimately produced.  And again, there was battles going

21   back and forth, whether defendants or plaintiffs there had

22   the authority to produce them, whether once we determined

23   okay, we will go ahead and produce them, there was some

24   delay.  But again, it wasn't an issue of spoliation.  There

25   has always been a concern about privacy rights on the

1    Internet and trying to protect those, and when it finally

2    came to disclosing them defendants have produced everything

3    that they can.

4    Again, the issue of Justin Bunnell's hard drive

5    crashing, I think probably everybody has experienced a hard

6    drive crash.  It's just another little fact that has been

7    thrown in to create a huge mountain of espionage and

8    scheming where none exists.  It's a difficult matter to

9    produce the volumes of data that have been produced in this

10   case, particularly -- I have been personally involved in the

11   production with our client's servers in the Netherlands,

12   transferring gigabytes of data to our clients and producing

13   them to me and producing them to plaintiffs is a feat in

14   itself.  And so there has been difficult things that have

15   prolonged issues in this case.

16   So, Your Honor, I think those are the main issues that

17   I hope I've cleared up some facts that may have been

18   misconstrued or spun in a way that's not entirely true and

19   submit that the issue of the delay in discovery defendants

20   have been sanctioned $30,000 which they paid, and so they

21   have been punished.  I believe the facts are that the

22   plaintiffs have all the data necessary to make their case if

23   they are going to make it from all the data that they had at

24   this point, including the database from the TorrentSpy

25   website of January 31st, 2007, and all of the data from the

1    TorrentSpy forums.  Albeit, there are names redacted.  Those

2    are not an issue of spoliation.  If it's showing the intent

3    to foster infringement in general, then the names of the

4    titles is irrelevant anyways.

5        So, Your Honor, we'd submit that the tentative ruling

6    denying the motion for terminating sanctions stand.  Thank

7    you.

8                MR. FABRIZIO:  Your Honor.

9                THE COURT:  One minute.  We are very late and I've

10   got a lot of matters backed up behind you.

11               MR. FABRIZIO:  I understand, Your Honor.  Thank

12   you for giving us all of the time you have.  Let me just

13   address a couple of inaccuracies in that rendition.  The IP

14   addresses were not -- it wasn't a change of policy in

15   January of 2007.  A couple of weeks ago defendants told us

16   that they just found a backup that was dated from

17   January 2007.  The IP addresses were destroyed days before

18   the hearing at which they would have been incredibly

19   relevant.  Now, this backup which does have full IP

20   addresses and demonstrates the lie that has been perpetrated

21   from the beginning of this case is useless, and these

22   defendants who were very experienced in Internet ways knew

23   they were useless.  To trace back IP addresses, you have to

24   take the IP address, go to the ISP, and the ISP can

25   correlate who had that account.  ISP's don't keep those

1    records for very long, Your Honor, as these defendants knew

2    full well.  They keep them for 30 days, 60 days, at tops 90

3    days.  So for these defendants to produce nine month old

4    data and say just found it, now you are whole is

5    disingenuous.  They knew full well it was meaningless.  All

6    it does is prove what was done, but that wasn't a policy

7    change in January.

8            In April of 2007, their administrators were going

9    crazy on private messages and private forums because of this

10   change and how it was hurting their ability to do their

11   jobs, because they couldn't just ban one person anymore.

12   They had to ban 256 people at a time, because that last

13   octet, Your Honor, is 256 IP addresses.  So the notion that

14   it was because it was better is belied by all of the

15   documents, many of which were cited in our briefs, where the

16   administrators say it's a crazy thing to do.

17           The notion that they were just implementing a

18   longstanding policy on cleansing the forums is also -- it

19   requires a suspension of reality, Your Honor.  The documents

20   are plain.  Mr. Parker went onto a site and said go back and

21   do this for all of the old stuff.  His administrator drew up

22   a plan which she communicated with him privately.  He

23   approved it.  Because she wanted all of the site

24   administrators to know that it came from defendant Parker,

25   she asked him to come on the site and publicly approve her

1   plan, which he did.  This was not a matter of in January

2   2006 they archived everything and then began editing going

3   forward on a realtime basis.

4          In March, on the day -- late February, early

5   March, basically the day they got the complaint, they

6   decided that January 2006 would be the cutoff, but again,

7   what was done was if there was any post January 2006 or

8   later, any current post basically, everything in that whole

9   thread was reviewed.  I don't know where defendants get the

10  notion of 280 or 782 edited posts, aside from the fact that

11  that's a lot of evidence to be edited and changed.

12         THE COURT:  I really need to cut you off.

13         MR. FABRIZIO:  Okay.  Your Honor had asked us to

14  address the issue of lesser sanctions.  Obviously, in

15  discussing the prejudice we did to some degree.  Would it be

16  useful for Your Honor for us to submit a proposed order?

17         THE COURT:  I don't think so.  I will just take

18  another look at this based on the argument I've heard here

19  today and will issue an order as soon as I can.

20         MR. FABRIZIO:  Thank you, Your Honor.

21         MR. SMITH:  Your Honor, as far as further briefing

22  or declarations.

23         THE COURT:  I don't need anything further.  Thank

24  you.

25

1          (At 11:24 a.m. proceedings were adjourned.)

1                           --oOo--

2                          CERTIFICATE

3

4

5          I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  February 15, 2008

13

14

15                          _____

16                               WIL S. WILCOX
                                U.S. COURT REPORTER
17                                CSR NO. 9178

18

19

20

21

22

23

24

25