1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE FLORENCE-MARIE COOPER, JUDGE PRESIDING

- - -

COLUMBIA PICTURES INDUSTRIES,     )
INC., et al.,                     )
                                  )
              PLAINTIFFS,         )
                                  )
       VS.                        ) NO. CV 06-01093-FMC(JCx)
                                  )
JUSTIN BUNNELL, et al.,           )
                                  )
              DEFENDANTS.         )
_____ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, MAY 5, 2008

SANDRA L. BECERRA, CSR 10024
COURT REPORTER
UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
SUITE 429-K
LOS ANGELES, CALIFORNIA 90012
(818) 831-3796

Dockets.Justia.com

1   APPEARANCES OF COUNSEL:

2
    ON BEHALF OF THE PLAINTIFFS:
3
                JENNER & BLOCK
4               BY:  STEVEN B. FABRIZIO, ESQ.
                601 THIRTEENTH STREET, NW
5               SUITE 1200 SOUTH
                WASHINGTON, DC 20005
6               (202) 639-6000

7

8

9
    ON BEHALF OF DEFENDANTS JUSTIN BUNNELL, WES PARKER AND
10  VALENCE MEDIA, LTD.

11              ROTHKEN LAW FIRM LLP
                BY:  IRA P. ROTHKEN, ESQ.
12              3 HAMILTON LANDING
                SUITE 280
13              NOVATO, CALIFORNIA  94949

                (415) 924-4250
14

15
                LAW OFFICES OF KIRK J. RETZ, APC
16              BY:  KIRK J. RETZ, ESQ.
                21535 HAWTHORNE BOULEVARD
17              SUITE 200
                TORRANCE, CALIFORNIA  90503
18              (310) 540-9800

19

20

21

22

23

24

25

1                          I N D E X

2

HEARING RE
3        NOTICE OF FILING FOREIGN BANKRUPTCY          4

4        DEFAULT JUDGMENT AND PERMANENT INJUNCTION   13

5        COURT TAKES MATTER UNDER SUBMISSION         51

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      LOS ANGELES, CALIFORNIA; MONDAY, MAY 5, 2008; 10:00 A.M.

2                              - - - -

3      THE CLERK:  Calling Civil Case 06-1093-FMC,

4      Columbia Pictures Industries, Incorporated, et al., versus

5      Justin Bunnell, et al.

6      MR. FABRIZIO:  Good morning, your Honor.  Steven

7      Fabrizio for the plaintiffs.

8      MR. ROTHKEN:  Good morning, your Honor.  Ira

9      Rothken for Valence Media.

10      THE COURT:  Okay.

11      MR. RETZ:  Good morning, your Honor.  Kirk Retz

12      especially appearing for Valence Media, Ltd.

13      THE COURT:  Okay.

14      The calendar -- the calendar.  The matter is on

15      calendar this morning on plaintiffs' request for default

16      judgment and also request for a permanent injunction.

17      Just this morning I received, on behalf of Valence

18      Media, a notice of filing foreign bankruptcy, indicating that

19      apparently an involuntary bankruptcy of Valence Media was

20      filed on behalf of English creditors in the United Kingdom.

21      Off the top of my head, I don't know what the impact of that

22      is.

23      Evidently there is a footnote indicating that

24      there's some authority for the notion that federal courts, as

25      a matter of comity, recognize foreign bankruptcies and issues

1   stays, but in the 22 seconds since I received this document,

2   I haven't had a chance to actually do any research.

3         So if you have any input for me, I'd appreciate it.

4         MR. RETZ:  Your Honor, we had a couple more minutes

5   than 22 seconds to look at this but not a whole lot more time

6   than you.

7         We received notice of this late over the weekend,

8   and I've done the briefest of -- well, actually the most

9   complete investigation I could do under the short time frame.

10  But it is very brief at this point.

11        In the case of In Re Artimm, A-r-t-i-m-m, and

12  that's cited at 278 B.R. 832, it -- it's a case where a stay

13  was granted.  There was a foreign bankruptcy.  In this case,

14  it was in Italy.  And the court went through its rationale

15  for why the stay should be appropriate.

16        It says:  "An automatic stay under United States

17  bankruptcy law applies to all estate property whereever it is

18  located," citing In Re Lykes, L-y-k-e-s, Brothers S.S.

19  Company, and that's at 207 B.R. 282 at page 287.

20        Thus the automatic stay under United States state

21  law, applicable in a bankruptcy case filed in the United

22  States, would apply to an Italian creditor who otherwise

23  could file an action in Italy -- in the United States as a

24  debtor.

25        And in the same case -- this is still cited within

1    In Re Artimm, your Honor -- it also says the bankruptcy laws

2    of most countries provide for a similar stay or moratorium

3    against creditor collection activities outside of the

4    insolvency proceeding.  And that is Lender Fund, Inc., versus

5    Polly Pack International PLC, 143 B.R. 807 at 809.  And

6    that's describing the automatic stay under the English law.

7              THE COURT:  Okay.

8              MR. RETZ:   And, in essence, your Honor, I'm a bit

9    confused at this point as to whether I have the authority to

10   be here, so why the special appearance, because we haven't

11   had a chance to fully brief this.  So what I would request,

12   your Honor, is that we have some time to do the necessary

13   briefing on both sides to determine the impact of this

14   international bankruptcy.

15             THE COURT:  Okay.

16             Yes, sir?

17             MR. FABRIZIO:  Your Honor, plaintiffs got notice of

18   this when I woke up and was able to do the electronic case

19   filing e-mail that I had received.

20             It's more than a little suspicious -- the

21   coincidence that there was an involuntarily proceeding filed

22   in England on the very day that the individual defendants

23   filed here.  We've been litigating this case for two years,

24   we've never heard of any assets or property in England or any

25   English creditors.

1          But be that as it may, this is not a matter where

2    the court needs to delay further and have briefing on this

3    issue.  There is no automatic stay under the Bankruptcy Code,

4    and that is clear.  And it is not likely there will ever be

5    an automatic stay under these circumstances, and let me

6    explain.

7          Again, your Honor, this was purportedly filed on

8    May 1st.  We got copied this morning.  We have still not

9    received a copy of any bankruptcy papers that were

10   purportedly filed in England.  We haven't received the

11   uncertified copies, we haven't received certified copies.  At

12   this point they are -- they are imaginary, if I can say so.

13   The defendants' filing does not even say that there in fact

14   was a proceeding filed.  It says that counsel has been

15   advised that there was a proceeding filed.

16          But even if there was a proceeding filed, the

17   Bankruptcy Code of the United States was amended in 2005 to

18   deal specifically with this situation, and that is 11 USC,

19   Section 1515, your Honor.

20          THE COURT:  1515?

21          MR. FABRIZIO:  1515.  And I have a couple of

22   related statutory provisions.  Fortunately, your Honor,

23   unlike some provisions of the Bankruptcy Code, these are

24   quite clear.

25          (Laughter.)

1          MR. FABRIZIO:  Filing in a foreign jurisdiction has

2     no effect unless and until the foreign representative, which

3     may be the foreign trustee, has that foreign filing, and this

4     is recognized by a United States Bankruptcy Court.  And the

5     only way to do that is by filing a petition under Chapter 15

6     of the United States Bankruptcy Code.

7          Once a petition under Chapter 15 has been filed --

8     and, your Honor, we have absolutely no information or

9     received no notice that any petition has been filed.  And

10    there is some questions about whether it could be -- the

11    Bankruptcy Court in the United States under Section 1517,

12    that would be 11 USC 1517, has three options.  It can

13    recognize that foreign bankruptcy proceeding has a main

14    proceeding, "a main" being a term of art, your Honor.

15         It can recognize that foreign proceeding as a

16    non-main. Or, under 11 USC 1506 -- 1-5-0-6, your Honor -- it

17    can determine not to recognize the proceeding because there

18    is some impropriety in its filing, or it simply manifests the

19    unfair to creditors.

20         Now, most pertinent to this morning's proceeding,

21    your Honor, only -- only -- if the proceeding is recognized

22    as a main proceeding by issuance of an order of the United

23    States Bankruptcy Court is there an automatic stay of this

24    proceeding.

25         That Chapter 15 proceeding, which has not been

1    filed, as far as we know, would have to be under law a

2    noticed proceeding with a hearing in a U.S. Bankruptcy Court.

3    Plaintiffs would have an opportunity to be heard, and it

4    would be a main proceeding only if the debtor, meaning

5    Valence Media in this case, has its center of main interest

6    in England.  Essentially, if it's headquartered there or has

7    all of its assets there.  That cannot be the case here, your

8    Honor.

9         This is a company that we understand to be

10   incorporated in West Nevis.

11        THE COURT:  In where?  I'm sorry.

12        MR. FABRIZIO:  West Nevis or "Nevis."  It is owned

13   by the three individual defendants who are all Los Angeles

14   residents.  It is operated exclusively out of Los Angeles.

15   And after two years of litigation and supposedly discovery of

16   all of defendants' documentation, the only bank accounts or

17   assets that we know about are in the Los Angeles area.

18        So in the event there ever is a Chapter 15 petition

19   filed, it is highly unlikely that this proceeding -- that the

20   foreign bankruptcy proceeding would ever be recognized as a

21   main proceeding.  We obviously, your Honor, at this point

22   think that there is at least enough suspicion about the

23   filing of it that we would likely challenge it as a sham

24   proceeding.

25        If it was recognized as a non-main proceeding,

1   there is no automatic stay.  So the stay is discretionary at

2   the option of this Court.

3          And the Artimous case or the Artimm case that

4   defendants' cite on Footnote I, which I have to admit, your

5   Honor, I have not myself read but has been described to me,

6   actually lays out the Chapter 15 circumstance and, as I

7   understand it, your Honor, the stay was -- there was an

8   automatic stay in that case precisely because there had been

9   a Chapter 15 filing, a noticed hearing, and an order from a

10  U.S. bankruptcy judge under those facts declaring that

11  foreign proceeding the main proceeding in that case.

12         So, your Honor, we have -- we have been at this an

13  awfully long time, and the bankruptcy filings by the

14  individual defendants late last week, after all of these

15  issues had been briefed and there was nothing left but for

16  the Court to render judgment, can only be viewed as tactical

17  in an effort to delay these proceedings.

18         The Court, obviously, has little choice at this

19  juncture but to honor the stay as to the individual

20  defendants that filed in the United States.  The Court does

21  not have -- there is no authority for a stay of these

22  proceedings.

23         In fact, the Bankruptcy Code, Section 362(a), 11

24  USC 362(a), is the provision of the Bankruptcy Code that

25  governs automatic stays, and it provides that there is only

1    an automatic stay in three circumstances, none of which are

2    met here.  Those circumstances would be all filings in the

3    United States under Sections 301, 302, or 303.  Absent a 301,

4    302, or 303 filing in the United States, the only way for

5    there to be an automatic stay is through a Chapter 15

6    proceeding in the United States, which hasn't been filed.

7              THE COURT:  Yes, sir.

8              MR. RETZ:   A couple of points, your Honor.  First

9    of all, the assets where the company is filed in Nevis,

10   the -- Valence Media.  Nevis is -- any lawsuits in Nevis must

11   be --

12             THE COURT:  I'm sorry.  I didn't hear you.

13             MR. RETZ:   Any lawsuits relating to Nevis property

14   regarding bankruptcy need to be in -- filed in England.  So

15   that's why it's an English filing.  And it's not a sham

16   filing, as I understand it.  Again, I'm working on very

17   little information here, but as presented in opposition, it

18   was presented that this is a sham filing for the mere purpose

19   of trying to delay actions.  And in reality, as I understand

20   it, it is the only place where this could have been filed was

21   in England.

22             Secondly, the case cited in the brief, this was

23   very, very quickly put together, obviously, because we

24   received such late notice ourselves, there is a -- there are

25   two matters that are both entitled In Re Artimm, and one is a

1    later case.  The 355 B.R. 149 cited in the brief was actually

2    cited for a different purpose.

3            The case that I referred to a while ago is 278 B.R.

4    832, and that was cited for the purpose earlier on in the

5    matter prior to the hearing being brought.

6            And again, in the Artimm case, the stay was

7    granted, and one -- at 278 B.R. 832.

8            And the -- as I understand it, there is a three-day

9    holiday in England right now.  And we tried to reach counsel

10    this morning for additional information, but we have been

11    assured that the filing did take place.

12            The procedure in London, as I understand it, is a

13    little different than in California, but I'm not a bankruptcy

14    lawyer of the United States, and I'm sure not a bankruptcy

15    lawyer in England.  But I do know that the filing did take

16    place on May 1st.

17            THE COURT:  Okay.  Well, what I would propose to

18    do, I have no reason to doubt the accuracy of your citations

19    to the Bankruptcy Code sections.  I'm not a bankruptcy judge

20    either, and so any time this comes up, I start from scratch

21    and read them.

22            Assuming that, in fact, under the new Bankruptcy

23    Code there would be no authority to issue a stay absent a

24    proceeding in the United States Bankruptcy Code under Section

25    15, then I think we should go ahead and talk about the two

1    matters that are on calendar today, which have to do with the

2    damage award and the injunction as to Valence only, or

3    Valence, I think you are calling it.

4           I will then do the research on the bankruptcy

5    situation and make a determination as to whether I do have

6    jurisdiction to proceed.  Assuming I do, I'll enter the

7    damages judgment and injunction.  And if I don't, then I'll

8    issue a stay.  But I think since you're all here, we

9    certainly should be talking about the merits.

10          On the question of the default prove-up, the issue

11   that I spent some time on is the question of the amount of

12   the judgment.  Plaintiff is requesting statutory damages for

13   a very large number of infringements.  In looking at this, my

14   initial reaction was that starting with the normal rule that

15   if you're proceeding by way of default, the plaintiff is

16   limited to the amount of damages requested in the Prayer, and

17   that will make sense because it's a question of notice.  The

18   defendant who chose not to answer the Complaint made that

19   decision based on the maximum amount of damage that he felt

20   he could suffer.

21          Here, the defendant has been actively involved in

22   the litigation and certainly has notice of all of the

23   plaintiffs' claimed damages.  So my initial reaction was that

24   the limitation in the statute would not apply.

25          I then read the only Ninth Circuit case that really

1    seems to be discussing this, which is the Fong case.  And the

2    Ninth Circuit in Fong just rejected that distinction and said

3    the words say what the words say and they mean what they say,

4    and it doesn't matter whether it's a default by

5    non-appearance or a default later for a violation of

6    discovery, plaintiffs are limited.  So I am --

7           The other circuits disagree.  And frankly, if I

8    were queen of the world, I would go with what the other

9    circuits have to say because this doesn't seem to make sense.

10   But I sit in the Ninth Circuit; so I'm bond by their

11   conclusions.

12          Having said that, the plaintiff in response argues

13   that, in fact, the Complaint language is broad enough.  The

14   Complaint doesn't say we're limited to the works in Exhibit

15   A, but talks about thousands of works including, which is

16   very broad language.

17          So I think you may want to respond to the argument

18   that the Complaint by its very term authorizes a large -- a

19   finding of a large number of infringements in assessing

20   damages.

21          MR. RETZ:   Okay.  Mr. Rothken has been prepared

22   for this part of the argument.

23          THE COURT:  Okay.

24          MR. ROTHKEN:  I'm not sure I'm prepared, but --

25          THE COURT:  Expecting it is not prepared.

1        MR. ROTHKEN:  Thank you for the road map, your
2    Honor.  I wish it had to do with a different topic, though.
3        THE COURT:  Yes.
4        MR. ROTHKEN:  Let me first start off, because I
5    don't have a lot of experience handling a case involving
6    terminating sanctions.  It's the first case that I've ever
7    had.
8        So I just want to start off by making some points
9    that we agree on so that we can at least see where we
10   disagree.
11       I think that my clients understand and agree that
12   you cannot destroy relevant evidence during a litigation.
13   And I think they say the same in their declarations that they
14   gave in relation to this proceeding.  And a particularly good
15   example, I think they understand that they made a mistake.
16       For example, they went ahead and redacted out
17   postings on the forms that had to do with what I'll say
18   allegedly bad stuff, and they didn't save back-up copies.
19   And, you know, I just want to say that -- and I'll discuss
20   this later -- that they do understand it, and they understood
21   they made a mistake, and they didn't understand the
22   consequences of their mistake.
23       And so when there is an elephant in the room, I
24   thought I would just point it out; okay?
25       Now having said that, I think it's important -- and

1    I hope your Honor agrees -- that even when you're dealing

2    with a very unfortunate situation involving defendants, and

3    they were basically, you know, three guys in a small office,

4    created a high tech company that did this Torrent site and a

5    bunch of other things, they're not sophisticated in terms of

6    litigation.  In fact, I think this was their very first case.

7            I think it's important that all due process not be

8    dispensed with even in a proceeding like this.

9            You know, I understand that when someone doesn't

10   come and respond to a Complaint, the Court intervenes and

11   still tries to provide some quantum of due process in that

12   instance.  I mean, it's not on the record, but even waiting

13   in the back today, I heard a situation where the Court was

14   involved in getting someone due process who may not have

15   technically been entitled to it, or at least you gave him a

16   reasonable amount.

17           Here, your Honor, I think that even though you

18   found that there should be terminating sanctions, I think

19   that the respect for due process would demand that the

20   plaintiffs can come in, just say anything they want on paper

21   and get whatever they want, and that all inferences should be

22   in their direction, because that also would also be unfair

23   when you consider the notion that -- and my best guess is

24   that there are over a million pages of documents -- if

25   digital stuff that was converted to documents were provided

1    in this case, that undoubtedly, because we've agreed with

2    you, that some errors were made in preserving some of that.

3            But also the other point is this, there is for

4    every example of where something was not preserved, there's

5    plenty of sampling that they have, and they've admitted to

6    having, of things that were preserved for different time

7    periods.

8            So you would expect that in a proceeding like this,

9    in order for it to pass procedural due process muster, to

10   provide for some sense of justice and fairness, that they

11   would at least make an attempt for the other time periods

12   where there was a full and robust record, where there was

13   full and robust foreign posting, where they had IP addresses,

14   because they got full IP addresses, and for which they also

15   could control their own destiny through subpoenas, that they

16   would come to this Court and provide for a sampling during

17   that time period in order to provide some sort of fairness

18   and tether for any other request for damages in this

19   judgment.

20           So with that being said, I just want to point out

21   that, as you know, the Valence Media is a foreign

22   corporation.  At all times relevant in this case, they were

23   foreign.  Their server was at all relevant times located in

24   the Netherlands.  And --

25           So we start out with the notion that the bias would

1    be that they would not be subject to U.S. law and

2    jurisdiction until the plaintiffs could come forth and

3    provide some tether, some evidence of something bad happened

4    in the United States.

5         But in this default hearing -- and I use that term

6    loosely because I'm not entirely sure what the name of this

7    hearing is.  And as your Honor may have pointed out, there

8    may even be a request for judgment hearing that we're in --

9    they don't provide a single copyright work in a copyright

10   case.  There's -- at least I could -- I looked through the

11   record on this motion, and I couldn't find any evidence of

12   actually one copyrighted work being compared and put into

13   evidence to show that there is a substantial similarity in

14   order to have infringement.

15        The record has got things like indicia of -- I

16   forgot exactly what the quote was but some sort of indicia of

17   badness, or indicia of infringement, but we don't know what

18   those indices are.  And I would suggest to your Honor that

19   when dealing with a situation where someone's conduct was

20   wrongful in nature, we shouldn't also have a situation where

21   we allow for absolute speculation and a failure to properly

22   prove certain things that are in the control of the

23   plaintiffs and for which defendants did not interfere.

24        So I'm suggesting to your Honor that you would

25   establish some sliding scale of due process that would not be

1   an all-or-nothing situation in determining, you know, damages

2   and injunction in this case.

3          And I'm going to provide to you some factors I

4   would ask that your Honor consider in this context.  And

5   these go to damages injunction, to willfulness and to various

6   other things, equity.

7          Number one, which is fascinating because I couldn't

8   find any, but is there any clear appellate precedent that

9   defendant is liable in this case?  And we did a search using

10  the word torrent or torrent file and -- to find cases, but we

11  haven't been able to find any appellate cases which actually

12  say that a torrent site is infringing, secondarily infringing

13  or primarily infringing.

14         We found one other case where there was default,

15  but we have found no appellate authority for liability in

16  this context.  The closest case we have is Grokster.  And in

17  Grokster, as we pointed out in our brief opposing the

18  Injunction, in that case the Supreme Court discussed a new

19  theory called inducement.  There's a posit of cases

20  discussing what all that means after the Supreme Court came

21  down with it.  We have the other case going on in Judge

22  Wilson's court, where we are working on that issue as well.

23         And I would suggest to your Honor that if you take

24  a look at the Grokster case and look at the way Justice

25  Souter wrote that, it involves a copying device.  There the

1    copying device was the Grokster software that allowed for

2    people to fetch copies and make copies and deposit them in

3    their hard drive of actually infringing works.

4           There's no claim in the Complaint that's what

5    occurred here, and there can't be.  I mean, I think everyone

6    is agreeable to that.

7           There's no device; there's no copying device.  The

8    device, if we were to draw a metaphor, would be the bit

9    torrent client software that is needed to go out and fetch

10   content and deposit it on someone's hard drive, but the bit

11   torrent software is not involved in this litigation at all.

12          The only other executable device that one would

13   have in this litigation is the browser, but the browser is

14   not involved in copying.  It's involved maybe in copying a

15   torrent file, but it's not involved in copying the copyright

16   infringing work.

17          And so I would suggest to your Honor that just by

18   looking at the four corners of the Complaint, there would be

19   no inducement theory that would apply here.

20          And same thing with vicarious liability.  Looking

21   at the Perfect 10 line of cases, most notably Perfect 10

22   versus Google and Amazon.  The courts here in the Ninth

23   Circuit and the Federal District Court basically found that

24   there is no vicarious liability when the infringing content

25   is found someplace else, on someone else's servers, which is

1   the case here as pled in the Complaint, or at least can be

2   implied by the Complaint, and you have no control over --

3   your supervision over that infringing work.

4           There is no evidence, neither from the Complaint

5   nor put into evidence, that Valence Media was at all involved

6   in ever touching a copyrighted work, posting a copyrighted

7   work, copying a copyrighted work, or ever going out and

8   fetching from the servers copyrighted works and analyzing

9   them.

10          THE COURT:  We're getting a little off the track of

11  is there any clear appellate precedent in this case because I

12  know in your papers you do continue to argue the merits.  We

13  are at a situation where default judgment has been entered

14  against your client; so the merits are really beyond the

15  purpose of this hearing, which is the nature and extent of

16  the judgment and the injunction.

17          MR. ROTHKEN:  Okay, your Honor, I'll move on.

18          I was hoping beyond hope that if the Court found

19  even in this context that the complainant cannot make out a

20  claim, that that would be a factor to consider in whether or

21  not to award any monetary damages at all.  But I'll move on

22  to the next point, which is more according to what you're

23  saying.

24          This would go to willfulness, and the question --

25  the factor for you to consider would be did the defendant

1    have in place reasonable methods and processes -- sorry,

2    about that, your Honor.

3            THE COURT:  Okay.

4            MR. ROTHKEN:  Did the defendants have in place

5    reasonable methods and processes to remedy intellectual

6    property disputes worldwide?  And the answer here is yes.  We

7    don't believe there was any willfulness in their conduct.

8    And, in fact, we provided in two different places Professor

9    Horowitz's testimony, that I took his deposition, where he

10   actually agreed to very robust processes to IP disputes, to

11   have a DMCA policy in place.  I'm not arguing that as I

12   cannot -- as an affirmative defense, but I am arguing that

13   that would show a lack of willfulness.

14           He did indicate that, when they were given notice,

15   they would remove things by hash so that it would not be

16   reindexed, and the hash is sort of like a fingerprint.  He

17   did say that for copyright owners that there was a counsel

18   they had where they can go ahead and on demand take things

19   down.

20           And without going into all of them, I'm just going

21   to ask your Honor to consider the full list of things that

22   were in there.

23           Now, the next factor I'd like you to consider, your

24   Honor, is did the plaintiffs avail themselves of defendants'

25   IP protection methods and processes?  And the answer here is

1   no.  At any point in time, an equity -- this would be

2   certainly an equitable point, but the plaintiffs could have

3   gone ahead and given themselves a de facto injunction against

4   defendants.

5          As Professor Horowitz pointed out, they could have

6   availed themselves of those processes.  They could have gone

7   ahead and removed any work they wanted, including the litany

8   of file names that they provided to this court.  And they

9   could have gone ahead if it was worth a half a billion

10  dollars to them, they could have gone ahead anytime they

11  wanted and taken down whatever they wanted.

12         So I would suggest to your Honor that it wasn't

13  worth a half a billion dollars to them, unless they acted in

14  an illogical economic matter, which I'm not going to go ahead

15  and say they did.

16         The next issue, and I say this respectfully, I --

17  I -- these are all controversial things, but I'm going to

18  argue them from my clients' perspective -- did defendants

19  take steps to reduce the controversy?  I know that in the

20  papers they're filled with what I would consider to be

21  somewhat hyperbole, but early on in this case, if you look at

22  the transcript in February that was attached to these papers,

23  we had a conversation with the magistrate judge regarding the

24  aspects of TorrentSpy.

25         When I was reading it over the other day, I

1    actually noticed there was not a lot of issues in dispute in

2    this case.  It seemed like, you know, right up front we

3    agreed with almost everything.  You know, TorrentSpy is --

4    you know, is a site that indexes torrent files.  It

5    statistically likely is going to be, you know, linking to

6    things that have good and bad content downstream.  I mean,

7    nearly every single thing -- I would say that over half of

8    the case at least was stipulated to up front.

9         I would ask your Honor to go back, and you can take

10   a look at it because I had a very long conversation with

11   Magistrate Choolijan where we, you know -- this case really

12   could have been very much narrowed upon reflection.  I think

13   in the end the areas of disagreement are areas where arguably

14   the -- the misconduct by the defendants may not have

15   impacted.

16        I think the areas of disagreement were twofold.

17   Number one, attenuation.  How far away is the TorrentSpy site

18   from any misconduct or primary infringement that occurs

19   downstream?  Okay.

20        That's the problem that's been permeating this

21   case.  It's the problem, frankly, that the plaintiffs have

22   pointed out as part of their unfair -- alleged unfair

23   prejudice, was that the only way they can get this

24   information would be to get it from the defendants.

25        But I would suggest to you, your Honor, that if the

        1    defendants handed over every single thing they were supposed

        2    to hand over, they would still have to go out, go someplace

        3    else, to third party servers, and issue a subpoena and take

        4    some depositions.  This is not like the Grokster and Napster

        5    cases where -- where there was any involvement with the

        6    copyrighted work.

        7          So we have a situation right here where right up

        8    front the plaintiffs really -- the defendants really narrowed

        9    the issues, and we still had tremendous aggressive discovery

        10   in which ultimately my clients made mistakes, and yet I

        11   don't -- I think that one could still argue that you should

        12   take into consideration the notion that the main issues up

        13   front were agreed to.

        14         And then on top of that and more importantly, in

        15   August of 2007, well before any terminating sanctions were

        16   issued in this case, the defendants stopped U.S. traffic from

        17   coming to the TorrentSpy search engine on their own and

        18   thought that that would go ahead and reduce the controversy

        19   and start winding up the case by mooting it, or substantially

        20   mooting it out, and maybe reaching a settlement or resolving

        21   the case without the need for any more litigation or even to

        22   be here today.

        23         As your Honor knows, it did not do that.  But

        24   that's not somebody who is -- who's not obeying the laws of

        25   gravity, who is going off and snubbing their nose.  That's

1    somebody who just decided at that point in time that, given

2    the totality of the circumstances, that they would just go

3    ahead and stop the controversy.

4          I think to a certain extent at that point they were

5    acknowledging that it was -- it was, you know, no longer

6    economically efficient to use the courts' resources, to go

7    ahead and to litigate the matter.  And apparently, I guess,

8    it's -- it had the opposite effect.

9          The next factor, your Honor, is -- and I'll try

10   speeding this up.  I apologize.  It's like a half a billion

11   dollars; so I feel compelled to make these arguments -- where

12   there were other explanations for defendants' actions or

13   alleged misconduct or your finding by your Honor misconduct.

14   And I'm just going to make this argument because unlike other

15   cases where somebody will just destroy some evidence and

16   there's simply no other beneficial policy to what they've

17   done, I'm going to point some of these out.

18         The first one that comes to mind is that by

19   removing about 750 posts or redacting them, they were

20   removing things that were discussing allegedly infringing

21   works worldwide.  Normally, outside of litigation that would

22   be laudable.  The one thing that they didn't understand, or

23   they, you know, I think they did understand it, but they made

24   a mistake, was that -- that you have to preserve digital

25   evidence.  And they knew that their system automatically

1    backed things up.

2           What wasn't apparent to them was that when it backs

3    things up, it overwrites the last backup.  So you're saving

4    the redacted thing.  And that's in their declarations.

5           And again, your Honor, I mean, it goes without

6    saying that those sorts of backups should have been made so

7    that the data would be preserved.

8           The other part of this, your Honor, is that they

9    were also acting in their own way to protect user privacy.

10   User privacy is axiomatic. It should not be protected when it

11   violates a court order.  But having said that, there is at

12   least some of the policy in play right here that mitigates

13   the wrongfulness of their conduct.  And they were acting to

14   protect user privacy.

15          Now the next point I'm going to make is clearly

16   something which is -- we were prepared to argue in a Motion

17   In Limine if we went to trial, as it's a factor I'd like you

18   to consider right here, and that is this:  The -- the

19   plaintiffs are essentially trying to get into evidence in

20   this proceeding things that happened after the Complaint was

21   filed.  In fact, it looks to me like that is pretty much

22   everything that's in evidence or they are trying to get into

23   evidence.  Listings of torrent files after the Complaint was

24   filed.

25          We have discovery rulings from the magistrate

1    judge, which I think your Honor affirmed by saying it was not

2    an abuse of discretion.  But if we go back and look at the

3    record just from a fairness perspective, and I think

4    hindsight is beneficial to all of us right here, the

5    plaintiffs were entitled to get discovery of torrent files

6    and data after the Complaint was filed against the

7    defendants.

8            But when the defendants moved to get documents

9    related to copyrighted works and authorization and all the

10   things that would test the integrity of what they're trying

11   to get into evidence today or they would try to get into

12   evidence at trial, the magistrate gave an order saying that

13   the discovery cutoff for the defendants to get those

14   documents was roughly the date of the Complaint filing.

15           So I would argue that what we're looking at here is

16   to see what plaintiffs would be able to get into evidence at

17   trial or misconduct related to what they can get in at trial.

18   I would argue they would not be allowed to get into trial

19   documents and things for which defendants were not entitled

20   or couldn't get discovery on to test the integrity of it.

21   And that includes the status of copyrighted works and

22   copyrighted -- and things that were needed to prove a

23   copyright infringement.

24           So the lack of symmetry should be a factor, for

25   better or for worse, most decidedly hindsight being

1    beneficial maybe to all of us.

2         Next factor, your Honor, is -- I'm not going to

3    dwell on this because -- well, I may dwell on it.  The

4    defendants provide sufficient evidence of secondary liability

5    to justify statutory damages.  That's intertwined with the

6    issue that you raised, which is they're asking for over half

7    a billion dollars.  It's a very large number of

8    infringements.  I would respectfully say that they didn't

9    provide a very large number of infringements.  They provided

10   a very large number of file names.  Those file names have no

11   content in them.  They are copyrightable.  They are torrent

12   files.

13        There is a wholesale lack of notice of claimed

14   damages today even but also in the Complaint.  And I do agree

15   with your point regarding the Ninth Circuit that they should

16   be limited to what was alleged in the Complaint.  To do

17   otherwise would provide for a total lack of symmetry and

18   injustice.

19        When you have a Complaint that's filed, you're

20   required to prove up subject matter jurisdiction.  You're

21   required to attach copyright registrations.  I didn't see any

22   prove-up of subject matter jurisdiction or copyright

23   registrations equivalent to what you would see in a

24   Complaint, even in this filing before the Court for a

25   judgment.  I saw just torrent file names.

1          And then to make matters worse, it looks to me that

2     the torrent file names are associated with a time period when

3     the U.S. was shut off, which was in August of 2007.  And so

4     that would be unfair to allow for statutory damages in a time

5     period, in August of 2007, when U.S. citizens couldn't get

6     access without hacking the site.

7          The discovery cutoff, again for us to be able to

8     get documents, was at the time of the Complaint.  So we

9     wouldn't have been allowed to even ask them theoretically for

10    these sorts of things to test the integrity of them if we

11    would have gone to trial.

12         They provided no copyrighted works, as I mentioned

13    earlier, just a list of files, torrent files.

14         Under super films, as we cited in our papers, there

15    needs to be some showing that this not extraterritorial of

16    the subject matter jurisdiction.  And we have a Netherland

17    server.

18         We have no evidence in the United States of

19    infringement.

20         There's no showing of causation in order to justify

21    the damages.  They are totally speculative.

22         The use of the word indicia, without describing it

23    with more particularity in this context, is speculative and

24    inadequate.  It lacks foundation.  There are no copyright

25    registrations.  No proof of substantial similarity.  And

1    based upon the evidence that they put in for damages right

2    now, there's an even more compelling argument regarding the

3    First Amendment would allow for a site to list in text format

4    and text files these file names without anything being

5    tethered to them.

6          I would also argue to you that in this context, as

7    opposed maybe to time of trial, the Communications Decency

8    Act would immunize the interactive services provider, such as

9    Valence Media, TorrentSpy.com, from your text files that are

10   posted that are not considered to be federal intellectual

11   property, given the notion again that they are not tethered

12   again to a copyright infringement or copyrighted work under

13   the immunity provision, I think, of Section 230, and under

14   the precedent here in California, Federal Court, Perfect 10

15   versus CC Bill, which requires in order to be except from CBA

16   immunity, it would have to be federal intellectual property.

17         In that case it says you can't even file a lawsuit

18   against an interactive service provider for content created

19   provided by a third party.

20         And if you look at the declarations from Mr. Wes

21   Parker, he indicates that all those torrent files were

22   provided by third parties under penalty of perjury.

23         The next factor I'd ask for your Honor to

24   consider -- I'm almost done -- did the plaintiffs themselves

25   engage in any inequitable conduct?

1          I think that at this point in time whether you want

2     to use the word hacker or whatever, I'll use as a term of

3     convenience, but in the related case, which started this

4     entire copyright case, where they started their investigation

5     through their trade organization, the NPAA, they paid a

6     hacker $15,000 to get the initial information which led to

7     this copyright litigation.  And I don't know what you call

8     it.  At the end of the day, it may not even be a violation of

9     law, but we believe that it is one of the best examples of

10    inequitable conduct one is going to find.

11         We believe that -- and I say this in the

12    alternative because we don't have full discovery on it -- but

13    we believe that if a declaration was provided to your Honor

14    in this context for a default in the period of time in August

15    of 2007, from when they knew or should have known that the

16    U.S. site was shut down and they didn't tell your Honor, we

17    believe that that would be evidence of inequitable conduct,

18    if they obfuscated that notion and then requested damages in

19    this proceeding for those torrent file names.

20         The next factor I would ask your Honor to look at

21    only because it does go to due process, especially if we look

22    at the cases, like the BMW case that involved punitive

23    damages, and these are the cases that came after Pacific

24    Mutual Life versus Haslip, its progeny, where you look at

25    some ratio of proving actual damages to punitive damages.

1       There, in order to comport with due process in this

2   context, I would argue that there needs to be some evidence

3   of actual damages, some actual harm that was done, and there

4   is none, none that I can see in the record.  And certainly

5   nothing to be able to justify over half a billion dollars in

6   statutory damages.

7       And again, I would say the bias here would be

8   against actual damages because they never availed themselves

9   of the DMCA policy that they knew they could have taken works

10  down with.

11      The plaintiff was most decidedly able to be able,

12  if they wanted to, to make some possible claim of actual

13  damages to tether this half a billion dollar request.  They

14  had, even though some IP addresses apparently were

15  inappropriately redacted, the plaintiff had IP addresses.

16  And they are most able to know how to subpoena ISP's and

17  others with those IP addresses to get third parties who may

18  have been involved in uploading or downloading torrent files

19  from TorrentSpy.com.

20      This goes to the point I made before about

21  sampling.  And I'm not aware they made any such  subpoenas in

22  this case.  And they could have gotten their testimony, or

23  they could have gone ahead and subpoenaed to see what was on

24  their servers.  They could have asked them for server logs.

25  None of that occurred in this case.

1          Again, it does not justify the defendants in not

2    preserving their own data, but it is certainly a factor for

3    you to consider in deciding whether or not what the damages

4    should be in light of this.  They are very sophisticated

5    parties.  They provided no evidence of actual copyrighted

6    works, but they could have gone ahead and downloaded

7    copyrighted works and at least brought some to court.

8          They didn't do that.  Again, that may -- and I

9    would still argue that under the West case that we provided

10   that an authorized party downloading works, it's not showing

11   infringement, but at least it would be more than just

12   bringing file names to court.

13         So there was no what I would call admissible

14   evidence of actual damages.  There is no -- insufficient

15   evidence of statutory damages.

16         I'm going to sum up right now, your Honor.  I do

17   want to make one other point, and that is in terms of

18   injunctive relief.  I believe it is an important First

19   Amendment issue right here.  And the way I want to phrase it,

20   mostly because I'm a techie guy, is like this:

21         If we were to go ahead in the legal profession, and

22   whether it be Google or some start-up and say okay, we all

23   agree that you should be allowed to search for dot-torrent

24   files on the Internet, or for that matter .pdf files or .hgml

25   files, which are web pages, here's how you could do it.  I

1  really would be at a loss, given the nature of the way things

2  have evolved on what to say to them.

3        I mean, I think that I'd like to believe that we

4  all agree at some point, you know, as part of the legal

5  profession, that people should be allowed to index and search

6  for torrent files.  But if you provide for a broad index that

7  goes ahead and tries to be as broad as one could possibly be

8  to find torrent files, and the state of the Internet as a

9  whole is that maybe it's statistically likely that torrent

10  files have a lot of bad stuff in them or lead to bad stuff

11  ultimately, well, how do you do it?

12        What should the injunction say?  You can't -- you

13  can't index torrent files, or you could do it and have a DMCA

14  policy.  And as Professor Horowits testified under penalty of

15  perjury, and there's no contrary evidence that I could see in

16  this record, the defendants had a DMCA policy.

17        Are you not allowed to have a torrent file search

18  engine because, given the state of the Internet as a whole

19  there is going to be a lot of famous titles in them?  Well,

20  that would mean you can't have a torrent file search engine

21  until things evolve on the Internet.

22        Now, as pointed out in our papers, Google has a

23  torrent file search engine just built into their total search

24  engine.

25        Is the rule as simple as the fact that you have to

1    have a lot of other things you search for in order to be able

2    to have torrent file search?

3             You know, your Honor, this case is very difficult

4    because there are multiple policies in play right here.  Most

5    decidedly up front is the policy that you've got to preserve

6    electronic evidence.  But I also have to say, your Honor,

7    that given the totality of the circumstances, there are other

8    policies in play here, like the First Amendment, like

9    pragmatism, due process.

10            This could very well be a situation, your Honor,

11   where we hope that you would fashion a judgment that would

12   find that the defendants, even if they have done something

13   wrong in discovery, that they were not willful in their

14   conduct as it relates to the torrent file search engine, and

15   that any injunction would take into account the fact that

16   there needs to be some sort of balance, and maybe the balance

17   is the DMCA in the end, and not be so broad as to prevent

18   these three -- well, they are not here today -- but Valence

19   Media from being able to conduct business on the Internet.

20            And as Mr. Retz stated before, there is a

21   bankruptcy proceeding going on in England.  I am not familiar

22   with bankruptcy procedure in the United States, and I don't

23   know anything about the Court of the Exchequer or their

24   procedures or whatever, but I could say that certainly

25   there's probably some stakeholders over across the world who

1    wish they were here today so that they could discuss what

2    their stake is, who may be the people in a typical order, you

3    and those in concert with you.  They're not here today.

4            So all I could say, your Honor, is that if for some

5    reason this case is not stayed, that you would consider a

6    fair injunction that would not automatically wipe out the

7    ability of a company to search for torrent files and for

8    people to find them even if it so happened later on to lead

9    downstream to good and bad things, that would be

10   disproportional.  It would usurp the First Amendment,

11   especially when a single copyrighted work was put into

12   evidence here and when the site itself never touched the

13   copyrighted work.

14           And as far as damages, your Honor, I would suggest

15   to you that based upon the fact they produced no copyrighted

16   works at this hearing, and they had the ability to subpoena

17   people to be able to get some testimony and they have not

18   done it, that I would ask your Honor to find that either

19   there be the minimal statutory damages for the works

20   mentioned in the Complaint, or you find that they're too

21   vague and too speculative on this record, and to not award

22   any at all.

23           And unless your Honor has any other questions, I'm

24   done with my diatribe.

25           THE COURT:  Thank you, sir.

1          MR. ROTHKEN:  Thank you.

2          MR. FABRIZIO:  May I?

3          THE COURT:  Yes.

4          I need to ask you to be somewhat brief.  I know

5     that defense had the laboring oar, and so I gave them a lot

6     of time, but I have a criminal calendar coming up.  So if you

7     can --

8          MR. FABRIZIO:  I will do my best, your Honor.

9     Mr. Rothken said a lot of things.  Most of them I won't even

10    try to respond to.

11         There are actually three things that I'd like to

12    do.  First, I'd like to answer the question that your Honor

13    started with, then I would like to discuss a little about

14    the amount that we've sought, and then I will -- and I

15    promise you, not in order or in the same depth, to address a

16    couple of the issues that Mr. Rothken raised because some of

17    them are simply inaccurate.

18         First, as to the question -- pardon me.  First, as

19    to the question your Honor raised.  The Ninth Circuit case

20    that your Honor cited, the Fong case, the 1962 in the Ninth

21    Circuit.  That was a case where the Complaint did not plead a

22    certain type of damages.  There the Complaint didn't seek

23    actual damages at all.  And in a default setting, the court

24    said that, well, having not sought actual damages at all in a

25    category of damages, you can't go back and now seek them

1   because the defendants weren't on notice of an entire

2   category of damages.  It's a very different case, your Honor.

3           And here, as your Honor pointed out, this Complaint

4   from day one -- and there's no question that defendants knew

5   it because we told them over and over again.

6           This case from day one was about their infringement

7   of thousands of works.  Exhibit A to the Complaint was

8   expressly in the Complaint and since -- just the illustrative

9   examples of those works.  And, in fact, your Honor granted an

10  order specifically bifurcating the issue so that we could at

11  a later junction, after liability was established, go -- you

12  know, put in the evidence of all of those works, which is

13  actually what we've now done.

14          But I refer your Honor to paragraph 16 -- paragraph

15  6 of the Complaint, where plaintiffs specifically allege the

16  infringement of thousands of their copyrighted works.

17  Paragraphs 34, 36, where we specifically identify Exhibit A

18  works as illustrative examples, including those Exhibit A

19  works but not limited to them.

20          Throughout the entire Complaint, there is more than

21  adequate notice this was never about the 18 works in the

22  Complaint.  To allow defendants off on something like that,

23  your Honor would not just reward their misconduct, you would

24  encourage every defendant to do it when they got to a point

25  in the case where things aren't going their way.  It's a

1    great way to cap damages.

2            So we think, your Honor, the Complaint, by its

3    terms expressly, is not limited to Exhibit A.  Defendants

4    were on more than fair notice.  And as the Elektra vs.

5    Crawford case that we cited at page 10 of our motion makes

6    clear is that we asked for damages for each infringement.

7    Defendants were on notice that there are numerous works which

8    plaintiff were seeking damages.

9            We don't believe that there is any artificial

10   limitation based on the 18 works that were included in an

11   illustrative example at the end of the Complaint, and we

12   certainly don't think the Fong case, which again was where

13   there was an entire category that was never pled even speaks

14   to that issue.

15           That is the first issue, your Honor.

16           As to the amount of damages, plaintiffs seek the

17   maximum amount of 150,000 for each of almost 37 works

18   infringed.  Yes, the total amount is very substantial.  Yes,

19   it is more than these defendants can currently pay.  We know

20   that.  However, an award of the maximum statutory amount is

21   necessary in light of their conduct.  Their conduct

22   intentionally, not just willfully, intentionally infringing

23   plaintiffs' copyrights and their conduct in this litigation.

24   It is established as fact that they purposefully and

25   intentionally set up a business to massively infringe

1    plaintiffs' copyrights and to profit from doing so.

2            In this litigation -- and these are not

3    allegations.  Now these are found facts by your Honor and the

4    magistrate judge.  They stonewalled discovery.  They violated

5    court orders.  They systematically destroyed wide groups of

6    evidence.  They gave false testimony under oath to hide their

7    destruction.  They tried to get third parties to give false

8    testimony under oath to hide their destruction of evidence.

9    And even now, eighteen months, two months, two years into the

10   case, they defy the magistrate judge server log order, which

11   your Honor affirmed.  And, you know, after six months of

12   intense litigation, they just simply refused to obey it.

13           The scope of defendants' infringement is also mind

14   boggling.  It's impossible to know the full scope because of

15   their intentional evidence destruction, but we do know it was

16   massive.

17           If there is a case that warrants maximum, your

18   Honor, this has to be it.  It's difficult on a principle

19   basis, looking at the authorities, to justify a lower award.

20   And when you look at what defendants have said in response,

21   they don't even make a case against the amount.

22           As a threshold, we have more than sufficiently

23   proven direct infringement.

24           Defendants ran with the largest websites, pirated

25   torrent types in the world.  The very purpose of the site as

1    alleged -- it's established as fact -- was to draw users to

2    their site to download torrent files that would lead to

3    copyrighted works.  That was the lure that got users to their

4    site.  Millions of users did that.

5          In both the torrent by forms and the user columns

6    for individual dot-torrent files, their users openly admit to

7    directly infringing plaintiffs copyrighted movies and

8    television shows.  We presented statistics from defendants'

9    own servers that give numbers to the number of people at any

10   moment in time who were infringing plaintiffs' copyrighted

11   works, and the numbers are massive.  And those numbers are

12   conservative by multiples because those numbers reflect only

13   a small snapshot in time as opposed to three years' worth of

14   infringement.

15         Their suggestion that this doesn't prove

16   infringement ignores two things that are very important here,

17   your Honor.  One, we don't need to prove infringement beyond

18   all metaphysical doubt.  We have to prove it by a

19   preponderance of the evidence.  We have to prove that its

20   more likely than not that the works were infringed.  Here

21   we've clearly done that to a moral certainty, they were each

22   infringed repeatedly.

23         It also ignores the fact that the evidence of this

24   infringement that would have come from their own servers they

25   destroyed.

1        Mr. Rothken talks about sort of justifiable

2   violation of court orders or destruction of evidence for the

3   greater good.  Be that as it may, they destroyed the

4   evidence.  They cannot now come to this court arguing that we

5   didn't present the evidence that they destroyed.

6        As to the amount of the award, again, this conduct

7   was more than willful.  It was intentional.  Intentional and

8   willful infringement is not, as Mr. Rothken seemed to

9   suggest, something that's available for the court to find as

10  a matter of fact based on a record where this Court has

11  already found they destroyed so much evidence a fair

12  adjudication is not possible.

13       Willfulness and intentional infringement is

14  established as a matter of fact based on the allegations of

15  the Complaint.

16       Your Honor, there's also ample evidence of it.

17  Your Honor has seen much of it throughout the course of this

18  case.  But these defendants put up categories, directories

19  that could only be for infringement.  Cam movies here,

20  meaning unlawfully recorded in a movie theater with a

21  handheld cam recorder.  Steal those and put them here.  We've

22  created a category for you.  We've created a category for

23  television shows which are inherently infringing by their

24  names, The Simpsons, The Family Guy.

25       The evidence is overwhelming but the fact is

1   established.

2          The willfulness of the defendants' conduct is a

3   critical factor that the courts in this jurisdiction consider

4   in awarding statutory.  The Ninth Circuit has made clear that

5   in cases of willful conduct, the -- in cases -- I'm sorry --

6   that the -- when defendants' conduct is particularly

7   egregious, an award -- a high award is appropriate.

8          Now in Dastars (phonetic), which is in your Honor's

9   cases, you determined that the maximal award of $150,000 was

10  appropriate in that case.  And in that case it was because

11  the defendants failed to initially investigate the

12  possibility that their actions were infringing and then later

13  simply turned a blind eye to the evidence that it was.  The

14  facts here are far more egregious.

15         Defendants' litigation conduct also weighs heavily

16  in consideration of the amount of statutory award.  I won't

17  go through the conduct again, your Honor.  I think your Honor

18  has it in mind, but your Honor obviously has a lot more

19  experience than anyone in this courtroom in seeing conduct of

20  litigants, but this conduct was extreme.  In my experience,

21  something I had not seen before.

22         The sheer scope of the infringements, we presented

23  evidence as 3700 works.  Your Honor, that's just the tip of

24  the iceberg.  Defendants boasted of tens of thousands.  And

25  each of them was infringed repeatedly.  The popular ones,

1    probably tens of thousands of times.

2           And the vital lawsuits, your Honor, mean that it's

3    the infringement that continues, even with TorrentSpy shut

4    down, those works are now still being offered to other people

5    because they had the defendants' infringing site.

6           Courts have described this type of infringement as,

7    quote, exponential rather than linear.  Threatening virtually

8    unstoppable infringement.  And that's the 20th Century Fox

9    vs. Streeter case, your Honor, that we cite.

10          Some of the most valuable and popular movies in

11   television shows ever created were infringed.  No plaintiff

12   distributes their works without built-in protections to

13   ensure that they cannot be serially copied like that.

14   Defendants' conduct has put all of them, has exposed all of

15   them, to unending infringement.

16          The need to deter these defendants and others is

17   also a vital consideration here, your Honor.  This is what

18   the Ninth Circuit said, in punitive -- the punitive and

19   deterrent purposes of the copyright act and the statutory

20   damages are particularly important in cases of willful

21   infringements.  They ran one of the most notorious pirate

22   operations in the world.

23          And, your Honor, they submitted declarations.  I

24   will spend a minute in a second.  But these defendants, even

25   shutting TorrentSpy down, were defiant.  On the day they shut

1    TorrentSpy down, they put a full page up on their website

2    saying this isn't because of any court ruling.  This is

3    because we want to protect you, our users, and your privacy

4    because we don't like some of the orders that the court has

5    issued.

6         And they ended it, your Honor, not as declarants

7    have submitted to your Honor declarations saying we're

8    remorseful.  No.  They ended it with, "It's been a wild

9    ride."  Even then they were mindful of their place in the

10   pirate community and their reputation in pirate community,

11   and they were defiant even then.

12        The pirate community watches these cases, your

13   Honor.  They watch the tactics that defendants have taken in

14   this case.  If we don't send a strong message to them now,

15   even if these defendants can't afford to pay it, we're

16   telling other people that here's a good strategy for

17   proceeding next time.

18        Now, defendants don't really rebut any of this.

19   They submitted two declarations from Wes Parker and Justin

20   Bunnell.  So what do these declarations say?

21        One, they are nearly identical, word for word.  And

22   what they say is we were newcomers to litigation.  And this

23   is exactly, quote, we were confused.  We're trying to find a

24   proper approach like any newcomer.

25        Your Honor, newcomers to litigation don't behave

1    like this.  Certainly they didn't find a proper approach.

2    Everything that they did was geared towards subverting the

3    judicial process and avoiding their liability.  False

4    testimony, trying to get third parties to give false

5    testimony, violating court orders, destroying evidence in a

6    large scale.  They are not, as what was suggested,

7    unsophisticated pro se defendants.

8          These defendants have had half a dozen or more

9    lawyers on this case from day one.  All of the conduct that's

10   at issue happened when they were represented by counsel.

11         The declarations reveal, in fact, that they are

12   anything but remorseful.  Each of those declarations is an

13   example of continued false testimony under oath to your

14   Honor.  They will do and say anything to avoid liability or

15   responsibility.

16         I will give you two examples, your Honor, and I'll

17   move through them quickly.  They're the same in both

18   declarations, word for word.  In Mr. Bunnell's declaration at

19   paragraph 5, he says, quote, everything we do that could make

20   us viable for copyright infringement is public, close quote.

21         Your Honor, the IP addresses that they destroyed

22   were not public.

23         Mr. Wes Parker gave testimony that he thought they

24   were so important to a case, he was boasting to somebody, to

25   a third party before this case, that if they don't get IP

1    addresses, they can't make the case.  They knew that wasn't

2    public.  They knew it was important.  That's why they

3    destroyed it.

4            To come to this court and say in an attempt to be

5    contrite, there was nothing that we did that could have hurt

6    their case because everything was public is false testimony.

7            The same with the server logs.  They, of course,

8    knew it wasn't public.  To come in and tell you now, under

9    oath, that it was is not contrition.

10           Mr. Wes Parker.  Mr. Wes Parker was the -- was

11   TorrentSpy's DMCA compliance agent.  What that means is he

12   was their official copyright compliance officer.  He

13   testifies at paragraph 9 that it was always our intention and

14   actual policy to oppose the use of bit torrent technology for

15   purposes of copyright infringement.  And in paragraph 10, I

16   had no knowledge of specific infringing materials on

17   TorrentSpy that could be used by a visitor to fine

18   infringement materials, end quote.

19           That is nothing short of a lie.

20           On May 1st, 2006, one of the plaintiffs -- in fact,

21   your Honor, I did it personally on their behalf -- sent

22   TorrentSpy a cease-and-desist letter about a particularly

23   egregious work.  It was Family Guy, it was a popular

24   television show.  Season 4 was just beginning, episode 1 had

25   found its way onto the Internet before it even aired on

1    television, and it found its way on TorrentSpy.  On May 1st

2    we sent them a notice saying take that down.

3            What we didn't know at that moment, your Honor, but

4    we found out in discovery is that Defendant Wes Parker

5    himself, with his personal hand, was promoting that very

6    dot-torrent file to that infringing work that had not even

7    aired yet.

8            A week earlier he was going to forums on the

9    Internet, populated with -- popular with file sharers and

10   infringers, and he was boasting about how he had a link to

11   that dot-torrent file and TorrentSpy.  He was trying to

12   encourage people to go to TorrentSpy.  He posted a link to

13   the episode 1 of season 4 of The Family Guy the same exact

14   work that was the subject of our notice.

15           He can't in any honesty, in any sense of honesty

16   come to this Court and say what he said in his declaration.

17   What it shows, your Honor, is that they will continue to do

18   anything and continue to say anything in order to avoid

19   responsibility.

20           Any suggestion that these defendants wouldn't do

21   the exact same thing again tomorrow, if they thought they

22   could get away with it, is just not believable.

23           Let me -- if your Honor, can give me another minute

24   just to address a couple of things that Mr. Rothken --

25           THE COURT:  Okay.  Briefly, please, because I

1    really have to -- we're past our time.

2              MR. FABRIZIO:  All right.

3              All right, I'll make two quick points.  I'm mindful

4    of your Honor's time.

5              One, the suggestion that we haven't put in -- we've

6    only put in file names are not evidence of infringement.

7    Your Honor, the evidence we put in we believe is fairly

8    overwhelming.  And the Ninth Circuit in Nabster said

9    directly, if the file names don't match what is in the

10   content, the system don't work.  And here the system was

11   working for three years, and they had millions of users

12   because of it.

13             We don't believe there is any question that the

14   evidence we submitted makes out more than an adequate case of

15   direct infringement.

16             And let me just say Mr. Rothken mentioned it

17   several times that some of this data came after April, 2007,

18   when they had purported to shut off some access to users.  If

19   they are, we believe it's not true.  There is no foundation

20   for it.  Be that as it may, it's not true.

21             Mr. Pozza in his declaration makes clear, every one

22   of the four databases that were considered and that were used

23   in creating Exhibit 1 were all gathered prior to the time

24   that defendants purported to cut off access to U.S. users.

25             I'll leave it there, your Honor.

1          Thank you very much for your time.

2          THE COURT:  Thank you.

3          All right.  I will take these matters under

4   submission and issue both a judgment and injunction, assuming

5   I'm satisfied the Court has jurisdiction to do that.

6          MR. FABRIZIO:  Thank you, your Honor.

7          THE COURT:  Thank you very much.

8          MR. ROTHKEN:  Your Honor, would you like us to

9   brief at all the bankruptcy issue?

10         THE COURT:  If I would like further briefing, I'll

11  certainly let you know.

12         MR. ROTHKEN:  Thank you, your Honor.

13         THE COURT:  Thank you.

14         (PROCEEDINGS CONCLUDED AT 11:25 A.M.)

15                               - - - -

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5

6            I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

7    TRANSCRIPTION FROM THE STENOGRAPHIC RECORD OF THESE

8    PROCEEDINGS.

9

10

11

12

13

14    _____

15    SANDRA L. BECERRA, CSR 10024

16    OFFICIAL COURT REPORTER

17

18

19

20

21    DATED: _____

22

23

24

25